**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (310) 285-5330
Email:  jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
C. Dov Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
       ahood@pomlaw.com
       cdberger@pomlaw.com

*Attorneys for Plaintiff*
*[Additional Counsel on signature page]*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD ENG, Individually and on Behalf of All Others Similarly Situated, | Case No.  **'15CV1478 BEN JMA** |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| EDISON INTERNATIONAL, THEODORE F. CRAVER, JR. and WILLIAM JAMES SCILACCI, | |
| Defendants | DEMAND FOR JURY TRIAL |

Plaintiff Harold Eng ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Edison International ("Edison" or the "Company"), as well as media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Edison securities between July 31, 2014 and June 24, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.     Defendant Edison, through its subsidiaries, generates and distributes electrical power and invests in energy services and technologies.  Southern California Edison ("SCE"), Edison's largest subsidiary, is one of the largest utilities in the United States, serving nearly 14 million people in Central, Coastal and Southern California.  SCE

is regulated by the California Public Utilities Commission (the "CPUC" or the "Commission") and by the Federal Energy Regulatory Commission.

3. The Company was founded in 1987 and is incorporated in California, with headquarters in Rosemead, California. Its shares trade on the NYSE under the ticker symbol "EIX."

4. Edison, through SCE, was at all relevant times the operator and majority owner of the San Onofre Nuclear Generating Station ("SONGS"), a now-inoperative nuclear power plant in Southern California. In January 2012, Edison shut down two SONGS reactor units for maintenance. Although the units never returned to service, Edison continued to bill SCE customers tens of millions of dollars in rates each month to support the defunct units and to buy replacement power.

5. On October 25, 2012, the CPUC instituted an investigation into the causes of and accountability for the SONGS unit closures. After extensive settlement negotiations under the auspices of the CPUC, Edison reached a 3.3 billion dollar settlement (the "SONGS Settlement"), pursuant to which, among other terms, Edison would refund customers and reduce rates in compensation for the excess charges they had incurred after the SONGS units were taken offline. Several environmental and consumer advocacy groups were parties to the settlement, including the Utility Reform Network ("TURN"). On November 19, 2014, the CPUC approved the SONGS Settlement.

6. Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance

policies.  Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison's ex parte contacts with CPUC decision makers were more extensive than the Company had reported to CPUC; (ii) that belated disclosure of Edison's ex parte contacts with CPUC personnel would jeopardize the Company's $3.3 billion dollar SONGS Settlement; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

7.     On February 9, 2015, SCE submitted a notice to the CPUC disclosing that a previously unreported ex parte contact between Stephen Pickett ("Pickett"), then an executive vice president at SCE, and Michael Peevey ("Peevey"), then president of the CPUC, had occurred at an industry conference on March 26, 2013.  At that time the SONGS Settlement negotiations were ongoing, and Pickett and Peevey's conversation concerned the future of SONGS and a possible resolution of the CPUC's investigation. Pursuant to the CPUC's rules, the Company's failure to timely report the ex parte meeting between Pickett and Peevey represented a possible violation of CPUC rules governing ex parte contact between CPUC decision makers and interested parties.

8.     Prompted by SCE's belated disclosure and amidst growing public criticism of the relationship between the CPUC and California's utilities, the CPUC ordered SCE to turn over additional communications regarding the SONGS Settlement's negotiation. On April 29, 2015, SCE duly complied.  After reviewing the additional SCE documents, TURN's attorney stated that the documents showed "a number of unreported ex parte contacts and that Edison violated the rules by not reporting those communications."

9.     On May 4, 2015, an article published by *SFGate* reported that SCE's newly released documents revealed a previously unreported May 2014 meeting between Peevey and SCE executives, at which the parties discussed donating millions of dollars to a UCLA institute at which Peevey held an advisory post.

10.     On this news, shares of Edison declined $2.87 per share over two days of trading, or roughly 3.75%, to close at $59.60 on May 6, 2015.

11.     On June 22, 2015, the law firm Strumwasser & Woocher released an independent report commissioned by the CPUC in connection with a review of ex parte meetings between utility lobbyists or executives and CPUC decision makers (the "Strumwasser Report").  The Strumwasser Report described such ex parte meetings as "frequent, pervasive, and at least sometimes outcome-determinative," and recommended banning them altogether in rate cases.

12.     On June 24, 2015, in response to the Strumwasser Report and SCE's earlier disclosures in February and April, TURN filed an application with the CPUC that charged SCE with "fraud by concealment" and urged the CPUC to set aside the SONGS Settlement and reopen its investigation.

