1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD ENG, individually and on behalf of all others similarly situated , <div align="right">Plaintiff,</div><br>v.<br><br>EDISON INTERNATIONAL, et al., <div align="right">Defendants.</div> | Case No.:  15CV1478 BEN (KSC)<br>**ORDER GRANTING MOTION TO DISMISS**<br><br>[Docket No. 23] |

Defendants Edison International, Southern California Edison's ("SCE")[1] parent company, Theodore F. Craver, Jr., William James Scilacci, and Ron Litzinger have filed a Motion to Dismiss Plaintiff's Amended Complaint.  (Docket No. 23.)  The crux of the Amended Complaint for securities fraud is that Defendants' favorable statements about a 2014 settlement allocating the costs of shutting down the San Onofre Nuclear Generating Station ("SONGS") failed to disclose that reportable ex parte communications related to the settlement had occurred between SCE and the California Public Utility Commission ("CPUC") and had not been reported.  The Motion raises three primary issues:  (1) whether Defendants' statements were materially false or misleading; (2) whether the Amended Complaint sufficiently alleges scienter; and (3) whether the Amended Complaint sufficiently pleads loss causation.  The Court finds Plaintiff has alleged materially

---

[1] The Court refers to Defendant as SCE throughout.

misleading statements, but has not sufficiently pled scienter or loss causation.  The Court **GRANTS** the motion to dismiss, but gives Plaintiff leave to file an amended pleading.

<div align="center">

**BACKGROUND**[2]

</div>

**I.     SONGS Settlement**

SCE is a partial owner of SONGS.  In January 2012, following installation of two replacement steam generators, one of the new steam generator tubes leaked.  SONGS was shut down.  The CPUC initiated an investigation, Order Instituting Investigation (OII), in October 2012.  (AC ¶ 35.)  Part of the investigation focused on how to allocate the costs of the outage and eventual shut down as between SCE, San Diego Gas & Electric ("SDG&E"), and consumers.

A settlement was reached between SCE, SDG&E, The Utility Reform Network ("TURN"), and the Office of Ratepayer Advocates ("ORA") in March 2014.[3]  Over the course of the next few months, SCE made numerous public statements about the settlement.[4]  On March 20, 2014, SCE filed a Form 8-K with the SEC announcing the settlement.   On March 27, 2014, SCE made a number of statements regarding the settlement.  SCE issued a press release formally announcing that a settlement had been reached and indicated that "[i]f implemented, the Settlement Agreement will constitute a complete and final resolution of the [OII] and related proceedings regarding" SONGS.  (AC ¶ 63.)  The same day, SCE held a conference call in which Craver, Edison's Chief Executive Officer, stated that the settlement "resolves all matters related to the [OII]

---

[2] The Court is not making any findings of fact, but rather, summarizing the relevant allegations of the Amended Complaint for purposes of evaluating Defendants' Motion to Dismiss.

[3] ORA and TURN are consumer advocacy groups.

[4] The Court highlights those statements emphasized by the parties in briefing the Motion, but notes the Amended Complaint includes additional statements.  The Court has considered all the statements identified in the Amended Complaint even if not specifically discussed or noted.

involving" SONGS.  (AC ¶ 64.)  On the same call, Litzinger, President of SCE at the time, in responding to an inquiry from an analyst about CPUC's involvement in the settlement, stated that the CPUC commissioners "were not involved [in the settlement process] other than encouraging settlement publically."  (AC ¶ 65.)  Similarly, at a May 28, 2014 conference, Craver indicated that the settlement was primarily negotiated with consumer groups.  (AC ¶ 78.)

The CPUC Administrative Law Judge ("ALJ") overseeing the investigation held an evidentiary hearing on May 14, 2014 on the settlement that included the parties to the settlement, objectors, CPUC President Michael Peevey, and other commissioners.  In response to a question from an objector about his communications with commissioners, Litzinger stated that "[t]he only ex parte communication [he] had with Commissioners was following the Phase I Proposed Decision.  And it was noticed."  (AC ¶ 76.)  Similar to its public statements at the time the settlement was reached, SCE's Form 10-Qs, filed on April 29, 2014, July 31, 2014, and October 28, 2014, state that implementing the settlement "will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding" SONGS shut down and settlement.  (AC ¶¶ 80, 88.)  On October 28, 2014, during a conference call, Craver, when asked about ex parte communications with reference to recent issues at PG&E, stated that SCE was making sure personnel were aware of expected proper conduct, they had a compliance program and training, and were redoubling efforts on awareness.  (AC ¶ 89.)