13.     On this news, shares of Edison declined $1.56 per share or over 2.70%, to close at $56.07 on June 24, 2015.

14.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §7 8aa and 28 U.S.C. §1391(b), as the Company maintains corporate offices in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **THE PARTIES**

19.     Plaintiff, as set forth in the attached Certification, acquired Edison securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant Edison is a California corporation with its principal executive offices located at 2244 Walnut Grove Avenue, Rosemead, California 91770.  Edison's common stock is traded on the NYSE under the ticker symbol "EIX."

21.     Defendant Theodore F. Craver, Jr. ("Craver") served at all relevant times as Chairman, President and Chief Executive Officer of Edison.

22.     Defendant William James Scilacci ("Scilacci") served at all relevant times as Executive Vice President, Chief Financial Officer and Treasurer of Edison.

23.     The defendants referenced above in ¶¶ 21-22 are sometimes collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## Background

24.     Defendant Edison, through its subsidiaries, generates and distributes electrical power and invests in energy services and technologies.  SCE, Edison's largest subsidiary, is one of the largest utilities in the United States, serving nearly 14 million people in Central, Coastal and Southern California.  SCE is regulated by the CPUC and by the Federal Energy Regulatory Commission.

25.     The Company was founded in 1987 and is incorporated in California, with headquarters in Rosemead, California.  Its shares trade on the NYSE under the ticker symbol "EIX."

26.     Edison, through SCE, was at all relevant times the operator and majority owner of SONGS, a now-inoperative nuclear power plant in Southern California.  In January 2012, Edison shut down two SONGS reactor units for maintenance.  Although the units never returned to service, Edison continued to bill SCE customers tens of millions of dollars in rates each month to support the defunct units and to buy replacement power.

27.     On October 25, 2012, the CPUC instituted an investigation into the causes of and accountability for the SONGS unit closures.  After extensive settlement negotiations under the auspices of the CPUC, Edison reached a $3.3 billion settlement, pursuant to which, among other terms, Edison would refund customers and reduce rates in compensation for the excess charges they had incurred after the SONGS units were taken offline.   Several environmental and consumer advocacy groups were parties to the settlement, including TURN.  On November 19, 2014, the CPUC approved the SONGS Settlement.

### Materially False and Misleading
### Statements Issued During the Period

28.     The Class Period begins on July 31, 2014, when Edison filed a quarterly report on Form 10-Q with the SEC announcing its financial and operating results for the second quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the second quarter, net income was $566 million, or $1.63 per diluted share, on revenue of $3.02 billion, compared to a net loss of $70 million, or $0.29 per diluted share, on revenue of $3.05 for the same period in the prior year.  In addition, the Q2 2014 10-Q contained signed certifications pursuant to SOX by defendants Craver and Scilacci, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     In the Q2 2014 10-Q, the Company stated, in part, that:

In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that consolidated all San Onofre issues in related CPUC regulatory

proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

On March 27, 2014, SCE entered into a settlement agreement (the "San Onofre OII Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA") and SDG&E, which was later joined by the Coalition of California Utility Employees ("CUE") and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings before the NRC or proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. Implementation of the San Onofre OII Settlement Agreement is subject to the approval of the CPUC. The parties to the San Onofre OII Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval. The San Onofre OII Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it within six months of submission, but there can be no certainty of when or what the CPUC will actually decide. . . .

On April 3, 2014, the Settling Parties filed a motion in the OII requesting the CPUC to approve the San Onofre OII Settlement Agreement without change, find the Settlement Agreement reasonable and expedite consideration of the San Onofre OII Settlement Agreement in order to provide the benefits of it as soon as possible. . . . The Settling Parties further agree to review any CPUC orders regarding the San Onofre OII Settlement Agreement to determine if the CPUC has changed or modified it, deleted a term or imposed a new term. If any Settling Party is unwilling to accept any such change, modification, deletion or addition of a new term, then the Settling Parties will negotiate in good faith to seek a resolution acceptable to all Settling Parties. If they are unable to resolve the matter to the satisfaction of all Settling Parties or to obtain prompt CPUC approval of an agreed upon resolution, then any Settling Party can terminate the Settlement Agreement upon prompt notice.

Under CPUC rules, parties in the OII have had an opportunity to comment on the San Onofre OII Settlement Agreement, and the CPUC held an evidentiary

hearing on May 14, 2014 and a public participation meeting on June 16, 2014, at which various intervenors who were not Settling Parties opposed the proposed settlement and others supported it. Following conclusion of the public participation meeting, approval of the San Onofre OII Settlement Agreement was submitted to an Administrative Law Judge to render a proposed decision for further consideration by the CPUC. CPUC rules do not provide for any fixed time period for the CPUC to act on the San Onofre OII Settlement Agreement. Pursuant to the CPUC's rules, no settlement becomes binding on the parties to it unless the CPUC approves the settlement based on a finding that it is reasonable in light of the whole record, consistent with law, and in the public interest. The CPUC has discretion to approve or disapprove a settlement, or to condition its approval on changes to the settlement, which the parties may accept or reject.