Following the parties' approval of a modification recommended by the CPUC, the amended settlement was approved by the CPUC on November 20, 2014.  SCE issued a press release the same day describing the settlement as "resolving all issues regarding the public utility commission investigation."  (AC ¶ 93.)

## II. CPUC Investigation and Unreported Ex Parte Communications

Peevey's home was searched on January 27, 2015.  Notes about the settlement were found in a desk drawer, although the contents were not disclosed to the CPUC and public

until April 2015.  (AC ¶ 98.) On February 2, 2015, SCE adopted a broader reporting policy regarding ex parte communications with CPUC decisionmakers.  (AC ¶ 99.)  On February 9, 2015, SCE filed a notice of ex parte communication for a communication that took place on March 26, 2013 at an industry conference in Warsaw, Poland at a meeting that included SCE Vice President of External Relations Stephen Pickett, Peevey, and Edward Randolph, CPUC Director of Energy.  (AC ¶ 100.)  Pickett claimed at the time it was a one-sided communication in which he only listened to Peevey, took notes that Peevey kept, and did not engage.  (AC ¶ 49; Pl.'s Opp'n Mot. to Dismiss, Ex. A.)  SCE claimed in the Notice, that based on new information from Pickett, he may have crossed into a substantive communication in reacting to at least one of Peevey's comments. (Defs.' Req. for Judicial Notice ("RJN"), Ex. 2.)

SCE's February 24, 2015 Form 10-K reiterated the prior statements about the settlement resolving issues regarding SONGS.  (AC ¶ 106.)  It also disclosed the late-filed notice of ex parte communication as to the Warsaw meeting, noted the involved executive and CPUC president were retired, and acknowledged the Alliance for Nuclear Responsibility's ("A4NR") request for CPUC to open an investigation of the ex parte communications.  (AC ¶ 106.)  The same day Craver characterized the CPUC rules on ex parte communications as being geared to disclosure to provide equal access to decision makers, not prohibiting communications entirely, and stated "fundamentally, when we have proceedings before the Commission, we follow the rules."  (AC ¶ 107.)

On April 15, 2015, the CPUC ordered SCE to turn over all documents related to the settlement between March 2013 and November 2014.  (AC ¶ 110.)  On April 17, 2015, ORA sought return of $648 million to customers and TURN indicated it would urge the CPUC to assess the maximum sanction against SCE and apply it to reducing customer rates.  (AC ¶ 111.)  Documents were produced on April 29, 2015 and included an April 1, 2013 memo detailing "Elements of a SONGS Deal" from Pickett to Craver, Litzinger, and Scilacci, Edison's Chief Financial Officer.  (AC ¶ 48.)  Plaintiff also alleges that other

emails from 2013 and 2014 reflect a general knowledge at SCE of employee contacts with the CPUC that were not reported as ex parte communications.

On June 24, 2015, TURN called for the 2014 Settlement to be overturned or reopened.  On August 5, 2015, the ALJ issued a lengthy Order to Show Cause why not to impose sanctions for SCE's unreported reportable ex parte communications with the CPUC.  (AC ¶ 117; RJN, Ex. 7.)  The Order discussed SCE's conduct and identified ten violations of the CPUC's rules on ex parte communications.  (AC ¶ 117.)  This was followed by issuance of a proposed ruling and a final decision by the CPUC on December 3, 2015 to sanction SCE $16.7 million for failing to report eight reportable ex parte communications.  (AC ¶ 117-19.)

Most of the fine, $16.5 million, was for the March 26, 2013 communication at the Warsaw conference.  (AC ¶ 120.)  However, there were additional unreported reportable ex parte communications, including a dinner on March 27, 2013 in Warsaw, a May 2013 email to five commissioners concerning SCE's conduct during steam generator design, a communication about employee severance packages related to the shutdown in June 2013, a September 2013 lunch including Litzinger and Peevey on cost recovery for SONGS, and a November 2013 dinner including Craver and Peevey discussing Craver's efforts to bring Mitsubishi into SONGS negotiations.  (AC ¶¶ 47, 51.)  The CPUC characterized "SCE's series of acts and omissions [as] gross negligence."  (AC ¶ 119.)