30.     On October 28, 2014, Edison filed a quarterly report on Form 10-Q with the SEC announcing its financial and operating results for the third quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the third quarter, net income was $508 million, or $1.46 per diluted share, on revenue of $4.36 billion, compared to a net income of $463 million, or $1.34 per diluted share, on revenue of $3.96 billion for the same period in the prior year.  In addition, the Q3 2014 10-Q contained signed certifications pursuant to SOX by defendants Craver and Scilacci, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     In the Q3 2014 10-Q, the Company stated, in part, that:

In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

On September 23, 2014, SCE entered into an Amended and Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre. The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014. The San Onofre OII Amended Settlement Agreement . . . describes how shareholders and customers will share any potential recoveries. Implementation of the San Onofre OII Amended Settlement Agreement is subject to the approval of the CPUC. The San Onofre OII Amended Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it by December 23, 2014. On October 9, 2014, the Administrative Law Judges in the OII issued a Proposed Decision approving the San Onofre OII Amended Settlement Agreement. Under applicable rules, the CPUC cannot render a final decision for at least thirty days following the date of the Proposed Decision, but there can be no certainty of when or what the CPUC will actually decide. The parties to the San Onofre OII Amended Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval.

32.    The statements referenced in ¶¶ 28-31 were materially false and misleading because defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison's ex parte contacts with CPUC decision makers were more extensive than the Company had reported to CPUC; (ii) that belated disclosure of Edison's ex parte contacts with CPUC personnel would jeopardize the Company's $3.3 billion dollar SONGS Settlement; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

33.     On February 9, 2015, SCE submitted a notice to the CPUC disclosing that a previously unreported ex parte contact between Pickett, then an executive vice president at SCE, and Peevey, then president of the CPUC, had occurred at an industry conference on March 26, 2013.  At that time the SONGS Settlement negotiations were ongoing, and Pickett's and Peevey's conversation concerned the future of SONGS and a possible resolution of the CPUC's investigation.  Pursuant to the CPUC's rules, the Company's failure to timely report the ex parte meeting between Pickett and Peevey thus represented a possible violation of CPUC rules governing ex parte contact between CPUC decision makers and interested parties.

34.     On February 24, 2015, Edison filed an annual report on Form 10-K with the SEC announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2014 (the "2014 10-K").  For the fourth quarter, net income was $448 million, or $1.27 per diluted share, on revenue of $3.11 billion, compared to  net income of $326 million, or $0.92 per diluted share, on revenue of $2.94 billion for the same period in the prior year.  For 2014, net income was $1.72 billion, or $4.89 per diluted share, on revenue of $13.41 billion, compared to net income of $1.02 billion, or $2.78 per diluted share, on revenue of $12.58 billion for 2013.  In addition, the 2014 10-K contained signed certifications pursuant to SOX by defendants Craver and Scilacci, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     In the 2014 10-K, the Company stated, in part, that:

In October 2012, the CPUC issued an OII that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

On November 20, 2014, the CPUC approved the Amended and Restated Settlement Agreement (the "San Onofre OII Settlement Agreement") that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth (together, the "Settling Parties"). The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. SCE has recorded the effects of the San Onofre OII Settlement Agreement. Such amounts do not reflect any recoveries from third parties by SCE.

. . . On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of Ex Parte Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the ex parte communication. The application requests that the CPUC order SCE to produce all ex parte communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such ex parte communications.

36.     On April 28, 2015, Edison filed a quarterly report on Form 10-Q with the SEC announcing its financial and operating results for the first quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the first quarter, net income was $327 million, or $0.91 per diluted share, on revenue of $2.51 billion, compared to a net income of $202 million,

or $0.54 per diluted share, on revenue of $2.93 billion for the same period in the prior year.  In addition, the Q1 2015 10-Q contained signed certifications pursuant to SOX by defendants Craver and Scilacci, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.    In the Q1 2015 10-Q, the Company stated, in part, that:

As discussed in the 2014 Form 10-K, in November 2014, the CPUC approved the San Onofre OII Settlement Agreement that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth. The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries.

A federal lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application to the CPUC for rehearing of its decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On April 16, 2015, a ruling was issued dismissing the federal lawsuit with prejudice.

In February 2015, SCE filed in the OII proceeding a Late-Filed Notice of Ex Parte Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the ex parte communication. The application requests that the CPUC order SCE to produce all ex parte communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such ex parte communications.