After briefing and oral argument on this Motion, the CPUC "reopened the record to review the 2014 Settlement Agreement against [the CPUC's] standards for approving settlements . . . in light of the [CPUC's] December 2015 Decision fining [SCE] for failing to disclose ex parte communications relevant to this proceeding." (Order Reopening Record (Docket No. 33, Ex. A).)

Plaintiff does not dispute that under the CPUC's rules, communications between an interested party, like SCE, and a CPUC decisionmaker are not entirely prohibited. Procedural inquiries about scheduling, filing deadlines and the like are not required to be

15CV1478 BEN (KSC)

reported.  However, if they are substantive, they must be reported.  Additionally, as explained in both the ALJ's August 5, 2015 Order and the CPUC's December 3, 2015 decision, one-way communications by a decisionmaker to a party are not reportable ex parte communications, but might become reportable depending on the response from the party.  (RJN, Ex. 7 at 276; Ex. 9 at 323.)

## DISCUSSION

The Amended Complaint claims violations of Section 10(b) and 20(a) of the Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b-5.[5]  To state a securities fraud claim, a plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase and sale of a security; (4) reliance upon the misrepresentation

---

[5] Section 10(b) of the Exchange Act makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Pursuant to that section, the SEC promulgated Rule 10b-5, which makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), states that a person who:

> directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such a controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Section 20(a) claims may be dismissed summarily if, as here, the plaintiff fails to adequately plead a primary violation of Section 10(b). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

or omission; (5) economic loss; and (6) loss causation.  *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014).

All factual allegations are accepted as true and "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[6]

Securities fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA).[7]  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud." *Id.*  "In passing [the PSLRA], Congress 'significantly altered pleading requirements in securities fraud cases by . . . requiring that a complaint plead with particularity both falsity and scienter.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (quoting *Zucco Partners*, 552 F.3d at 990-91).  "A plaintiff must 'state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (describing these pleading requirements as "among the control measures Congress included in the PSLRA.").

Defendants argue that the Amended Complaint fails to sufficiently allege any materially false or misleading statements, scienter, or loss causation.  The Court finds

---

[6] The Court grants Defendants' Request for Judicial Notice as to all documents relied on or referred to in the Amended Complaint.

[7] The Court's analysis of the sufficiency of the Amended Complaint, particularly under this higher pleading standard, is not intended to suggest SCE's failures with regard to reporting its communications with its regulator or the CPUC's conduct should be excused.  Rather, the Court is simply trying to decipher whether the Amended Complaint sufficiently pleads securities fraud.

Plaintiff has sufficiently alleged misleading statements, but has failed to sufficiently plead scienter or loss causation.

### III.    Materially False or Misleading Statements

"The complaint must plead specific facts indicating why any alleged misrepresentation was false or any omission rendered a representation misleading." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016).  Plaintiff identifies numerous statements that were allegedly false or misleading, including statements about the settlement being a complete and final resolution of the OII, claims that the CPUC was not involved in arriving at the settlement, a statement that SCE was in compliance with the rules on ex parte communications, and Litzinger's testimony before the CPUC in which he claimed that he had not engaged in any unreported reportable ex parte communications. Plaintiff argues that Defendants statements were false or at least misleading because SCE had engaged in unreported reportable ex parte communications with the CPUC concerning the settlement in violation of CPUC rules.  Defendants argue the statements about the settlement were true — settlement was reached and it did provide a final resolution — and at worst, the statements were no more than incomplete and the statements about compliance with the CPUC's ex parte rules, including Litzinger's testimony, were too vague or impromptu to be material.

As to the statements that the settlement was a complete and final resolution of matters related to the OII, the Court agrees that these statements alone were not false. However, Plaintiff's allegations may be sufficient if the omitted information —unreported ex parte communications with the CPUC about that settlement — made the statements misleading. *Brody v. Transitional Hosps. Corp*, 280 F.3d 997, 1006 (9th Cir. 2002) ("[A] statement that is literally true can be misleading and thus actionable under the securities laws.")   However, the Ninth Circuit has "expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been

disclosed but were not.'" *Police and Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (quoting *Brody*, 280 F.3d at 1006). "In practical terms, 'to be actionable under the securities laws, an omission must be misleading, . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* (quoting *Brody*, 280 F.3d at 1006).