On April 14, 2015, the OII ALJs ordered SCE to produce unprivileged documents pertaining to oral and written communications regarding the possible settlement of the OII proceeding between any SCE employee and CPUC decision makers. SCE's response is due on April 29, 2015.

On April 17, 2015, ORA and TURN issued press releases asking the CPUC to impose penalties on SCE in connection with the ex parte communication. ORA recommended penalties in the amount of $648 million, representing ORA's calculation of the difference in ratepayer value between ORA's initial negotiating position in the SONGS OII and the approved settlement. TURN did not recommend a penalty amount. Neither party asked the CPUC to reopen the settlement. TURN stated that, based on SCE's response to the OII ALJs' April 14, 2015 order, it may seek a reopening of the OII proceeding. On April 27, 2015, the Alliance for Nuclear Responsibility filed a petition to modify the CPUC's decision approving the San Onofre OII Settlement Agreement due to the ex parte communication. The petition seeks the reversal of the decision approving the San Onofre OII Settlement Agreement and reinstatement of the OII proceeding.

SCE cannot predict the outcome of these proceedings.

38.    The statements referenced in ¶¶ 34-37 were materially false and misleading because defendants made false and/or misleading statements and/or failed to disclose that: (i) Edison's ex parte contacts with CPUC decision makers were more extensive than the Company had reported to CPUC; (ii) that belated disclosure of Edison's ex parte contacts with CPUC personnel would jeopardize the Company's $3.3 billion dollar SONGS Settlement; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

39.    Prompted by SCE's belated disclosure and amidst growing public criticism of the relationship between the CPUC and California's utilities, the CPUC ordered SCE to turn over additional communications regarding the SONGS Settlement's negotiation.

On April 29, 2015, SCE duly complied.  After reviewing the additional SCE documents, TURN's attorney stated that the documents showed "a number of unreported ex parte contacts and that Edison violated the rules by not reporting those communications."

40.    On May 4, 2015, an article published by *SFGate* reported that SCE's newly released documents revealed a previously unreported May 2014 meeting between Peevey and SCE executives, at which the parties discussed donating millions of dollars to a UCLA institute at which Peevey held an advisory post.

41.    On this news, shares of Edison declined $2.87 per share over two days of trading, or roughly 3.75%, to close at $59.60 on May 6, 2015.

42.    On June 22, 2015, the law firm Strumwasser & Woocher released an independent report commissioned by the CPUC in connection with a review of ex parte meetings between utility lobbyists or executives and CPUC decision makers.   The Strumwasser Report described such ex parte meetings as "frequent, pervasive, and at least sometimes outcome-determinative," and recommended banning them altogether in rate cases.

43.    On June 24, 2015, in response to the Strumwasser Report and SCE's earlier disclosures in February and April, TURN filed an application with the CPUC that charged SCE with "fraud by concealment" and urged the CPUC to set aside the SONGS Settlement and reopen its investigation.

44.    On this news, shares of Edison declined $1.56 per share, or over 2.70%, to close at $56.07 on June 24, 2015.

45.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Edison securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Edison Class Period, securities of Edison were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Edison or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Edison;

- whether the Individual Defendants caused Edison to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Edison securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Edison securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Edison securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of

securities.    Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Edison securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Edison securities and options at artificially inflated prices.    In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

58.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Edison securities.    Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Edison's finances and business prospects.

59.    By virtue of their positions at Edison, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.    Said acts and omissions of defendants were committed willfully or with

reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Edison securities from their personal portfolios.

61. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Edison, the Individual Defendants had knowledge of the details of Edison's internal affairs.

62. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Edison. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Edison's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Edison securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Edison's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Edison securities at artificially inflated prices and relied upon the price of the securities,

the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

63.    During the Class Period, Edison securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Edison securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Edison securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Edison securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

64.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period,

upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

66.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     During the Class Period, the Individual Defendants participated in the operation and management of Edison, and conducted and participated, directly and indirectly, in the conduct of Edison's business affairs.  Because of their senior positions, they knew the adverse non-public information about Edison's misstatement of income and expenses and false financial statements.

68.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Edison's financial condition and results of operations, and to correct promptly any public statements issued by Edison which had become materially false or misleading.

69.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Edison disseminated in the marketplace during the Class Period concerning Edison's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Edison to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were

"controlling persons" of Edison within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Edison securities.

70.     Each of the Individual Defendants, therefore, acted as a controlling person of Edison. By reason of their senior management positions and/or being directors of Edison, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Edison to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Edison and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

71.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Edison.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2015

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (310) 285-5330
Email:  jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
C. Dov Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
       ahood@pomlaw.com
       cdberger@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com