Plaintiff alleges the undisclosed ex parte communications significantly increased the likelihood that the settlement would be overturned. And, there are specific allegations to support this. Plaintiff alleges that on June 24, 2015, one of the parties to the settlement, TURN, changed its position from seeking sanctions for the violations to "formally ask[ing] the CPUC to overturn its prior ruling and reject the current settlement." (AC ¶¶ 112-13.) Additionally, as noted above, the CPUC has "reopened the record" to review the settlement "in light . . . of the December 2015 Decision fining [SCE] for failing to disclose ex parte communications relevant to [the OII]." (Order Reopening Record (Docket No. 33, Ex. A).).

Just identifying some undisclosed piece of information that might bear on a statement made is not sufficient. But here, particularly in light of SCE's statements of compliance with the ex parte rules and the affirmative statements that the CPUC was not involved in coming up with the settlement, Plaintiff has sufficiently alleged that SCE "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Intuitive Surgical*, 759 F.3d at 1061 (quoting *Brody*, 280 F.3d at 1006). That the parties reached a settlement was true, but in reality, Defendants had engaged in what were later found to be improper[8] ex parte communications with a CPUC decisionmaker in coming up with that settlement that may place the settlement in jeopardy.

---

[8] The Court may refer to the unreported ex parte communications that the CPUC found should have been reported as improper because they were improper in that they should have been reported, but were not. However, as the Court has noted, not all ex parte communications between a decisionmaker and a party are improper.

15CV1478 BEN (KSC)

Nor can the Court find at this stage that these omissions were not material.   In considering materiality, the Court must decide "whether a *reasonable* investor would have viewed the nondisclosed information, 'as having *significantly* altered the total mix of information made available.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).  Taking Plaintiff's allegations as true, the Court can draw a plausible inference that a reasonable investor would have viewed Defendants' violations of the CPUC rules on ex parte communications, in communications about the settlement, as altering the "total mix of information available," particularly given the allegations that analysts were specifically asking about SCE's compliance with the CPUC's ex parte rules.  *Id.*; *see also Reese*, 747 F.3d at 571 ("Facts demonstrating public interest in the withheld information support its materiality.").  Additionally, "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact' . . . because it depends on determining a hypothetical investor's reaction to the alleged misstatements."  *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)); *see also Basic*, 485 U.S. at 236 ("The determination of materiality requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him.").

Defendants argue SCE's general statements of compliance with the CPUC's rules on ex parte communications are too vague to be material and no reasonable investor would rely on Litzinger's statement at the hearing that his only ex parte communication was noticed.  As previously noted, these statements of rules compliance bear on Defendants' failure to disclose the violations when making positive statements about the settlement.  However, the Court agrees that, independently, Defendants' general statements describing its internal efforts to ensure compliance with the ex parte rules (having a compliance

program and training),[9] and its statement that fundamentally it complies with the rules,[10] in context, are too vague to be material.   Rather, these statements are comparable to statements of corporate optimism or inactionable puffery.

///

_____

[9] The full text from the Amended Complaint quotes Craver as stating:

> So, we're certainly trying to make sure that all of our personnel know what's expected of them, in terms of proper conduct with the PUC.  We have a compliance program. We have training. We have redoubled efforts along those things, just to make sure that that's very present in everyone's mind.  But beyond that, really we're pretty much in business as usual.

[10] The full text from the Amended Complaint quotes Craver as stating the following on February 24, 2015, in response to a question from an analyst about how attention to ex parte communications prompted by issues at PG&E were impacting business with the CPUC:

> Yes, in terms of affecting the business, I would say it doesn't really have a significant effect on the business.  This is a fairly arcane area. But I would just say, generally speaking, the ex parte rules, particularly on matters like the San Onofre matter, the OII, that's really designed to provide equal access to all parties to the proceeding with equal time. So it's I think one of the misconceptions is in something like SONGS OII that you are precluded from having conversations.  You're not. It's just the rules are designed to make sure that if we have conversations with decision-makers, that those are noticed, that those – that we include in there how much time we spent with which decision-maker, so that all the other parties have equal access, equal amount of time. That's the whole concept behind it.
> So I don't see any of this as hurting the ability to do business.  It's complicated and cumbersome, and sometimes kind of difficult on the interpretation of some of the specific provisions.  *But, fundamentally, when we have proceedings before the Commission, we follow the rules.* We go about doing the business the way it's really set up to do it. There's plenty of opportunity in all of those proceedings for all parties to be heard.  That's the point of having these things before the Commission.  So I don't see any big element there.

## IV.    Scienter

Failing to disclose that unreported ex parte communications about a SONGS settlement had occurred while at the same time making favorable statements about the resolution provided by the settlement, does not alone establish Defendants' scienter because Defendants may not have even known there were ex parte communications at the time.  Additionally, while the Court does not condone the violations, every rule violation does not give rise to securities fraud.[11]  The question here is whether Plaintiff has pled a compelling and cogent inference, at least as compelling as possible alternatives, that in 2014,[12] when making positive statements about the settlement, Defendants were deliberately reckless in not disclosing that reportable ex parte communications had occurred and were not reported.  *See Tellabs*, 551 U.S. at 324.  "The statement, 'the storm is passing and it will be sunny tomorrow,' when it in fact continues to snow the next day, may be bad forecasting, but it is not necessarily a lie.  Without more, it does not raise a strong inference of intentional or deliberately reckless falsity or deception." *Ronconi*, 253 F.3d at 433.

Although the Court could permissibly or reasonably infer that Defendants should have known that the March 26, 2013 meeting included an ex parte communication that

---

[11] Defendants focus heavily on the CPUC's decision characterizing Defendants' conduct as grossly negligent because "[n]egligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud." *DSMA Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002).  As the parties both acknowledge, this Court is not bound by the CPUC's characterization of SCE's conduct as grossly negligent, regardless of the great length and depth of that analysis.

[12] Any scienter had to exist in 2014 when the allegedly misleading statements about the settlement were made. "[T]he complaint must contain allegations of specific '*contemporaneous* statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements *when made*." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (emphasis added).

should have been reported, that inference is not cogent or compelling and is not strong in light of other explanations. *Tellabs*, 551 U.S. at 324 (explaining that the required strong inference of scienter must be more that merely "reasonable" or "permissible — it must be cogent and compelling, thus strong in light of other explanations.").

Plaintiff has not "stated with particularity facts giving rise to a strong inference that [D]efendant[s] acted with the required state of mind." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d at 701. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Reese*, 747 F.3d at 568 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Although a plaintiff "need not prove its case at the outset, [plaintiff] has to provide a narrative of *fraud*—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Capital Partners, LP v. Stratos*, — F.3d —, 2016 WL 3672051, *7 (9th Cir. July 11, 2016) (emphasis added).

The allegations of the Amended Complaint collectively do not support an inference that Defendants acted intentionally to hide unreported ex parte communications. However, in this circuit,[13] scienter may be satisfied by "a strong inference of, at a minimum, deliberate recklessness." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1053. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569 (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)). However, "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of *intentional or conscious misconduct*." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1053 (emphasis added).

---

[13] The Supreme Court has "not decided whether recklessness suffices to fulfill the scienter requirement." *Matrixx Initiatives*, 563 U.S. at 48 (noting the defendant did not challenge the Court of Appeals determination that deliberate recklessness may satisfy the scienter requirement).

Plaintiff primarily focuses on the March 26, 2013 Warsaw meeting that is the basis for $16.5 million of the total $16.7 million CPUC fine, although the Court has considered all the allegations of the Amended Complaint.  *Tellabs*, 551 U.S. at 323 ("The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").[14]  Plaintiff argues that Defendants knew or were deliberately reckless in not knowing Pickett's meeting with Peevey included an unreported reportable ex parte communication.  Plaintiff alleges Defendants knew the meetings happened, knew SONGS was a topic at the meetings, and Litzinger had suspicions about whether Pickett did more than just listen in the meetings as claimed.  In support, Plaintiff primarily relies on the following: a request from Pickett to Defendants that his notes from the March 26, 2013 meeting be used to create a term sheet for settlement negotiations; an email Pickett sent to a SCE executive on March 27, 2013 saying "sitting next to Peevey at dinner in Warsaw working . . . SONGS;" and an April 11, 2013 email from Litzinger to Defendants in which he expressed concerns about whether Pickett had been silent at the meetings, *i.e.* not engaged, as Pickett claimed.

These allegations support a strong inference that Defendants knew Pickett and Peevey met, but not that they knew it was a more than a one-way communication from Peevey to Pickett.  As previously explained, communications with CPUC decisionmakers were not entirely prohibited and a one-way communication in which Peevey spoke and

_____

[14] The Court analyzes some of the allegations as they are summarized, however, the Court considers them collectively, along with allegations that may not be specifically addressed, in determining whether Plaintiff has adequately pled scienter.  The Court also notes that the Amended Complaint fails to particularly plead allegations supporting a strong inference Defendants knew about or were deliberately reckless in not knowing about the other seven unreported ex parte communications identified as violations by the CPUC or knew that they were reportable in 2014 when making positive statements about the settlement.

15CV1478 BEN (KSC)

Pickett did not respond or engage, as he claimed, would not have been reportable.  And, the email Plaintiff relies on to allege Litzinger had concerns about Pickett explains Litzinger did follow up on the concern that Pickett might have engaged.  The email, sent to Craver and Scilacci, describes Litzinger meeting with Pickett "face to face," and "press[ing] him as to whether his two previous meeting[s], [March 26 and 27, 2013] were listen only."  (Pl.'s Opp'n to Mot. to Dismiss, Ex. A ("April 11, 2013 email").)  It also reports that Pickett "said he did not engage."  Litzinger also explains that he told Pickett "there can be no discussion with the CPUC on settlement that is not sanctioned by us [and] we are in listen mode only."  (*Id.*)  The Court is not excusing Pickett misleading or lying to Litzinger about his level of engagement or Defendants' decision to take him at his word. The CPUC has addressed these failures.  But the allegations, even in conjunction with hindsight, do not reflect intentional or conscious misconduct by Defendants.  The Court cannot find Defendants not knowing this meeting included a reportable ex parte communication, particularly when Pickett specifically denied as much, is any more an indicator of scienter than an accountant not following Generally Acceptable Accounting Principles in auditing financial statements.  *See DSM Global Value Fund*, 288 F.3d at 390 ("[M]ere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter.").

Plaintiff also asserts that the February 9, 2015 Notice itself establishes Defendants' scienter because it admits the March 26, 2013 meeting should have been reported.  Plaintiff argues that Defendants' knowledge of the meeting could only be based on the same information Defendants had in 2014 because there had yet to be a CPUC decision finding it reportable.  Essentially, Defendants knew then, including 2014, what they stated in the 2015 Notice because nothing new could have prompted the Notice.  Not only is this conclusory and without factual support, but it also conflicts with the allegations of the Amended Complaint and documents Plaintiff relies on.  The Notice states that it is "based on information received from Mr. Pickett *last week*" and goes on to state that "while Mr.

Pickett does not recall exactly what he communicated to Mr. Peevey, it *now appears* that he may have crossed into a substantive communication." (RJN, Ex. 1 (emphasis added).) The Notice also goes on to state "[w]hile SCE believes that it is not clear cut whether Rule 8.4 requires this meeting to be reported, SCE provides this notice." (*Id.*)  Even assuming everything was static and nothing else could impact Defendants' view of the meeting, the Notice itself suggests that Defendants were not even convinced when reporting it that it was a reportable communication.  In this respect, the Notice itself does not establish Defendants knew it was reportable in 2014.

Plaintiff also argues the timing of the February 9, 2015 Notice is suspicions.  As previously noted, SCE's February 9, 2015 Notice asserts that the disclosure was being made late because of additional information received a week before from Pickett.  However, Plaintiff alleges SCE had implemented a new more restrictive policy on ex parte communications that prohibited any private meetings with CPUC decisionmakers (like Peevey's meeting with Pickett) and in the days leading up to the February 9, 2015 Notice, Peevey's house was searched as part of an Attorney General investigation.[15]  Plaintiff additionally alleges Defendants were motivated to hide the unreported reportable communications to quickly reach a settlement resolving the OII to avoid hurting SCE's position in the arbitration with Mitsubishi over the defective steam tubes.

Finally, Plaintiff alleges that Defendants stock sales support scienter because Craver and Scilacci sold significant shares[16] shortly after the first announcement of the settlement and Litzinger did the same about a month later.  "If insiders owning much of a company's stock make rosy characterizations of company performance to the market while

---

[15] Notes similar to Pickett's were found in that search, although those notes were not disclosed until after the February 9, 2015 Notice.

[16] Defendants accurately note the Amended Complaint lacks allegations of the total number of shares sold or the percentages of their shares sold as would be needed to assess whether the sales were a significant portion of Defendants' holdings.

simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations are false and that they knew it." *Ronconi*, 253 F.3d at 434-35.   However, "insider trading is suspicious only when it is dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information*." *Id.* at 435 (emphasis in original).   These sales were not beneficial to the Defendants.   The basis for inferring scienter from sales is that it shows the seller knew about and took advantage of the false or misleading statements.   The inference makes no sense when there is no benefit to a defendant in the sales.   Here, the share price rose for eight months *after* they sold their shares.   The price did eventually fall, but it only fell to approximately the same price they sold at eight months before.   As the Ninth Circuit has explained in rejecting similar allegations as a basis for scienter, "selling stock for $54, [here $56], when the price subsequently rises to $74, [here $69], and then sinks to $49, [here $56], does not support an inference of knowing falsehood." *Id.*   Selling stock "at about what the stock was worth after the bad news was public, not when they might have gained market advantage from as yet undisclosed bad news" does not support scienter. *Id.*

From the allegations of the Amended Complaint, the Court can infer that Defendants knew a meeting took place in Warsaw, Litzinger had some concerns about it at the time, he followed up to verify Pickett did not engage, and Defendants did not pursue it further despite reservations.   Defendants had a motive not to pursue it further and, in hindsight, Defendants should not have accepted Pickett's version of events and investigated further at the time.   However, the Court cannot find that when making statements about the settlement in 2014 Defendants had reason to believe a reportable ex parte communication occurred or that Defendants had anything more than motive and opportunity.   "To allege a 'strong inference of deliberate recklessness,' [plaintiff] 'must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.'" *DSAM Global Value Fund*, 288 F.3d at 389.

Additionally, any malicious inference the Court could draw from the allegations is not as compelling as a number of innocent inferences that could be drawn.  "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d at 991. There are a number of competing inferences the Court can permissibly draw from these allegations, but the nefarious one Plaintiff seeks is not as compelling as the alternatives.

The Court could *permissibly* infer that despite suspicions that Pickett crossed the line at the Warsaw meeting (engaged in a reportable ex parte communication), Defendants chose to ignore it as long as possible in hopes the settlement would proceed without disruption.  When it became clear communications with decisionmakers were going to come under greater scrutiny because Peevey's conduct was under investigation, Defendants came up with a new policy, applied it to an old communication, and vaguely relied on new information from Pickett to disclose it.  However, there are numerous problems with it that undermine its strength, particularly in comparison to the non-fraudulent alternatives.

The Court could also infer that Litzinger had doubts about whether Pickett was silent at the meeting with Peevey as Pickett claimed.  After following up and pressing Pickett, he was satisfied and decided not to investigate it further.  As ex parte communications with the CPUC began to garner more public attention and Peevey's conduct came under greater scrutiny, SCE created a stronger policy on ex parte communications, revisited the meeting with Pickett, and reported it.

The Court could also easily infer from these allegations that Defendants never believed that the meeting in Warsaw involved an ex parte communication, particularly after Pickett denied it, but eventually reported it out of caution as greater public scrutiny of ex parte communications arose.  Or, perhaps Pickett lied and kept doing so until faced with

18

the possibility that it might come out in the investigation of Peevey and disclosed it to Defendants only the week before it was reported.  Under any of these more compelling inferences, there is no intentional or conscious misconduct by Defendants in not disclosing the unreported ex parte communications in 2014.  Plaintiff has failed to plead scienter.

## V.   Loss Causation

To sufficiently plead loss causation, Plaintiff must "allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors."  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  "In other words, the plaintiff must plausibly allege that the defendant's fraud was revealed to the market and caused the resulting losses."  *Id.*  Here, Plaintiff must allege that the stock price declined when the unreported reportable ex parte communications were revealed.

"[T]he announcement of an investigation, 'standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything and therefore does not qualify as a corrective disclosure.'"  *Id.* at 890 n.3 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013)).  Announcements of investigations cannot serve as the basis for loss causation because it is only "notice of a *potential* for future disclosure of fraudulent conduct."  *Id.* at 890.  However, "the announcement of an investigation can 'form the basis for a viable loss causation theory' if the complaint also alleges a subsequent corrective disclosure by the defendant."  *Lloyd*, 811 F.3d at 1206.  "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Id.* at 1206.

Defendants challenge the sufficiency of Plaintiff's loss causation allegations in two respects.  First, Defendants argue Plaintiff cannot rely on the CPUC's investigation as a revelation of fraudulent activity.  Defendants argue that the disclosures Plaintiff has to rely on (because they are the only disclosures followed by a price drop) were part of an investigation revealing only the potential for future disclosure of fraudulent conduct and

there is no subsequent corrective disclosure that resulted in a price drop.   Second, Defendants argue there can be no loss causation because the stock price did not drop in response to the disclosures that actually revealed the unreported reportable ex parte communications — SCE's February 9, 2015 Notice, the ALJ's August 5, 2015 decision describing SCE's violations, or the CPUC decision finding eight violations and fining SCE $16.7 million.   Defendants also note that the most significant disclosure, the ALJ August 5, 2015 decision was followed by a share price *increase*.

Plaintiff counters that the alleged corrective disclosures here did not just reveal an investigation, but rather revealed facts regarding Defendants' misleading statements. Plaintiff relies on the following: (1) A4NR's February 10, 2015 request for sanctions against SCE (price dropped 2% on February 11); (2) California Assemblyman's March 19, 2015 letter requesting the CPUC order SCE to produce documents (price dropped .99% on March 20, 2015; (3) ALJ's April 14, 2015 order directing SCE to produce documents (price dropped .79%); (4) ORA and TURN's April 17, 2015 announcement they were seeking fines (price dropped .99%); (5) SCE's April 29, 2015 production of documents (price dropped 1.73% on April 30; and (6) TURN's June 24, 2015 request that the CPUC reopen the settlement (price dropped 2.71%).

Plaintiff argues these requests for more information, further disclosure, or sanctions, were more than an announcement of an investigation.   For example, Plaintiff asserts that the market did not understand the significance of the February 9, 2015 Notice disclosing the March 26, 2013 ex parte communication until A4NR filed a request for sanctions and later when SCE ordered the production of documents.   In essence, the requests made as part of the investigation helped the market understand the significance of previously disclosed information.   Assuming these disclosures were more than disclosures revealing only the potential for fraud, rather than fraud, the Court still cannot put blinders on and see only the disclosures Plaintiff picks to the exclusion of others.   The Court also cannot ignore that the market did not react negatively to the ALJ's August 5, 2015 Order identifying

SCE's violations and the CPUC's decision finding eight ex parte violations and fining SCE $16.7 million.  This is significant in two respects.  First, to the extent the filings Plaintiff relies on are part of an investigation that only reveals the potential for fraud, there is no "subsequent corrective disclosure" to the investigation that results in a price drop as required to support a "viable loss causation theory."  *Lloyd*, 811 F.3d at 1206.  Second, in combination with the lack of a reaction to the February 9 Notice, it reflects that the stock price did not drop on "a revelation of fraudulent activity."  *Loos*, 762 F.3d at 887.

Even if the Court finds these five disclosures disclosed more than just the potential for fraud and disclosed new information not previously disclosed, even when combined with the April 29, 2015 production of documents that suggested SCE executives knew about the Warsaw meeting, it is not sufficient.  It does not makes sense that the market would react to these requests, but have no negative reaction, or a positive one, to the actual disclosure of the facts that Plaintiff alleges support fraud — unreported ex parte communications about the settlement occurred and were not disclosed.  Plaintiff has failed to sufficiently plead loss causation.

## CONCLUSION

Defendants' Motion to Dismiss is **GRANTED**.  Plaintiff shall have 21 days from the date this Order is filed to file a First Amended Complaint.

**IT IS SO ORDERED.**

Dated:  September 14, 2016

Hon. Roger T. Benitez
United States District Judge

21

15CV1478 BEN (KSC)