1  ROBBINS GELLER RUDMAN
2    & DOWD LLP
   X. JAY ALVAREZ (134781)
3  THOMAS E. EGLER (189871)
   JEFFREY J. STEIN (265268)
4  655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
7  jaya@rgrdlaw.com
   tome@rgrdlaw.com
8  jstein@rgrdlaw.com
9
   Lead Counsel for Lead Plaintiff
10

11         UNITED STATES DISTRICT COURT

12         SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13  HAROLD ENG, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:15-cv-01478-BEN-KSC |
| 14 | CLASS ACTION |
| 15                      Plaintiff, | SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| 16          vs. | |
| 17  EDISON INTERNATIONAL, THEODORE F. CRAVER, JR., | |
| 18  WILLIAM JAMES SCILACCI and RON LITZINGER, | |
| 19 | |
| 20                      Defendants. | DEMAND FOR JURY TRIAL |
| 21 | |

22

23

24

25

26

27

28

1193402_1

1      Lead Plaintiff City of Fort Lauderdale General Employees' Retirement System

2  (the "Retirement System" or "plaintiff") alleges the following based upon personal

3  knowledge as to itself and its own acts, and upon an investigation conducted by and

4  through plaintiff's attorneys, which included, among other things, a review of Edison

5  International's Securities and Exchange Commission ("SEC") filings, its press

6  releases, conference calls, public statements issued by defendants, media reports,

7  analyst reports, industry reports and filings before the California Public Utilities

8  Commission ("CPUC").  Plaintiff believes substantial additional evidentiary support

9  will likely exist for the allegations set forth herein after a reasonable opportunity for

10  discovery.

11                **SUMMARY OF THE ACTION**

12      1.    This is a securities fraud class action on behalf of purchasers of Edison

13  International securities between March 21, 2014 and June 24, 2015, inclusive (the

14  "Class Period") against Edison International; its former Chairman, President and

15  Chief Executive Officer ("CEO"); its former Chief Financial Officer ("CFO"),

16  Treasurer and Executive Vice President ("EVP"); and its former President of its

17  subsidiary, Southern California Edison ("SCE"), for violating §10(b) and §20(a) of the

18  Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5

19  promulgated thereunder.

20      2.    Edison International is the parent holding company of SCE.  SCE is a

21  public utility company and majority-owner of the San Onofre Nuclear Generating

22  Station ("SONGS"), a nuclear power plant in San Diego County.  As a California

23  utility company, SCE relies on ratepayers to fund its operations and is subject to

24  regulation from, *inter alia*, the CPUC.  Edison International and SCE are herein

25  referred to as "Edison" or the "Company."

26      3.    Edison faced disaster at SONGS in January 2012, when design flaws in

27  its newly installed steam generators led to "unprecedented" wear and an internal

28  radioactive steam leak.  The Company immediately took the SONGS plant off-line.

4.      In October 2012, the CPUC issued an Order Instituting Investigation (the "SONGS OII" or "OII") to determine, *inter alia*, Edison's culpability for the leak and the amount it could charge its ratepayers for the cost of consequential remediation. The Utility Reform Network ("TURN") and the Office of Ratepayer Advocates ("ORA"), the consumer advocacy arm of the CPUC, joined the proceeding to represent ratepayers' interests.  According to the CPUC rules, Edison could avoid an official finding regarding responsibility for the issues at SONGS by negotiating a settlement with the ratepayer representatives, contingent upon CPUC approval.

5.      In June 2013, Edison announced that instead of attempting to repair the flaws with the steam generators, the entire plant would be shut down and deconstructed.  The closing process would require additional billions of dollars and decades of work.  The allocation of the shutdown costs between the Company and ratepayers became part of the CPUC investigation.

6.      Along with facing the SONGS OII proceeding, in July 2013 Edison lodged a culpability-related "notice of dispute" against the steam generator manufacturer, Mitsubishi Heavy Industries, Ltd. ("Mitsubishi").  This "notice of dispute" became an arbitration in October 2013.  Because both the SONGS OII and the arbitration addressed questions regarding who was responsible for the SONGS failure, Edison executives had a motive to resolve the CPUC inquiry quickly.

7.      Starting in at least March 2013, prior to the public announcement of the shutdown and the "notice of dispute," Edison executives met privately with CPUC officials and determined their expectations for a shutdown settlement agreement with ratepayers.  From March 2013 through June 2014, Edison executives discussed substantive SONGS OII issues with CPUC officials, outside the presence of the ratepayers' advocates, on at least eight separate occasions.  CPUC rules, however, expressly prohibit such private "*ex parte*" communications with CPUC officials without proper notice to the opposing side.  Edison executives, including defendants,

1  publicly expressed knowledge of the CPUC rules, yet repeatedly violated them with
2  regard to the SONGS OII proceeding.

3       8.     Several of Edison's executives' improper communications were with
4  CPUC President Michael Peevey ("Peevey"), whose house was searched in January
5  2015 pursuant to a warrant in an investigation relating to his work at the CPUC.  The
6  most egregious *ex parte* violation relevant to the SONGS OII occurred at a March
7  2013 meeting in Warsaw, Poland between Peevey and SCE Executive Vice President
8  of External Relations Stephen Pickett ("Pickett").   During  the  meeting,  the  two
9  outlined  a  "framework"  of  specific  terms  about  cost  allocation  between  Edison
10  shareholders and ratepayers on the shutdown of SONGS, and discussed "what [they]
11  thought a settlement agreement would look like."  Pickett and Peevey both wrote out
12  notes  during  the  meeting,  but  Peevey  kept  all  of  them.   The  notes  were  later
13  discovered during the search of Peevey's house.[1]  Pickett typed up his recollection of
14  the notes taken during the meeting with Peevey and shared them with the Individual
15  Defendants (as defined below) and Edison General Counsel Robert Adler ("Adler")
16  via email.[2]

17       9.     Armed with inside knowledge from this and other meetings with Peevey
18  and other CPUC officials, Edison executives entered negotiations and completed an
19  agreement with ratepayers.  The Administrative Law Judge ("ALJ") overseeing the
20  matter suggested changes to the agreement, which the parties adopted.  The ALJ
21  proposed that the CPUC adopt the agreement, and the CPUC accepted her proposal.
22  The final agreement included striking similarities to the terms Pickett and Peevey
23  discussed in Warsaw.  As the parties advanced toward CPUC approval, Edison
24  repeatedly touted the finality of the deal to shareholders and celebrated the end of the
25  SONGS cost uncertainty.

26  ───────────────
27  [1]   A copy of the notes is attached as Exhibit A.
28  [2]   A copy of Pickett's email is attached as Exhibit B.

10.     Despite their duty to do so, Edison executives failed to disclose their improper communications with the CPUC to the investing market.  In fact, they affirmatively stated the opposite, telling the market that Edison was abiding by all the applicable rules.  Edison repeatedly painted a positive false picture of progress toward resolution of the SONGS OII.  As the appearance of risk about the cost allocation of the settlement decreased, Edison's stock price climbed higher.

11.     In January 2015, when the criminal investigation against Peevey uncovered the notes from the Warsaw meeting, Edison began to face very public consequences for its improper acts.  Soon after Peevey's house was searched, but before knowledge of the secret notes for a settlement of SONGS was made public, Edison submitted a "late-filed" notice of the Warsaw meeting, but maintained its innocence, claiming its duty to disclose was "not clear cut."

12.     Despite Edison's effort to downplay the bad facts, the revelations about the secret meetings caused an uproar.  California Assembly member Anthony Rendon called for the CPUC to closely scrutinize Edison's conduct during the settlement process.   The ALJ ordered Edison to produce all SONGS-shutdown-related documents, which in turn revealed additional improper communications.  Incensed ratepayer representatives demanded sanctions.  Edison attempted to assure the public that it acted properly, but further negative developments uncovered more facts about the uncertainty surrounding the SONGS deal and Edison's stock price fell a statistically significant amount.  Finally, on June 24, 2015, a ratepayer representative that had negotiated the deal with Edison recanted its support for the agreement and demanded that the CPUC unwind it – an almost unprecedented step caused by the revelation of defendants' improper actions.  On the news, the stock price fell a statically significant amount yet again and Edison's investors sustained further damage.

13.     Before any of the revelations, however, Edison insiders capitalized on their inside information.  Theodore F. Craver, Jr. ("Craver"), William James Scilacci

1  ("Scilacci"), Ron Litzinger ("Litzinger") and Adler sold $9.6 million, $8.0 million,

2  $1.2 million and $12.9 million worth of stock during the Class Period, respectively.

3  **JURISDICTION AND VENUE**

4  14.   This Court has jurisdiction over the subject matter of this action pursuant

5  to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) as the claims

6  asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act

7  (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder

8  (17 C.F.R. §240.10b-5).

9  15.   Venue is proper in this District pursuant to §27 of the Exchange Act and

10  28 U.S.C. §1391(b).

11  16.   In connection with the acts and conduct alleged in this Complaint,

12  defendants, directly or indirectly, used the means and instrumentalities of interstate

13  commerce, including, but not limited to, the U.S. mails, interstate telephone

14  communications and the facilities of the national securities exchanges and markets.

15  **INDIVIDUALS AND ENTITIES**

16  **Parties**

17  17.   Lead Plaintiff City of Fort Lauderdale General Employees' Retirement

18  System is a public retirement system in Fort Lauderdale, Florida that provides benefits

19  to approximately 2,300 participants.[3]   The Retirement System purchased Edison

20  common stock at artificially inflated prices during the Class Period and suffered

21  damages as a result of defendants' alleged misconduct.

22  18.   Defendant Edison International is the parent holding company of SCE, a

23  public utility primarily engaged in the business of supplying and delivering electricity

24  to an approximately 50,000 square mile area of Southern California.  Until January of

25  2012, up to 20% of SCE's distributable electricity came from SONGS, a nuclear

26  power plant located in San Diego County.  Edison's principal offices are located at

27  _____

28  [3]   The Certificate of Named Plaintiff is attached as Exhibit C.

2244 Walnut Grove Avenue, Rosemead, California 91770.  Throughout the Class Period, Edison common stock was traded under the ticker "EIX" on the New York Stock Exchange ("NYSE"), an efficient market.

19.     Defendant Theodore F. Craver, Jr. acted as Edison's Chairman of the Board of Directors, President and CEO during the relevant time period.  Craver was elected Chairman and CEO in August 2008, and President in April 2008.  As CEO, Craver spoke on Edison's behalf in releases, conference calls and SEC filings.  Craver certified the Company's Form 10-K filed with the SEC on February 24, 2015 on behalf of himself and Edison.  He retired on September 30, 2016.  During the Class Period, Craver sold 172,644 Edison shares for an average price of $56.03, reaping proceeds of $9,673,243.

20.     Defendant William James Scilacci acted as Edison's EVP, CFO and Treasurer during the relevant time period.  Scilacci was appointed to these positions in August 2008.  As CFO, Scilacci spoke on Edison's behalf in releases, conference calls and SEC filings.  Scilacci certified the Company's Form 10-K filed with the SEC on February 24, 2015 on behalf of himself and Edison.  He retired on September 30, 2016.  During the Class Period, Scilacci sold 143,438 Edison shares for an average price of $56.12, reaping proceeds of $8,049,741.

21.     Defendant Ron Litzinger was President of SCE from January 2011 until September 2014.  Since then, Litzinger has served as President for Edison Energy, a non-utility subsidiary of Edison.  During the Class Period, Litzinger spoke on Edison's behalf during conference calls and provided testimony in declarations and at a hearing before the CPUC in his capacity as an Edison executive, regarding *ex parte* communication violations.  During the Class Period, Litzinger sold 21,706 Edison shares for an average price of $55.43, reaping proceeds of $1,203,164.

22.     Defendants Craver, Scilacci and Litzinger are sometimes collectively referred to herein as the "Individual Defendants."

23.     Because of their positions as Edison's senior-most executive officers during the Class Period, the Individual Defendants obtained, had access to and/or were in possession of material, adverse, non-public information concerning Edison via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith.  As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     As senior executive officers and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act during the Class Period, and was actively traded on the NYSE and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Edison's operations, business and *ex parte* settlement discussions with the commissioners of CPUC regarding its investigation into the problems at SONGS and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Edison securities would be based upon truthful and accurate information.  Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

**Other Individuals and Entities**

25.     Michael Peevey acted as CPUC President from 2002 until he stepped down in 2014.  He also acted as an Edison executive from 1984 until 1995, serving as President of Edison International and President of SCE.  Peevey's tenure at the CPUC was riddled with controversy well before the relevant time period.  As early as 2004, publishers reported harsh critiques of Peevey's conduct, particularly his back-door

dealings with utility companies.  On December 16, 2004, *Factiva* wrote about Loretta Lynch and her concern regarding Peevey:

> To Lynch, the California Public Utilities Commission under Michael Peevey, who replaced her as president, has been "running rough shod over the law, the truth, due process, and the public trust."

> The majority of commissioners approve the funding of almost every pet project the utilities put in front of them without really examining costs or benefits, according to Lynch, who noted that Peevey was once president of CPUC-regulated Southern California Edison and its parent Edison International (EIX).

> *       *       *

> "Deals are done every day behind closed doors that are supposed to be done in public," she said.

More recently, on May 24, 2011, the website *Indybay.com* reported that "Peevey's behind-the-scenes engagements with private-sector organizations bent on shaping statewide energy policy demonstrate how power is wielded in California's energy world, a system in which regulators seem to be partnering with utilities rather than policing them."  By November 27, 2014, as Peevey neared the end of his second term, the controversy surrounding him caused enough turmoil to force his retirement.  *The San Diego Union-Tribune* reported:

> Peevey and his staff have been swept up in accusations of overly cozy relations between the commission and Pacific Gas & Electric in the aftermath of the deadly San Bruno natural gas pipeline explosion in 2010.  Peevey has recused himself from related proceedings and has said he will not seek a third appointment when his term expires at the end of the year.

26.     Stephen Pickett acted as Executive Vice President of SCE during the relevant time period until he retired on November 30, 2013.  He is a lawyer who previously served as General Counsel to SCE.  Defendants sent Pickett to meet with Peevey in Warsaw, Poland in March 2013.  At the time, Pickett and Peevey were

former co-workers, neighbors and social friends.  The information Pickett obtained in Warsaw was within the scope of his employment at Edison.

27.     Edward Randolph ("Randolph") is, and at all relevant times was, the Director of the Energy Division at the CPUC.  Randolph is the only other known attendee of the meeting between Pickett and Peevey in Warsaw.

28.     Robert Adler acted as Executive Vice President and General Counsel for Edison during the relevant time period until he retired in January of 2015.  Craver designated Adler to "oversee SCE's efforts to negotiate a settlement of the [SONGS] OII" and put him in charge of fielding settlement-related questions and concerns from Peevey.  During the Class Period, Adler sold 220,678 Edison shares for an average price of $58.44, reaping proceeds of $12,897,123.

29.     TURN and ORA are ratepayer advocacy groups who negotiated the SONGS OII settlement with Edison.  After TURN and ORA learned of Pickett's meeting with Peevey in Warsaw, they each individually recanted their support for the agreement.

## BACKGROUND

### The History of SONGS

30.     SONGS is a nuclear power plant on the Southern California coastline. Edison operates the plant and owns 78% of its shares.  San Diego Gas & Electric Company ("SDG&E") and the City of Riverside own the remaining 20% and 2% of shares, respectively.  SONGS consists of three nuclear containment units.  The original plant, Unit 1, operated from 1968 to 1992.  Unit 2 began commercial operations in 1983 and Unit 3 began service in 1984.  Until 2012, SONGS was a major source of power for the residents of Southern California.  When operating at full strength, SONGS provided ratepayers with 2,150 megawatts of energy, or 20% of Edison's total output.

31.     Each of the two nuclear containment units housed a separate nuclear reactor.  In basic terms, the reactors rely on nuclear fission to heat surrounding water.

1   The water, which is extremely hot and radioactive, is then pumped into a series of

2   pressurized tubes inside steam generators.  The steam generators use heat exchangers

3   to transfer the heat from the radioactive water to a separate pool of non-radioactive

4   water, turning it into steam.  The expanding steam in turn rotates turbines, which

5   produce usable electricity.  Under typical use conditions, the steam generator systems

6   should last 20 to 40 years.

7       32.   In 2004, the original steam generators in Units 2 and 3 began to approach

8   the end of their effective lifespans and required replacement.  Edison planned to

9   replace the old steam generators with the largest and most intricate available and

10   intended to purchase replacement power while it completed the installation.  Edison

11   estimated the replacement project would cost $680 million.  The CPUC approved

12   Edison's proposal and the Company began planning for the replacements.

13       33.   Edison hired Mitsubishi to build the new steam generators.  Edison

14   provided extensive oversight of the project and participated in the design and

15   manufacture processes.  The project was implemented and initially appeared to be a

16   success.  The Unit 2 reactor was restarted in April 2010 and Unit 3 was brought back

17   online in February 2011.

18       34.   The upgrade project, however, ultimately proved to be a disaster.  On

19   January 10, 2012, Edison took Unit 2 offline for routine refueling.  On January 31,

20   2012, with Unit 2 still offline, an alarm sounded at Unit 3 because of what turned out

21   to be a leak of radioactive steam from a generator tube.  Because of the radioactive

22   leak, Edison suspended operation of both steam generators.  They would never go

23   back into service.

24       35.   Subsequent investigations into both Unit 2 and Unit 3 revealed that

25   tightly packed tubes inside the steam generators had repeatedly collided with each

26   other as the steam generators vibrated.  This vibration and friction was not part of the

27   plan for the upgraded steam generators.  The constant friction created

28   "unprecedented" wear in thousands of tubes in both units and rendered them prone to

leakage.  Several reports blamed Edison for the design and manufacturing failures. On March 19, 2012, the Nuclear Regulatory Commission ("NRC") dispatched an Augmented Inspection Team to gather facts about the outages.  On July 18, 2012, the NRC issued a report entitled, "San Onofre Nuclear Generating Station – NRC Augmented Inspected Team Report," which, among other things, identified flaws in the design of the replacement steam generators.  On December 23, 2013, the NRC issued a Notice of Violation to Edison, which concluded Edison failed to establish "design control measures . . . for verifying or checking the adequacy of certain designs."

36.    Meanwhile, on February 9, 2013, *The San Diego Union-Tribune* described a "proprietary report [from] the generator manufacturer [Mitsubishi]," which showed Edison was "aware of safety problems before installations and failed to fully correct them."

37.    The San Onofre problems surfaced within a year of the March 11, 2011 devastating nuclear meltdown in Fukushima, Japan, which created worldwide concern about nuclear reactors.  Like the Fukushima plant, SONGS sat on the Pacific coastline not far away from populated areas.  The San Onofre leak inflamed public opinion and amplified calls to close the entire plant.  Ultimately, on June 7, 2013, Edison announced it would permanently retire SONGS.

38.    The price tag for the SONGS shutdown was $4.7 billion, not including accelerated decommissioning costs.  Local media outlets called for Edison's investors, rather than the ratepayers, to cover this expense.  On March 13, 2013, *The Los Angeles Times* wrote:

> With so much money at stake, it's unsurprising that in recent months the question of who pays for San Onofre, how much and when has dominated the discussions about the plant before the CPUC.  It's a fair bet that, in time, the volume of legal briefs on those issues will far exceed those relating to the more basic questions of what happened and whose fault it is.

That's because the latter questions have mostly been answered: The replacement steam generators were poorly designed, and the responsible party is Southern California Edison. Even if it turns out that the generators' builder, Mitsubishi Heavy Industries, screwed up the job, that happened on Edison's watch. As far as ratepayers are concerned, the utility is "it."

That points to the basic philosophical issue of why Edison's customers, and not its shareholders, should continue to pay for a nuclear plant that shows as much life right now as a raccoon flattened by a semi-truck on the 5 Freeway.

39. The potential for enormous costs also created unrest among Edison's investors and was closely watched by the investing community. For example, on May 15, 2013, while Edison had not yet announced the SONGS retirement, a financial analyst at Jeffries warned, "If SONGS is shut down permanently it will become harder for the company to recover costs on an asset which is no longer used and useful." The balance of whether investors or ratepayers would foot the bill for the shutdown, therefore, was an important issue for all involved. The allocation of cost decision also was important to one of SONGS's chief regulators, the CPUC.

**The CPUC Action: SONGS OII**

40. On October 25, 2012, the CPUC's five commissioners, including Peevey and Michael Florio ("Florio"), initiated the SONGS OII proceeding to consider "the causes of the outages, the utilities' responses, the future of the SONGS units, and the resulting effects on the provision of safe and reliable electric service at just and reasonable rates."

41. In many ways, OII proceedings resemble litigation under the Federal Rules of Civil Procedure, as various parties present their cases to a decisionmaker through written motions and oral hearings. CPUC proceedings are guided by their own specific rules and statutes, which provide for the collection and presentation of evidence to a decisionmaker.

42.     "Ratesetting" proceedings like SONGS OII are designed to determine the amount the utility company may charge its customers.  The energy companies typically represent themselves through counsel and advocacy groups typically represent ratepayers' interests.  Each "ratesetting" action is assigned a CPUC ALJ, who specializes in utility disputes.  ALJs handle day-to-day issues and render proposed decisions, but their rulings are subject to the review of CPUC commissioners.   The CPUC assigns a commissioner – called the Assigned Commissioner ("AC") – to each ratesetting case.  The AC often confers with other commissioners before approving or modifying an ALJ's order.  Accordingly, the ALJ and all commissioners are considered "decisionmakers" under the CPUC rules.  *See* Cal. Pub. Util. Code §1701 *et seq.*; *see also* CPUC Rules of Prac. and Proc. 8.1, 8.3, 8.4.  As in litigation, parties to the proceeding can agree to resolve the dispute through settlement, subject to approval from the decisionmakers.

43.     On November 1, 2012, the CPUC assigned Hon. Melanie Darling as ALJ and Florio as the AC to preside over the SONGS proceeding.  Several groups joined as parties to represent ratepayers' interests including TURN and ORA.  The Alliance for Nuclear Responsibility ("A4NR"), which describes itself as an organization that "works to educate and protect the citizens of the State of California and future generations from the dangers of radioactive contamination," also joined the SONGS OII as a party.

**CPUC *Ex Parte* Rules**

44.     The CPUC employs specific rules for *ex parte* communications, which it defines as "any oral or written communication between a decisionmaker and a person with an interest in a matter before the commission concerning substantive, but not procedural issues."  The commission allows *ex parte* communications without prior notice, but imposes duties to maintain equality among the parties.  For instance, regardless of who initiated the interaction, the party must file a notice of the *ex parte* communication within three days.  The notice must include the date, time and location

of the communication; whether it was oral or written; the identities of the everyone present; and a description of all non-decisionmakers' communications.  The rules provide that if a decisionmaker meets with one party, all other parties must be granted an individual meeting of a substantially equal period of time.

45.    Edison and its executives were familiar with the *ex parte* rules and their nuances.  For instance, Edison concedes that it must limit its communications with decisionmakers to procedural statements or insubstantial responses, such as "I understand" or "I will get back to you," in order to avoid disclosure.  Further, the record is replete with reminders to Edison and its employees to follow the rules.  The order initiating the SONGS OII issued by the CPUC on October 25, 2012 specifically held that "*Ex parte* communications in this proceeding are subject to the restrictions and reporting requirements stated in Article 8 of the Commission's Rules of Practice and Procedure."  Early in the proceedings, the ALJ sent Edison an email reminding it that "[i]t is improper and unfair for parties to have [*ex parte*] communications without disclosure to other parties in a rate-setting proceeding."[4]

46.    Additionally, throughout the Class Period, executives at Edison repeatedly referenced the *ex parte* communication rules and their importance.  For example, on September 25, 2014, Edison Chief Ethics and Compliance Officer Mike Montoya, SCE General Counsel Russell Swartz, and SCE Senior Vice President of Regulatory Affairs R.O. Nichols ("Nichols") emailed Edison company personnel to discuss CPUC rules.  The email appears to refer to recently revealed *ex parte* violations by PG&E, another utility company.  The email stated that "[w]hile we are well aware of the CPUC's *ex parte* communications rules, this situation makes clear that awareness of the rules is not enough.  We must understand them and ensure that

---

[4]    *See* Morgan Lee, *IMPROPER LOBBYING IN SAN ONOFRE PROBE? ONOFRE LOBBYING RAISES QUESTIONS: Edison says it's not aware of talks taking place without notice*, San Diego Union-Tribune, Dec. 25, 2013.

they are consistently adhered to." Also, during a third quarter 2014 earnings call on October 28, 2014, Craver told investors:

> [W]e're certainly trying to make sure that all of our personnel know what's expected of them, in terms of proper conduct with the CPUC. We have a compliance program. We have training. We have redoubled efforts along those things, just to make sure that that's very present in everyone's mind.

And during a fourth quarter 2014 earnings call on February 24, 2015, Craver acknowledged the *ex parte* rules are "designed to provide equal access to all parties to the proceeding with equal time . . . to make sure that if we have conversations with decision-makers, that those are noticed."

47. In reality, defendants had been secretly flouting the CPUC *ex parte* rules since at least March 2013.

## THE IMPROPER *EX PARTE* COMMUNICATIONS

48. On the surface, Edison appeared to abide by the CPUC rules. From the start of the SONGS OII through January 2015, Edison filed 15 notices of *ex parte* communications. The notices disclosed various relatively minor interactions, including in-person meetings with commissioners' advisors and a letter to Peevey about the NRC investigation. However, despite defendants' knowledge and use of the CPUC *ex parte* disclosure procedures, they violated the rules when they engaged in a series of secret meetings with CPUC officials between March 2013 and June 2014. The most egregious of these violations occurred in Warsaw, Poland on March 26 and 27, 2013.

**The Two Warsaw Meetings and Their Aftermath**

49. In March of 2013, Pickett and Peevey traveled to Warsaw as part of a "study tour" organized by the California Foundation on the Environment and Economy ("CFEE"). Defendants knew Peevey planned to attend the tour and sent Pickett with specific instructions to seek him out and discuss the status of the SONGS restart.

50.     On the evening of March 26, 2013, Pickett, Peevey and Randolph met privately for dinner at the Bristol Hotel in Warsaw and discussed a possible "framework" for a settlement of the SONGS OII between Edison and various ratepayer groups.  At the time, Edison had not yet discussed settlement directly with ratepayers' representatives.  During the meeting, Peevey provided details about the terms the CPUC would be willing to approve.  Pickett took notes at the meeting and, according to Randolph, Pickett described "what he thought a settlement agreement would look like."  During the meeting, Peevey added annotations to Pickett's notes and kept the notes with him at the meeting's conclusion.  After the meeting, at 12:13 a.m. in Warsaw, Pickett emailed SCE Executive Vice President of Public Affairs Polly Gault ("Gault").  He wrote, "Greetings from Poland, where I just had dinner with . . . Peevey. *Redacted – NonResponsive*."[5] Pickett later claimed the meeting lasted only "approximately half an hour." According to the CPUC's three-day disclosure deadline, to act in compliance with applicable law Edison should have reported this meeting by March 29, 2013.  It did not.

51.     The following evening, Pickett and Peevey attended a dinner party in Warsaw where they sat next to each other and further discussed the SONGS OII. During the dinner, Pickett again emailed Edison executives to brag about his interactions with Peevey.  To Gault, he wrote "From Poland sitting next to Peevey, God help me. . . .  Yes, I am moderately intoxicated.  Thank God!"[6] Twenty minutes later, Pickett emailed SCE Senior Attorney Elizabeth Matthias ("Matthias") and bragged that he was "[s]itting next to Peevey taking in the last formal evening of the trip. *Redacted - NonResponsive*"[7] Immediately afterward, he emailed Gault again and described his interaction with Peevey, saying "sitting next to Peevey at dinner in

---

[5]   A copy of this email is attached as Exhibit D.

[6]   A copy of this email is attached as Exhibit E.

[7]   A copy of this email is attached as Exhibit F.

1    Warsaw *working . . . SONGS*.  *Deserve combat pay*."[8]  In a declaration dated

2    April 28, 2015, Pickett demonstrated a foggy memory of the evening, but conceded

3    that "President Peevey may have mentioned SONGS during dinner."  Edison's

4    deadline to report this communication was March 30, 2013.  It failed to do so.

5       52.    On the same day as the dinner party, while Pickett was still in Warsaw,

6    defendant Litzinger's assistant scheduled a meeting for April 1, 2013, the first

7    Monday after Pickett's return to California.  The subject of the meeting was "CFEE

8    Download" and its only invitees were Pickett, defendants Craver, Scilacci and

9    Litzinger, and General Counsel Adler.[9]

10      53.    At the meeting on April 1, 2013, Pickett told Craver, Scilacci, Litzinger

11   and Adler that Peevey had affirmatively laid out "a framework for a possible

12   resolution of the SONGS OII" in  Warsaw.  This admission caused the executives to

13   discuss whether Edison should file a late-filed *ex parte* notice regarding Pickett's

14   interactions with Peevey.  Litzinger admitted he became "concerned" because "SCE

15   had not designated . . . Pickett as its representative to discuss settlement."

16   Accordingly, after the meeting Litzinger confronted Pickett and stressed that he "was

17   not authorized to negotiate a settlement" and that "SCE was in 'listen-only' mode."

18   Pickett claims he also "consulted with SCE's counsel on the ex parte reporting issue"

19   after the April 1 meeting.  That same day, after meeting with the Individual

20   Defendants and Adler, Pickett sent them an email that contained a recently typed-up

21   version of the Warsaw notes, saying "[h]ere is a typed-up version of my notes from

22   our conversation this morning."[10]  Indeed, the attached document, entitled "Elements

23

24

25

26   [8]   A copy of this email is attached as Exhibit G.

27   [9]   A copy of this scheduling email is attached as Exhibit H.

28   [10]  A copy of this email is attached as Exhibit B.

of a SONGS Deal," provided a near-exact copy of the notes he created with Peevey in Warsaw three days earlier.[11]

54.     Although Litzinger claims he told Pickett not to participate in settlement negotiations, Edison admits that he subsequently took "a few . . . short-lived internal steps to develop a potential settlement framework" regarding the SONGS OII.  On April 4, 2013, Pickett sent an email entitled "next steps" to two Edison executives, SCE Vice President of SONGS Strategic Review Megan Scott-Kakures ("Scott-Kakures") and SCE Director of Regulatory Operations Russell Worden ("Worden"). Pickett recommended that the Company "take my notes and turn [them] into a simple term sheet we could use to help guide the negotiations." He also referenced Litzinger's oversight of the project and stressed the importance of a quick turnaround, writing "Ron [Litzinger] is going to want to pull a subset of the INMG together sometime next week to discuss this, so if we could have something on paper by Tuesday or so it would be great."[12]

55.     Edison's privilege log filed on April 29, 2015 supports the fact that, over the next eight days, Edison executives including Pickett, Adler, Worden and Scott-Kakures circulated multiple drafts of the term sheet.   Edison withheld these documents from its production to the CPUC.[13]

56.     On April 11, 2013, Litzinger met with Pickett again to discuss his conduct in Warsaw.  Litzinger again "confirmed that the meeting in Poland was a one-way communication" and  "reinforced the message that Mr. Pickett was not authorized to negotiate any SONGS settlement."   After meeting with Pickett, Litzinger emailed the Individual Defendants and Adler to summarize the discussion.

---

[11]   Exhibit I provides a simple comparison between the Warsaw notes (attached as Exhibit A) and Pickett's memorandum (attached as Exhibit B), which demonstrates their striking resemblance.

[12]   A copy of this email is attached as Exhibit J.

[13]   A copy of Edison's privilege log is attached as Exhibit K.

1   Litzinger disclosed that he became concerned about whether Pickett's interaction was
2   "listen only" because he "heard whispers from the CPUC of significant SCE presence
3   on the [SONGS settlement] issue."   Litzinger's discussion with Pickett did not
4   assuage his fears, as he "left the meeting uneasy" and expressed worry about "yet
5   another  'social dinner'" that Pickett had just scheduled with Peevey.  (Quotation
6   marks around "social dinner" included in original email.)  Despite his fears, Litzinger
7   could not help but relay some new inside information he obtained from Pickett.  He
8   said:

> For what it is worth, he volunteered independently that we should
> only engage with TURN at first (he mentioned Matt Friedman).  I used
> that as an opportunity to seek out the answer to our question on "TURN
> without DRA [Department of Ratepayer Advocates]".  Steve said that
> can be done, but would likely result in a "protested settlement" with a
> hearing-DRA of course filing the protest.  He would recommend
> considering inviting DRA in later in the process. I took it all under
> advisement. He said President Peevey feels strongly about Geesman.  I
> merely responded his testimony shows him to be merely a "bomb
> thrower".  He said is smart and could be trusted –"at least when he was
> in a superior position as a regulator".  I again stated his testimony was
> inflammatory.[14]

Notwithstanding Litzinger's concerns and fears about Pickett's meeting with Peevey
in Warsaw, he apparently took no further steps to find out what really happened.

57.   Five days after Pickett and Litzinger's meeting, on April 16, 2013,
Pickett and Peevey indeed did meet for "yet another 'social dinner.'"  Heading into
the dinner, Pickett arranged to meet with Matthias, a Senior Attorney at Edison,
immediately after he finished with Peevey.[15] The next day, Pickett again bragged to
Gault, claiming "Had dinner with . . . Peevey last night **_Redacted –_**
**_NonResponsive_**."[16]

---

[14]   A copy of this email is attached as Exhibit L.

[15]   A copy of this email is attached as Exhibit M.

[16]   A copy of this email is attached as Exhibit N.

58.    A month later, Edison executives exchanged emails regarding the substantive information Pickett provided to Peevey in Warsaw.  On May 29, 2013, Senior Director of State Energy Regulation Michael Hoover ("Hoover") relayed to Vice President of Regulatory Policy and Affairs Les Starck ("Starck") that Carol Brown, Peevey's Chief of Staff, "indicated that Pickett was well prepared in Poland with specifics" about the SONGS OII settlement.[17]

59.    When Edison finally disclosed the Warsaw meeting in the CPUC action, the CPUC required it to produce "all documents pertaining to oral and written communications about potential settlement of the SONGS OII between any SCE employee and CPUC decisionmaker(s) between March 1, 2013 and November 31, 2014" and "all written communications internal to SCE which reported, discussed, referred to, or otherwise contained, a description of oral or written communications about settlement with CPUC decisionmaker(s)."  Edison complied with this request in three installments, on April 29, 2015, July 3, 2015 and October 20, 2015.  These productions provided the emails and declarations referenced in this pleading.

60.    On December 8, 2015, after the CPUC reviewed the evidence, it issued a decision (the "CPUC Decision") that criticized Edison's failure to properly investigate Pickett's interactions with Peevey.  It wrote:

> There is no indication that SCE made any attempt to contact former President Peevey, or Mr. Randolph, to clarify the content of the communication or get a copy of the Notes.  Nor did SCE acknowledge the possibility of a Rule 8.4 violation and follow-up with Mr. Pickett when he promptly began to take internal steps to develop a potential framework for settlement in the event of a permanent shutdown of SONGS.

61.    The terms discussed at the Warsaw meeting impacted the SONGS OII settlement.  Several of the terms listed in Pickett's notes were similar to the final settlement agreement.  For instance, both call for ratepayers to absorb the entire cost

---

[17]   A copy of this email is attached as Exhibit O.

of replacement power, both require Edison to pay replacement generator costs incurred after February 1, 2012, both call for Edison and the ratepayers to divide money recovered from Mitsubishi, and both require significant annual donations from Edison to the University of California for a center to study greenhouse gas emissions.

**The Individual Defendants' *Ex Parte* Violations**

62.     Rather than tighten their policies after the Warsaw meeting and their internal expressions of concern about Pickett's actions, the Individual Defendants made their own improper communications with decisionmakers.  The CPUC Decision outlined six additional *ex parte* violations, five of which involved at least one Individual Defendant.[18]  The CPUC found these violations unjustly left the ratepayer groups "in the dark" about the status of the settlement.

63.     On June 26, 2013, Litzinger met with AC Florio after an unrelated hearing.  Edison admits that Litzinger "provided a brief update on the status of SCE's bargaining efforts with respect to the severance of SONGS employees." The CPUC found this non-public communication substantive because:

> The question of SCE's employee compensation commitments and cost recovery of employee severance costs relate to substantive issues in the OII because the reasonableness of these expenses would be considered by the Commission when reviewing 2013 SONGS Operations and Maintenance (O&M) expenses in Phase 3 or later.

64.     On September 6, 2013, Litzinger and Stark met Peevey over lunch to discuss SONGS.  Peevey suggested to Litzinger that Edison could expect to recover either its capital or its replacement power costs, but not both.   Edison admits "Litzinger said that the outcome would be somewhere in between those extremes" and also told Peevey  "settlement negotiations were progressing."  Subsequent internal

---

[18]  The sixth improper communication occurred on May 28, 2013 when Starck emailed an SCE press release to all five commissioners. According to the CPUC, the press release contained "substantive and argumentative content about the reasonableness of SCE's actions related to the design of the RSGs, a substantive issue in the OII."

emails among Edison executives reveal that Litzinger improperly drove the conversation.  On the same day as the lunch, Pickett asked Starck "How did it go? . . . If you don't want to put it in an email, call me."  Starck replied with a summary, describing the lunch as "[f]riendly and cordial" and providing more insight into Litzinger's contribution to the discussion. He wrote, "Ron [Litzinger] responded that it would be a combination of disallowances of the two . . . no reaction from Mike [Peevey].  Ron did say that he felt good about the progress of settlement discussions with multiple parties."[19]  Starck then forwarded his summary to Hoover, SCE Director of Regulatory Affairs Laura Genao ("Genao"), and other executives.   Genao responded, "You should talk to Mike H[oover] about the potential ex parte implication of today's conversation."  Hoover replied, "He should not put this in notes……" (ellipses in original).[20]  The CPUC determined that Litzinger's interaction violated *ex parte* rules because "when SCE's President contrasted his position with that of former President Peevey on a substantive issue in a non-public meeting, it became a reportable ex parte communication."

65.    On November 15, 2013, Craver and Peevey met for dinner to discuss SONGS.  Edison admits that Craver "briefly described SCE's efforts to get MHI to the table to discuss a financial settlement with respect to the defective replacement steam generators" and "outlined SCE's efforts to secure letters of support from various federal elected officials for MHI to engage with SCE on the matter."  After the dinner, Craver sent Peevey an email that reiterated his control over the discussion.  He wrote, "***As I emphasized*** with you during our dinner, we are pulling out all the stops to bring MHI to the table and hold them accountable for their failed steam generator design."[21]  The CPUC determined that "Mr. Craver's communications constituted an

---

[19]   A copy of this email is attached as Exhibit P.

[20]   A copy of this email is attached as Exhibit Q.

[21]   A copy of this email is attached as Exhibit R.

1   unreported, non-public communication between an SCE executive and former

2   President Peevey on a substantive issue in the OII."

3       66.     On May 28, 2014, Hoover emailed Nichols about a conversation he just

4   had with Peevey regarding the University of California donation for greenhouse gas

5   research, which is referenced in the Warsaw notes. In the email, Hoover relayed that

6   Peevey had recently discussed the issue with Litzinger. He wrote:

7       [Peevey] does not understand why we will not fund the UC data analysis
        program. He said Florio is supportive . . . . [Peevey] says he has talked
8       to you and Ron about it and he is frustrated. . . . [Peevey] wanted me to
        pass along that SONGS is on a "tight schedule" and [Peevey] would hate
9       to see it "slip".[22]

10

11  The CPUC determined "[t]hese facts and reasonable inferences support the conclusion

12  that an unreported, non-public communication occurred between one or more SCE

13  executives and former President Peevey on the substantive issue of a potential

14  modification to the SONGS OII settlement agreement," and that Edison was aware of

15  it.

16      67.     On June 5, 2014, Peevey called Litzinger to again discuss greenhouse gas

17  research. On June 11, 2014, Peevey followed up with Hoover. Hoover emailed

18  Nichols to report that Peevey "talked with Ron [Litzinger] last week" and is "lowering

19  the ask to 3 million."[23] The CPUC decided "[f]rom this evidence, it is reasonable to

20  infer there was a non-public unreported communication between former President

21  Peevey and Mr. Litzinger."

22      68.     Despite acknowledged familiarity with the CPUC rules, defendants

23  repeatedly engaged Peevey and other commissioners in substantive communications

24  about resolving the SONGS OII. Defendants failed to timely notify the other parties

25

26  _____

27  [22]  A copy of this email is attached as Exhibit S.

28  [23]  A copy of this email is attached as Exhibit T.

1    to the settlement of these communications and therefore deprived them of an

2    opportunity to gain equal time with the decisionmakers.

3        69.    Public scrutiny surrounding Peevey only increased as a result of his

4    conduct in this and other CPUC proceedings.  The scandal resulted in a criminal

5    investigation that is still ongoing.  Amid public pressure, Peevey left the CPUC at the

6    end of 2014.

7        70.    The March 26, 2013 Warsaw meeting, the dinner party the next day, and

8    all subsequent improper communications required timely public notice served on

9    Edison's counterparties, including TURN and ORA – but that did not occur as

10   required.  Instead, the CPUC Decision found the communications "concerned a

11   substantive issue in the SONGS OII, took place between an interested person and a

12   decision-maker, and did not occur in a . . . public forum."  The CPUC then imposed a

13   $16.7 million penalty and ordered the Company to "immediately" create a public

14   website to track non-public communications related to the SONGS OII.

15       71.    The CPUC also discussed the impact the violations had on the SONGS

16   OII.  It found because of Edison's failure to notify the other parties, they "lacked the

17   knowledge" that Peevey was considering a SONGS shutdown.  The counterparties

18   also "were in the dark" about his desire for contributions to the University of

19   California.

20       72.    Unbeknownst to Edison's investors, defendants' improper *ex parte*

21   communications gave them substantial, unfair leverage in their negotiations with

22   TURN and ORA, and therefore put the settlement as a whole in jeopardy.  During the

23   Class Period, defendants repeatedly assured the public that the proposed settlement

24   would resolve the SONGS OII for good.

25       73.    At the same time Edison executives were having undisclosed and

26   unlawful *ex parte* communications about a settlement with the CPUC, Edison was

27   planning to bring an action against Mitsubishi.  On July 18, 2013, Edison announced

28   via press release that it had "served a formal Notice of Dispute" on Mitsubishi,

blaming it for "designing and manufacturing defective Replacement Steam Generators" at SONGS.  The press release quoted Litzinger as stating that the action was "'about making sure that Mitsubishi takes responsibility for providing the defective steam generators that led to the closing of SONGS.'"  The allegations of responsibility on Mitsubishi's part were described in the 23-page notice, as well as in a 50-page "Request For Arbitration" Edison subsequently filed against Mitsubishi in October 2013.  Although the notice and request for arbitration were heavily redacted when released to the public, the available allegations made clear Edison's position that Mitsubishi was solely responsible for the problems.  Edison, however, faced the risk that the CPUC process, which was designed to address the "[n]ature and effects of the steam generator failures in order to assess the reasonableness of SCE's consequential actions and expenditures," would come to different conclusions and interfere with the potential multi-billion dollar claim against Mitsubishi.  Edison executives, therefore, had a great incentive to end the CPUC investigation as quickly and quietly as possible.

**FRAUDULENT STATEMENTS**

**First Suggestion of a Settlement**

74.   Defendants affirmatively decided to keep the unlawful *ex parte* communications with the CPUC secret as they entered settlement negotiations with TURN and ORA.  They never informed the other parties to the settlement about the non-public contacts, depriving TURN and ORA of equal time with CPUC officials and of knowledge about the dictated deal terms.  Using this improper advantage, defendants negotiated and finalized an agreement to settle all of the OII proceedings. Defendants knew the risks they took by violating the rules, including the risk that the settlement would be invalidated, but continued to hide the true facts.

75.   Late on March 20, 2014, Edison filed a statement on Form 8-K with the SEC, which first announced a possible settlement to resolve the CPUC investigation into SONGS.  The Company stated:

Under rules of the California Public Utilities Commission ("CPUC"), prior to signing any settlement, settling parties must provide notice and convene at least one conference for the purpose of providing all parties with the opportunity to discuss settlements in the proceeding. Pursuant to these rules, on March 20, 2014, Southern California Edison Company ("SCE"), San Diego Gas & Electric Co. ("SDG&E"), The Utility Reform Network, and the CPUC Office of Ratepayer Advocates ("ORA") (together, the "Parties") jointly gave seven days advance written notice (the "Notice") to all parties in the San Onofre OII of a conference to discuss terms to resolve the CPUC's proceedings regarding the outages and subsequent permanent shutdown of the San Onofre Nuclear Generating Station Units 2 and 3, I. 12-10-013 and related proceedings. At the same time, the Parties sent a letter to the Administrative Law Judges presiding over the OII requesting a stay of proceedings pending the outcome of the settlement conference. Any such settlement conference is confidential and limited to the parties in the proceeding and their representatives.

* * *

***The Notice is related to settlement discussions that have been held directly among the Parties***. Under the CPUC's rules, the terms discussed by the Parties are confidential and may not be disclosed outside the negotiations without the consent of all Parties participating in the negotiations. Consequently, except for discussions at the confidential settlement conference, the settlement terms discussed by the Parties will be maintained as confidential unless the Parties mutually agree to publicly release the terms or unless and until a formal settlement agreement has been signed, as to which no assurance can be given.

76. Edison's March 20, 2014 filing was false and misleading because it failed to disclose material information about defendants' improper *ex parte* communications regarding the SONGS settlement. On December 8, 2015, the CPUC affirmed the ALJ's proposed findings that, at the time of Edison's March 20, 2014 statements, Edison and its executives had non-public substantive communications regarding SONGS OII with CPUC decisionmakers on six occasions without proper notice to the parties to the settlement. When Edison's counterparties, TURN and ORA, learned of

its improper communications with decisionmakers, they asked the CPUC to unwind

the settlement.  The improper communications included:

(a)   the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(b)   the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)   the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)   the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)   the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS; and

(f)   the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials.

77.   The true facts then known or deliberately disregarded by defendants Edison, Craver, Scilacci and Litzinger when Edison made the statements detailed in ¶75 above were that:

(a)   As the CPUC found, Edison's "lax" culture permitted its employees, including Pickett, to be "too informal" and "too casual about what is permissible" in its interactions with decisionmakers.

(b)   The Individual Defendants sent Pickett to meet Peevey in a foreign country, knowing the two men had a decades-long close personal relationship and that Peevey had a reputation for improper communications with utility companies.  The CPUC opined, "it is difficult to imagine the meeting as described by

Mr. Pickett, and believe that this top SCE executive made no comment to the President of the Commission about any of the substantive issues raised."

(c) On at least four occasions during this trip to Warsaw, Pickett emailed Gault or Matthias to boast that he "just had dinner with Peevey," and was "sitting next to Peevey" and "working . . . SONGS."

(d) On the same day Pickett emailed Gault and Matthias, Litzinger scheduled a "CFEE Download" meeting between Pickett and the Individual Defendants, as well as Alder, upon Pickett's return from Warsaw. At the meeting, Pickett debriefed defendants about the content of his discussions with Peevey, which included "a framework for a possible resolution of the SONGS OII." The executives specifically discussed whether the meeting was reportable under the *ex parte* rules. Litzinger recalls that Pickett's report left him "concerned." After the meeting, Pickett sent a detailed document to Craver, Scilacci, Litzinger and Adler entitled "Elements of a SONGS Deal" that mirrored the notes he took reflecting his conversations with Peevey in Warsaw.

(e) On April 11, 2013, Litzinger emailed Craver, Scilacci and Adler to confess that he still felt "uneasy" about Pickett's communications with Peevey in Warsaw. Among other things, he criticized Pickett for scheduling "yet another 'social dinner'" with Peevey. He also expressed worry because he had "heard whispers" that the CPUC might reveal the "significant SCE presence on the [SONGS settlement] issue." This undermines defendants' claim that they had become satisfied the Warsaw meetings were from "Mr. Peevey to Mr. Pickett, and not from Mr. Pickett to Mr. Peevey."

(f) As the CPUC found, "[n]otwithstanding early concerns by Mr. Litzinger and Mr. Craver regarding Mr. Pickett's truthfulness, SCE did nothing to probe further about his claimed silence at the meeting, except to ask him again." Specifically, Edison never contacted Randolph, who attended the Warsaw meeting and who later revealed that Pickett told Peevey "what he thought a settlement agreement would look like." The Individual Defendants also failed to interview SCE executives Hoover and Starck, who both knew about Pickett's improper conduct. Indeed,

on May 29, 2013, Hoover emailed Starck to report that Peevey's Chief of Staff said Pickett was "'well prepared . . . with specifics'" when discussing the SONGS settlement with Peevey in Warsaw.  The CPUC criticized Edison's failure to undertake an "effective inquiry" into Pickett's story or the whereabouts of his notes from Warsaw:

> SCE failed to exercise due diligence to investigate Mr. Pickett's unlikely initial version of the meeting – or his evolving versions of the meeting – each recalling additional information about his conversation with President Peevey.  SCE also did not attempt to retain and disclose the written document used in connection with the ex parte communication, nor did it disclose that Mr. Pickett had re-created his recollection of the document for SCE just a few days later.

(g) Despite Litzinger's claim that Pickett was "not authorized to negotiate any SONGS settlement" with Peevey, on April 11, 2013, Pickett suggested settlement strategies to Litzinger, who took the suggestions "under advisement" and passed them along to Craver, Scilacci and Adler.

(h) Pickett, Adler and other high-level Edison executives spent eight days circulating drafts of a term sheet based on Pickett's "Elements of a SONGS Deal" memorandum.  Pickett initiated the process in order to "help guide the negotiations" with ratepayer groups.  Notably, many of the terms Pickett obtained from Peevey in Warsaw appeared in the final settlement agreement with TURN and ORA 20 months later.

(i) Craver and Litzinger engaged in their own improper *ex parte* communications with decisionmakers.  The CPUC held that Craver improperly "briefly described" and "outlined" substantive issues to Peevey on November 15, 2013.  It found Litzinger improperly "provided a brief update" to AC Florio on June 26, 2013; and "contrasted his position" with Peevey on September 6, 2013.

78.     The market reacted favorably to Edison's press release.  On March 20, 2014, in a report entitled "SONGS settlement in the works?," a Deutsche Bank analyst noted:

> We expect investors to react favorably to this development, as it suggests comprehensive settlement is both possible and might be reached in the near term.  In our view, SONGS is the last overhang on a new, simpler regulated growth story, so if the company can resolve this issue, we believe EIX stock should command a premium valuation relative to slower-growing regulated electric utility peers.

On March 21, 2014, *TheStreet.com* wrote: "This potential liability has been a huge risk factor for the stock.  Settling the exact cost of moving on from the incident has been a big step forward for the company."  On that same date, a Wells Fargo analyst wrote:

> In an 8K filing this morning (3/21), EIX subsidiary SoCalEd appears to indicate that a comprehensive settlement has been reached with key parties to the pending San Onofre OII.  We consider this an incremental positive to EIX as timely resolution of the four-phase SONGS OII would remove EIX's final overhang . . . .

79.     As a result of Edison's materially false and misleading statements and omissions, on March 21, 2014, Edison's stock price jumped 3.56%, from $52.02 to $53.87, on a high volume of over 5 million shares.

**SONGS OII Settlement Announcement**

80.     On March 27, 2014, after the close of the market, Edison filed a press release formally announcing a settlement to resolve the SONGS investigation:

> On March 27, 2014, SCE entered into a Settlement Agreement with The Utility Reform Network ("TURN"), the Office of Ratepayer Advocates ("ORA") of the California Public Utilities Commission ("CPUC") and San Diego Gas & Electric Company ("SDG&E").  *If implemented, the Settlement Agreement will constitute a complete and final resolution of the CPUC's Order Instituting Investigation ("OII") and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at the San Onofre Nuclear Generating Station ("San Onofre") and the related outage and subsequent shutdown of*

*San Onofre*.  The Settlement Agreement does not affect proceedings before the Nuclear Regulatory Commission or proceedings related to recoveries from third parties described below.   The Settlement Agreement was signed following an all-party settlement conference in the OII, which was required under CPUC rules as a condition to a settlement.

81.     Later in the day on March 27, 2014, Edison hosted a conference call led by defendants Craver, Scilacci and Litzinger.  During the call, Craver spoke about the SONGS settlement and assured investors that "*[t]his agreement resolves all matters related to the order instituting investigation involving the San Onofre nuclear generating station*."

82.     During the same call, an analyst asked about the extent of the CPUC's involvement in the settlement proceedings and Litzinger denied any CPUC involvement:

[Analyst:] Obviously, the CPUC has to approve this but we've heard from the CPUC president a number of times talking about settlement and his hope for that et cetera.  Just to get a sense, how involved is the CPUC in this proceeding, although they're not directly a party, or is this something that's completely autonomous and separate from the CPUC side of it?

*              *              *

[Litzinger:] No, it's the normal settlement process.  *You reach a settlement agreement with the parties involved in the proceeding, not with the commissioners. So, they were not involved other than encouraging settlement publicly* and then now we – the commissioners weigh in at this stage in the process after we file the agreement with them and that's where the administrative law judges and then the commissioners get to weigh in on the settlement.

83.     Defendants' March 27, 2014 statements were materially false and misleading when made.  The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger are described in ¶77 above.  At the time of Edison's March 27, 2014 statements, Edison high-level executives, including

defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least six occasions without notice to the parties to the settlement as required by law.  When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.  The improper communications included:

(a)   the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(b)   the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)   the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)   the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)   the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS; and

(f)   the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials.

84.   Defendants' misrepresentations had an immediate and positive effect on the investing community's perception of the SONGS settlement.  For example, on March 27, 2014, a Wells Fargo analyst claimed that the formal agreement, if approved, "removes a major fundamental concern."  On March 28, 2014, a Deutsche Bank analyst wrote "[w]hile we view the overall settlement as balanced we believe a

1  more timely conclusion to the case is a strong positive for EIX, as this had been an

2  overhang for some time."  On that same date, a UBS analyst report raised its EIX

3  rating recommendation to buy based on the SONGS agreement:  "If approved, this

4  removes a major overhang on the story and should clear the way for investors who

5  may have shied away from the stock until now for its elevated regulatory risk."

6      85.    Edison's stock price continued to rise over the next two business days,

7  climbing 5.05% from $53.89 to $56.61.

8  **Edison Executives Dump Their Stock**

9      86.    Just after this first series of false and misleading statements, Craver,

10  Scilacci, Litzinger and Adler opted to cash in before the market had a chance to learn

11  about their improper communications with the CPUC.  On March 31, 2014, just four

12  days after the settlement announcement, Craver and Scilacci sold substantial portions

13  of their stakes in the Company for millions of dollars.  Craver sold 172,644 (5%) of

14  his shares for $9,673,243.00.  This amount represents over 250% of the number of

15  shares he sold in the prior year (66,665).  Scilacci sold 143,438 (18%) of his shares for

16  $8,049,741.00.  The amount represents over 1000% of the number of shares he sold in

17  all of 2013 and the beginning of 2014 (13,177).  A month later, on May 2, 2014,

18  Litzinger sold 21,706 (3%) of his shares for $1,203,164.  This sale involved more

19  shares than Litzinger sold in all of 2013 and the first part of 2014.  Adler – who

20  oversaw the SONGS settlement, attended the Warsaw debriefing from Pickett, and

21  helped Pickett turn his notes into a term sheet – sold Edison stock on three separate

22  occasions during the Class Period.  On May 12, 2014, he sold 48,908 shares for

23  $54.99 each; on August 18, 2014, he sold 100,962 shares for $57.39 each; and on

24  November 12, 2014, he sold 70,808 shares for $62.33 each.  By the end of the Class

25  Period, he had dumped 220,678 (36%) of his shares and reaped profits of

26  $12,897,123.  These sales involved more shares than Adler sold in all of 2013 and the

27  first part of 2014.  In all, the Individual Defendants and Adler received proceeds of

28  almost $32 million as a result of their insider sales.

**Ratepayers Complain About the Unfair Deal**

87.     While the settlement was seen as a clear positive event for Edison shareholders, the ratepayers – which would pay large amounts under the deal – soon began to complain publicly.  For example, on April 20, 2014, Ray Lutz, a lawyer for the Coalition to Decommission San Onofre, lamented that "[r]atepayers are shouldering about $3.3 billion [in San Onofre costs], while investors are largely made whole."

88.     On May 11, 2014, *The San Diego Union-Tribune* editorial page expressed a similar sentiment:

> Southern California Edison, the utility that broke San Onofre, is spinning the settlement proposed last month as a fair deal for consumers. That's because $1.4 billion of the cost would be absorbed by Edison and its 20 percent partner in the plant, San Diego Gas & Electric.

> Let that sink in for a minute

> Imagine you own a bakery.  An engineering mistake destroys your biggest oven.  Would customers agree to cough up 70 percent of the oven's lost value – and buy you a replacement, too?

89.     On June 1, 2014, *The Los Angeles Times* editorial page concurred:

> Put simply, Edison and SDG&E wanted their customers to pay for everything, as though the transformation of an operating nuclear plant into a nonfunctioning husk were an act of God like a meteor strike, not human error.  The settlement, which was negotiated by the consumer advocacy group TURN and the Public Utilities Commission's Office of Ratepayer Advocates, relieves customers of about $1.4 billion of the $4.7 billion the utilities had wanted to keep collecting.

**First Quarter 2014 Form 10-Q and Conference Call**

90.     Edison continued to actively conceal the truth about its interactions with the CPUC while it assured investors that the beneficial deal would resolve the dispute in its entirety.  In its Form 10-Q filed on April 29, 2014, the Company reiterated:

> *If implemented, the Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings*

*regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre*.

91.   During a conference call on the same day, led by defendants Craver, Scilacci and Litzinger, Craver encouraged investors to look toward a bright future.  He said, "*[t]he significant progress made in resolving SONGS . . . should allow investors to focus on Edison International's long-term earnings and dividend growth*."

92.   Defendants' April 29, 2014 statements were materially false and misleading when made.  The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger are described in ¶77 above.  At the time of the April 29, 2014 statements, Edison high-level executives, including defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least six occasions without notice to the parties to the settlement as required by law.  When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.  The improper communications included:

(a)   the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(b)   the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)   the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)   the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)     the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS; and

(f)     the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials.

**Settlement Hearing**

93.     By the second quarter of 2014, rumors of Peevey's corruption and improper communications with energy companies had become widespread throughout the industry.  For instance, on March 28, 2014 the *San Francisco Chronicle* reported:

[C]ritics have accused the commission and its president, Michael Peevey, of being hesitant to penalize PG&E, saying the regulators have grown too close to the company.  The city of San Bruno even sued the commission last month seeking documents city officials say could expose a "cozy" relationship between the commission and PG&E.

Similarly, on April 17, 2014, the *Half Moon Bay Review* published an article entitled "Time to End Shadowy Relations Between Utilities Regulators" that criticized "the completely outrageous relationship that has blossomed between CPUC President Michael Peevey and the very companies he's paid to regulate."  In light of the scrutiny surrounding Peevey and the CPUC, Edison started receiving pointed questions about their *ex parte* contacts with the CPUC.

94.     On April 24, 2014, the ALJ issued an order setting an evidentiary hearing for May 14, 2014 to examine the parties' settlement agreement.  Attendees to the hearing included the parties to the settlement (including Edison, TURN and ORA), objectors (including A4NR), the ALJ, Peevey, and the other commissioners.  During the proceeding, objectors were permitted to ask "[q]uestions seeking clarification of the provisions of the Agreement."

95.    An attorney representing ratepayer interests specifically asked Litzinger about his communications with commissioners.  Litzinger addressed a far narrower question but still blatantly misrepresented the facts:

> Q Was Southern California Edison having ex parte meetings with the commissioners while the secret negotiations were taking place?

> A *The only ex parte communications I had with Commissioners was following the Phase 1 Proposed Decision.  And it was noticed*.

The attorney posed the same question to President Peevey, who met with Litzinger on several occasions.  In response, Peevey took a starkly defensive stance:

> PEEVEY: As far as TURN goes, I think it's general knowledge my relationship with TURN is, to be fair, chilly.  And I have never talked to Mr. Freedman on this topic during that whole time at all. Period. Mr. Freedman. That's it.  Sorry.

> [ATTORNEY]: What about Southern Cal Edison?

> PEEVEY: Sorry.  Edison?

> [ATTORNEY]: Yeah.

> PEEVEY: I'm not here to answer your questions. . . . I'm not here to answer your goddamn question.  Now shut up.  Shut up.

The ALJ later concluded that Litzinger "testified falsely" at this hearing.

96.    Litzinger misrepresented material facts on May 14, 2014, and did so knowingly or with reckless disregard for the truth.  During the May 14, 2014 hearing, Litzinger testified under oath that he never communicated with a commissioner without providing notice.  This statement was false and misleading because, as described by the CPUC Decision on December 8, 2015, Litzinger had at least two communications with commissioners as of the date of his testimony:

(a)    the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown; and

(b)     the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS.

The CPUC found "Litzinger made a false statement to the Commission while testifying under oath" and that it "was misled by Mr. Litzinger's false statement."

**Stanford C Bernstein Strategic Decisions Conference**

97.     At a May 28, 2014 conference, defendant Craver appeared and discussed the settlement.  Craver had an opportunity to discuss the full negotiation process including the *ex parte* communications, but chose not to do so.  During the conference an analyst asked him: "[W]hat is the probability that the current SONGS settlement will be accepted by the CPUC?"  In response, Craver discussed the publicly known negotiation process, but excluded his own and other Edison executives' *ex parte* negotiating with the CPUC.  He said: "*[W]e primarily negotiated that with the principal consumer advocacy groups of TURN and ORA, those are really the ones that are critical for anything that involves impacts on rates*."

98.     Defendants' May 27, 2014 statements were materially false and misleading when made.  The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger are described in ¶77 above.  At the time of the May 27, 2014 statements, Edison high-level executives, including defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least six occasions without notice to the parties to the settlement as required by law.  When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.  The improper communications included:

(a)     the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(b)     the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and

where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)  the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)  the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)  the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS; and

(f)  the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials.

**Second Quarter 2014 Form 10-Q and Conference Call**

99.    Edison filed its second quarter 2014 Form 10-Q with the SEC on July 31, 2014.  Without referencing the *ex parte* communications, Edison again claimed:

> *If implemented, the San Onofre OII Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre.*

100.   In the follow-up conference call, led by defendants Craver, Scilacci and Litzinger, Craver stressed the firmness of the deal:

> All the intervenors who are going to provide testimony have done so, and that was really what I was capturing there.  In terms of the direct signatories, it's the two utilities, the labor group [CUE], ORA, TURN, and Friends of the Earth.  So those were the direct signatories, representing all four of the main intervener groups.  In the testimony, several other groups – mostly consumer, various forms of consumer-related groups – also provided positive, supportive testimony of the settlement.

*And, as I indicated in my comments, really relatively few came forward with any opposition to the settlement.  So, I think basically everyone who has standing that wants to speak, has spoken.  And at this point, really all that part is over with.  We're really at the stage of waiting for the ALJ Proposed Decision*.

101.  Defendants' July 31, 2014 statements were materially false and misleading when made.  At the time of the July 31, 2014 statements, Edison high-level executives, including defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least eight occasions without notice to the parties to the settlement as required by law.  When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.  The improper communications included:

(a)  the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(b)  the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)  the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)  the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)  the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS;

(f)  the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials;

(g)    the May 28, 2014 series of communications between Hoover, Nichols, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research; and

(h)    the June 11, 2014 series of communications between Hoover, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research.

102.    The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger when Edison and Craver made the statements detailed in ¶¶99-100 above were that:

(a)    As the CPUC found, Edison's "lax" culture permitted its employees, including Pickett, to be "too informal" and "too casual about what is permissible" in its interactions with decisionmakers.

(b)    The Individual Defendants sent Pickett to meet Peevey in a foreign country, knowing the two men had a decades-long close personal relationship and that Peevey had a reputation for improper communications with utility companies. The CPUC opined, "it is difficult to imagine the meeting as described by Mr. Pickett, and believe that this top SCE executive made no comment to the President of the Commission about any of the substantive issues raised."

(c)    On at least four occasions during this trip to Warsaw, Pickett emailed Gault or Matthias to boast that he "just had dinner with Peevey," and was "sitting next to Peevey" and "working . . . SONGS."

(d)    On the same day Pickett emailed Gault and Matthias, Litzinger scheduled a "CFEE Download" meeting between Pickett and the Individual Defendants, as well as Alder, upon Pickett's return from Warsaw. At the meeting, Pickett debriefed defendants about the content of his discussions with Peevey, which included "a framework for a possible resolution of the SONGS OII." The executives specifically discussed whether the meeting was reportable under the *ex parte* rules. Litzinger recalls that Pickett's report left him "concerned." After the meeting, Pickett sent a detailed document to Craver, Scilacci, Litzinger and Adler entitled "Elements of a SONGS Deal" that mirrored the notes he took reflecting his conversations with Peevey in Warsaw.

(e)     On April 11, 2013, Litzinger emailed Craver, Scilacci and Adler to confess that he still felt "uneasy" about Pickett's communications with Peevey in Warsaw.  Among other things, he criticized Pickett for scheduling "yet another 'social dinner'" with Peevey.  He also expressed worry because he had "heard whispers" that the CPUC might reveal the "significant SCE presence on the [SONGS settlement] issue."  This undermines defendants' claim that they had become satisfied the Warsaw meetings were from "Mr. Peevey to Mr. Pickett, and not from Mr. Pickett to Mr. Peevey."

(f)     As the CPUC found, "[n]otwithstanding early concerns by Mr. Litzinger and Mr. Craver regarding Mr. Pickett's truthfulness, SCE did nothing to probe further about his claimed silence at the meeting, except to ask him again." Specifically, Edison never contacted Randolph, who attended the Warsaw meeting and who later revealed that Pickett told Peevey "what he thought a settlement agreement would look like."   The Individual Defendants also failed to interview SCE executives Hoover and Starck, who both knew about Pickett's improper conduct.  Indeed, on May 29, 2013, Hoover emailed Starck to report that Peevey's Chief of Staff said Pickett was "'well prepared . . . with specifics'" when discussing the SONGS settlement with Peevey in Warsaw.   The CPUC criticized Edison's failure to undertake an "effective inquiry" into Pickett's story or the whereabouts of his notes from Warsaw:

> SCE failed to exercise due diligence to investigate Mr. Pickett's unlikely initial version of the meeting – or his evolving versions of the meeting – each recalling additional information about his conversation with President Peevey.  SCE also did not attempt to retain and disclose the written document used in connection with the ex parte communication, nor did it disclose that Mr. Pickett had re-created his recollection of the document for SCE just a few days later.

(g)     Despite Litzinger's claim that Pickett was "not authorized to negotiate any SONGS settlement" with Peevey, on April 11, 2013, Pickett suggested settlement strategies to Litzinger, who took the

suggestions "under advisement" and passed them along to Craver, Scilacci and Adler.

(h)   Pickett, Adler and other high-level Edison executives spent eight days circulating drafts of a term sheet based on Pickett's "Elements of a SONGS Deal" memorandum. Pickett initiated the process in order to "help guide the negotiations" with ratepayer groups. Notably, many of the terms Pickett obtained from Peevey in Warsaw appeared in the final settlement agreement with TURN and ORA 20 months later.

(i)   Craver and Litzinger engaged in their own improper *ex parte* communications with decisionmakers. The CPUC held that Craver improperly "briefly described" and "outlined" substantive issues to Peevey on November 15, 2013. It found Litzinger improperly "provided a brief update" to AC Florio on June 26, 2013; "contrasted his position" with Peevey on September 6, 2013; "talked to" Peevey on May 28, 2014; and negotiated with Peevey on June 5, 2014.

103.   Analysts echoed Edison's positive outlook to the market. A SunTrust Robinson Humphrey analyst wrote: "Our bullish outlook on EIX is driven by the following factors: (1) the final approval of the SONGS settlement agreement should remove the key overhang on the stock . . . ."

104.   After the July 31, 2014 conference call, Edison's stock price climbed 2.08%, from $54.80 to $55.94, on a volume of over 3 million shares.

105.   An analyst from BMO Capital Markets described the settlement terms on August 21, 2014:

If approved, EIX would be authorized to recover in rates its remaining investment in SONGS (about $1.34 billion) over a ten-year period from 2/1/12 and would earn a reduced rate of return of 2.62%, which would float over time. In addition, EIX would be allowed to recover all of its approximately $680 million in purchase power costs associated with replacing the output from SONGS by the end of 2015.

Meanwhile, SCE continues to pursue claims against Mitsubishi for the defective replacement steam generators. The NRC has already determined that MHI's faulty computer codes were the cause of the tube

wear that led to the malfunctions.  The proposed SONGS settlement includes a provision that requires SCE and SDG&E to share benefits with customers should financial recoveries be forthcoming from Mitsubishi or insurance.

Sharing of SCE recovery proceeds:

• NEIL: 82.5% ratepayers/17.5% shareholders

• MHI: shareholders receive 85% of first $100 million; two-thirds of next $800 million; and one-quarter of amounts above $900 million

• Litigation costs recovered before sharing starts

106.  On September 5, 2014, the ALJ suggested changes to the SONGS OII settlement agreement.  On September 24, 2014, the parties filed a Joint Amended Settlement Agreement that adopted all of the ALJ's suggestions.  The changes implemented an even split of any recovery of money from Mitsubishi among ratepayers and Edison and added the University of California donation, which Peevey had privately insisted upon to Edison, but not to other parties.

On September 23, 2014, after the parties submitted the amended agreement, but before the CPUC accepted it, Edison summarized the changes in a Form 8-K. The changes included:

(a) "Any recoveries obtained from NEIL under the outage policy, net of legal costs incurred in pursuing such recoveries from NEIL, will be allocated 95% to the ratepayers and 5% to SCE."

(b) "Any recoveries obtained from MHI, net of legal costs incurred in pursuing such recoveries, will be allocated 50% ratepayers and 50% to SCE."

(c) "Provisions were added to the Amended Settlement Agreement regarding the funding of a Research, Development and Demonstration program at the University of California that is intended to develop technologies and methodologies to reduce greenhouse gas emissions, particularly at existing and future California power generating plants that

will be replacing the power generated by the San Onofre plant that would total approximately $4 million per year for five years for SCE's share."

**Third Quarter 2014 Form 10-Q and Conference Call**

107.   On October 28, 2014, the Company stated:

On September 23, 2014, SCE entered into an Amended and Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). *If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre*. The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014.

108.   During a conference call that same day, led by defendants Craver and Scilacci, an analyst asked Craver about *ex parte* communications. In response, Craver failed to mention the series of *ex parte* meetings and correspondence Edison executives had conducted with CPUC members:

[Analyst]: A couple questions. One is, can you tell us whether or not the ex parte communication situation that has evolved at PG&E has had any impact at all on your ability to conduct business at the CPUC? And if there's any potential for either a self-policing review or an external party looking for – looking into your communications with PUC?

[Craver]: Greg, this is Ted. In terms of has it caused any kind of interruption in the business that we have before the PUC, I think probably the best thing I can point to is the ongoing General Rate Case activities. I think I mentioned in my comments that we actually just finished up the evidentiary hearings as scheduled. So at least from what we can see, this seems to be really something that's primarily focused on the San Bruno item, as opposed to the activities that we have before the PUC.

*So, we're certainly trying to make sure that all of our personnel know what's expected of them, in terms of proper conduct with the PUC. We have a compliance program. We have training. We have redoubled efforts along those things, just to make sure that that's very present in everyone's mind. But beyond that, really we're pretty much in business as usual.*

109.   Defendants' October 28, 2014, statements were materially false and misleading when made.  The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger are described in ¶102 above.  At the time of the October 28, 2014 statements, Edison high-level executives, including defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least eight occasions without notice to the parties to the settlement as required by law.  When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.  The improper communications included:

(d)   the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(e)   the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(f)   the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(g)   the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(h)   the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS;

(i) the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials;

(j) the May 28, 2014 series of communications between Hoover, Nichols, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research; and

(k) the June 11, 2014 series of communications between Hoover, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research.

110. The market reacted quickly and positively to the statements. On October 29, 2014, a Credit Suisse analyst stated: "Fundamentally we think a lot of things are going right for EIX with 1) SONGS and EME firmly in the rearview mirror with mostly positive outcomes . . . ."

111. On November 3, 2014, *The Los Angeles Business Journal* linked the positive news to Edison's increased stock price:

> But analysts and investors nevertheless have a rosy outlook for the company. That's because, with a final San Onofre deal likely wrapping up this month, it looks like Edison management will be freed up to address a more fundamental concern for investors: the company's lagging dividend payout . . . .

> \*        \*        \*

> "Boosting the dividend growth has been a very important factor behind the stock price run-up," said Ali Agha, managing director of equity research for SunTrust Robinson Humphrey of Atlanta.

> "The unresolved issue of paying for the San Onofre closure was a big reason why Edison has not been able to grow the dividend."

**CPUC Formally Approves Settlement**

112. On November 20, 2014, President Peevey and the other commissioners approved the amended settlement agreement. On the same day, Edison issued a press release that celebrated the finality of the deal: "'***This settlement resolves all issues***

*regarding the public utilities commission investigation of San Onofre in a fair and reasonable manner* . . . .'"

113. Defendants' November 20, 2014 statement was materially false and misleading when made. The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger are described in ¶102 above. At the time of the November 20, 2014 statement, Edison high-level executives, including defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least eight occasions without notice to the parties to the settlement as required by law. When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement. The improper communications included:

(a) the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where the attendees laid out a framework for the SONGS settlement;

(b) the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and which Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c) the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d) the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e) the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS;

(f) the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials;

(g)   the May 28, 2014 series of communications between Hoover, Nichols, Litzinger and Peevey that focused on Edison's donation to the University of California for greenhouse gas research; and

(h)   the June 11, 2014 series of communications between Hoover, Litzinger and Peevey that focused on Edison's donation to the University of California for greenhouse gas research.

114.   The approval of the amended settlement agreement concluded the CPUC investigation into SONGS, its massive failure and blame for the failure, and the ultimate closure of the plant.  It also resolved the issue of who would pay for closure costs, with the lion's share being placed upon Edison ratepayers, to the benefit of Edison shareholders.  The effect of this positive, confirmatory news was to keep Edison's share price artificially inflated because the investing community was unaware of the true facts.

115.   In December 2014, Peevey left the CPUC at the end of a second three-year term.  Media stories discussed a cloud over his legacy relating to allegations of cronyism with a Northern California utility, but none discussed the *ex parte* communications with Edison employees concerning San Onofre.

116.   Edison's stock price continued an upward rise until January 29, 2015, when it closed at its highest value ever: $69.05.

**The Late-Filed Notice**

117.   Edison's plan began to unravel even as the stock hit its all-time high.  The short timeline leading up to Edison's forced disclosure of the Warsaw meeting fully confirmed defendants' scienter and rationale for submitting the late-filed notice.  Just two days before the high point of Edison's stock price, on January 27, 2015, the California Attorney General's Office executed a criminal search warrant on Peevey's home.  In the desk drawer of his office, they found the notes he and Pickett had created in Warsaw on March 26, 2013.

118.   On January 30, 2015, Edison learned that the notes would soon be revealed to the public when *The San Diego Union-Tribune* reported on the search of

Peevey's house, noting that the Attorney General "seized 'RSG notes on Hotel Bristol stationery.'"

119.   Three days later, on February 2, 2015, Edison internally adopted a broadened *ex parte* communications reporting policy.  The purported new policy placed heavy restrictions on interactions with CPUC decisionmakers and expressly prohibited "private dinners," "cocktails" and meetings outside "normal business hours," all of which occurred in Warsaw.  According to Edison, the policy went into effect on February 2, 2015 and did not apply retroactively.

120.   One week later, on February 9, 2015, Edison finally disclosed Pickett's meeting with Peevey in Warsaw.  The disclosure came 685 days after the meeting, but just 10 days after defendants learned the Warsaw notes would become public.  The late-filed notice failed to give any specific reason for the delay, citing only "further information received from Mr. Pickett last week."  Defendants admit that the Attorney General's discovery of the notes prompted further discussion with Pickett and, ultimately, the late-filed notice.  However, since defendants had Pickett's "Elements of a SONGS Deal" memorandum all along, the notes did not provide any new information.[24]

**2014 Form 10-K and Conference Call**

121.   Even after Edison submitted the late-filed notice that disclosed the Warsaw meeting, it continued to make material misrepresentations about its contacts with the CPUC and the finality of the settlement.  On February 24, 2015, Edison filed its 2014 Form 10-K, which defendants Craver and Scilacci prepared, reviewed and signed.  Defendants stated in the Form 10-K:

> On November 20, 2014, the CPUC approved the Amended and Restated Settlement Agreement (the "San Onofre OII Settlement Agreement") that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth

---

[24]   *See* Exhibit I.

(together, the "Settling Parties").  ***The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre***.

\*        \*        \*

On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex Parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions.  In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication.  The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

122.   During a conference call that same day, led by defendants Craver and Scilacci, an analyst asked Craver about *ex parte* communications in general, and, in particular the "late filed *ex parte*" of February 9, 2015.  In response, Craver did not mention any further details of the Warsaw meeting between Peevey and Pickett, or other unreported *ex parte* meetings and correspondence Edison executives had conducted with CPUC members:

[Analyst:]  Just a separate follow-up question.  Ted, may be you could just give us a little bit of color of – we see all the headlines on PG&E and ex parte issues and the new [mid-one] potential ex parte filing.  Just how much is this impacting the ability to function on the normal things that you have to get done at the Commission, including the getting the GRC done?  And also, just how should we think about the risk of you potentially having additional ex parte filings?

[Craver:]  Yes, in terms of affecting the business, I would say it doesn't really have a significant effect on the business.  This is a fairly arcane area.  But I would just say, generally speaking, the ex parte rules, particularly on matters like the San Onofre matter, the OII, that's really ***designed to provide equal access to all parties to the proceeding with***

*equal time*.  So it's I think one of the misconceptions is in something like SONGS OII that you are precluded from having conversations. You're not.  It's just the rules are designed *to make sure that if we have conversations with decision-makers, that those are noticed, that those – that we include in there how much time we spent with which decision-maker, so that all the other parties have equal access, equal amount of time*.  That's the whole concept behind it.

So I don't see any of this as hurting the ability to do business.  It's complicated and cumbersome, and sometimes kind of difficult on the interpretation of some of the specific provisions.  *But, fundamentally, when we have proceedings before the Commission, we follow the rules.*  We go about doing the business the way it's really set up to do it.  There's plenty of opportunity in all of those proceedings for all parties to be heard.  That's the point of having these things before the Commission.  So I don't see any big element there.

123.   The statements in the Form 10-K and during the conference call were materially false and misleading when made.   The true facts then known to or recklessly disregarded by defendants Edison, Craver, Scilacci and Litzinger are described in ¶102 above.  At the time of the statements, Edison high-level executives, including defendants Craver and Litzinger, had engaged in non-public substantive communications regarding SONGS OII with CPUC decisionmakers on at least eight occasions without notice to the parties to the settlement as required by law.   When Edison's counterparties, TURN and ORA, learned of its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.   The improper communications included:

(a)   the March 26, 2013 meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where Pickett and Peevey laid out a framework for the SONGS settlement;

(b)   the March 27, 2013 dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)   the May 28, 2013 email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)   the June 26, 2013 communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)   the September 6, 2013 lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS;

(f)   the November 15, 2013 dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials;

(g)   the May 28, 2014 series of communications between Hoover, Nichols, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research; and

(h)   the June 11, 2014 series of communications between Hoover, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research.

## INVESTORS BEGIN TO LEARN THE TRUTH

124.   The false and misleading statements defendants issued and the material omissions defendants failed to make during the Class Period had the effect of artificially inflating Edison's stock price. Plaintiff and other investors purchased Edison stock at inflated prices and suffered damages when Edison's stock price declined upon the revelation of the truth. As detailed above, some examples of defendants' materially false statements include: included:

(a)   the March 27, 2014 press release announcing the signing of the settlement and Litzinger's statement that the CPUC was "not involved other than encouraging settlement publicly";

(b)   the May 14, 2014 statements at the CPUC ALJ hearing, including Litzinger's false statement that "[t]he only ex parte communications I had with Commissioners was following the Phase 1 Proposed Decision . . . [a]nd it was noticed";

(c)   the May 28, 2014 statements by Craver that Edison "primarily negotiated that with the principal consumer advocacy groups of TURN and ORA"; and

(d)   the November 24, 2014 Edison press release issued after CPUC Chairman Peevey and the other CPUC commissioners adopted the amended settlement, which stated: "'This settlement resolves all issues regarding the public utilities commission investigation of San Onofre in a fair and reasonable manner . . . .'"

125.   Defendants further made various misleading statements regarding the settlement, which failed to include material information, such as:

(a)   Edison's Forms 10-Q on April 29, 2014, July 31, 2014 and October 28, 2014, which stated, *inter alia*, that "[i]f implemented, the San Onofre OII Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ('SGRP') at San Onofre and the related outage and subsequent shutdown of San Onofre";

(b)   Craver's April 29, 2014 conference call statement that "[t]he significant progress made in resolving SONGS and EME should allow investors to focus on Edison International's long-term earnings and dividend growth"; and

(c)   Craver's October 28, 2014 conference call statement that "we're certainly trying to make sure that all of our personnel know what's expected of them, in terms of proper conduct with the PUC. We have a compliance program. We have training. We have redoubled efforts along those things, just to make sure that that's very present in everyone's mind. But beyond that, really we're pretty much in business as usual."

**Revelations of the Truth**

126.   On February 9, 2015, Edison finally submitted its notice of *ex parte* communication filed with the CPUC, but this disclosure was clouded by contradiction and obscurity. Edison claimed that "Mr. Pickett does not recall exactly what he communicated to Mr. Peevey," but that he provided Edison with some unspecified

1    "new information" such that "it now appears that he may have crossed into a

2    substantive communication." Edison also contradictorily maintained that the

3    discussion was "by Mr. Peevey to Mr. Pickett, and not from Mr. Pickett to Mr.

4    Peevey," but that "Mr. Pickett believes that he expressed a brief reaction to at least

5    one of Mr. Peevey's comments." The disclosure failed to mention Edison's other *ex*

6    *parte* communications. Defendants' efforts to downplay or obscure the significance

7    of the disclosure temporarily worked, as the market did not immediately react to the

8    notice. However, the following day, the Alliance for Nuclear Responsibility filed a

9    motion for sanctions against SCE for the various failures described in the February 9,

10   2015 filing. On this news, Edison stock declined a statistically significant amount,

11   from $66.00 to $64.67.

12        127.   After defendants' partial disclosure in the late-filed notice, the inflation in

13   Edison's stock price was further dissipated through a series of incomplete revelations,

14   based on information provided by defendants and others, and then interpreted by

15   market analysts. These declines were due to firm-specific fraud-related disclosures

16   and not a result of market or industry factors.

17        128.   On March 19, 2015, California Assembly member Anthony Rendon,

18   chairman of the Assembly's Utilities and Commerce Committee, published a letter he

19   wrote to Peevey's replacement CPUC chair, Michael Picker ("Picker"), about the

20   settlement. According to *The Los Angeles Times*, Rendon asked Picker to "'turn over

21   to the commission all internal and external emails relative' to San Onofre," and stated

22   that it was "'imperative to investigate and scrutinize the entire settlement process . . .

23   to assure that the settlement process was legitimate and uncorrupted.'" According to

24   *The San Diego Union-Tribune*, Rendon warned Picker, "'your efforts to reform the

25   commission and restore the public's trust cannot be completed until the dark clouds of

26   the SONGS settlement and the specter of process manipulation by your predecessor

27   are fully and completely removed.'" Rendon continued, "'[a]nything short of total

28   transparency will be viewed by the public, this committee and history as a complete

failure to meet the duties of the commission.'"  As a result of this news, on March 20, 2015 Edison's stock price declined a statistically significant amount, from $64.81 to $64.17.

129.    On April 10, 2015, the Warsaw notes became part of the public record when plaintiffs filed them in *Citizens Oversight, Inc. v. California Public Utilities*, a federal class action against the CPUC for the SONGS shutdown.  The next day, *The San Diego Union-Tribune* discussed the striking similarities between the Warsaw notes and the actual settlement agreement, which Edison adopted 20 months later:

> Both the notes and the official agreement adopted in November call for ratepayers to absorb the entire cost of replacement power, an expense that has added hundreds of millions of dollars to the monthly bills sent to Southern California consumers.

> They also call for the commission to disallow billing of ratepayers for costs related to the $680 million faulty replacement steam generator project after Feb. 1, 2012, the day after a radiation leak resulted in the plant closure.

> Perhaps most telling are two amendments Commissioner Michel Florio proposed this past September – 18 months after Peevey and Pickett discussed them during their meeting at the Hotel Bristol.

> The first change called for Edison to split with ratepayers any money it recovers from its lawsuit against the steam-generator manufacturer, Mitsubishi Heavy Industries Inc.  The second called on plant owners to pay $5 million per year for a center to study greenhouse gas emissions.

130.    On April 15, 2015, the CPUC ordered SCE to turn over all documents related to the potential settlement of the San Onofre closure dated between March 2013 and November 2014.  As a result of this news, Edison's stock price declined a statistically significant amount, from $62.99 to $62.49.

131.    On April 17, 2015, ORA said it had analyzed the notes from the Warsaw meeting,  was "outraged" about the rule violations, and "[could] not honestly say that it got the best deal for ratepayers."  ORA sought "at least $648 million returned to

customers of Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E) because of recently revealed evidence of inappropriate conversations between" the two.  While ORA did not seek to overturn the settlement, its request for draconian fines demonstrated its indignation over Edison's misconduct. On the same day, TURN stated that it would "urge the CPUC to assess the maximum sanction on SCE for its *ex parte* violations and apply any financial penalties toward reducing customer rates."  As a result of this news, Edison's stock price declined a statistically significant amount, from $61.68 to $61.07.

132.   On April 29, 2015, Edison produced the documents the CPUC had ordered on April 15.  While maintaining its innocence in a press release linking to the documents, independent reviews of the materials revealed improper *ex parte* communications.  For example, the production included:

(a)   the April 1, 2013 email and memorandum from Pickett to the Individual Defendants detailing what Pickett termed the "Elements of a SONGS Deal" after his Warsaw meetings with Peevey;

(b)   the April 11, 2013 email from Litzinger to the other Individual Defendants expressing his continued concern about Pickett's interactions with Peevey;

(c)   the May 29, 2013 email between executives Hoover and Starck discussing the CPUC's report that "Pickett was well prepared in Poland with specifics" regarding the SONGS settlement; and

(d)   declarations from Pickett and Litzinger describing the Warsaw meeting and its aftermath.  Pickett's declaration tells a different story than the one Edison reported in its late-filed notice.  Indeed, Edison reported that Pickett "does not recall exactly what he communicated to Mr. Peevey" other than a "brief reaction to at least one of Peevey's comments."  But Pickett admitted that he "very briefly expressed disagreement" to Peevey about his ideas concerning "replacement power costs and replacement steam generator costs."  Edison made no attempt to reconcile its conflicting filings.

1    As a result of this disclosure, the following day Edison's stock price declined a

2    statistically significant amount, from $62.01 to $60.94.

3         133.   On May 6, 2015, in light of the now-public documents, A4NR amended

4    its motion for sanctions to incorporate what the public had learned.  Specifically,

5    A4NR alleged 72 violations of the *ex parte* rules and sought $38 million in sanctions.

6    On June 5, 2015, the California Attorney General's Office executed criminal search

7    warrants at the CPUC headquarters in San Francisco and at SCE offices in Los

8    Angeles.

9         134.   On June 24, 2015, TURN publicly denounced the settlement agreement.

10   While it previously sought only sanctions, it now became the first party to formally

11   ask the CPUC to overturn its prior ruling and unwind the existing agreement.  As a

12   result of this news, Edison's stock price declined a statistically significant amount,

13   from $57.63 to $56.07.  As of June 24, 2015, the last day of the Class Period, the

14   market finally understood that the SONGS OII settlement was not "complete and

15   final" as Edison promised.  All of the inflation was dissipated.

16        135.   The news was highly covered.  For example, *The San Diego-Union*

17   *Tribune* reported:

18          The San Francisco consumer group that brokered the $4.7 billion
19          deal dividing costs for the shutdown of the failed San Onofre nuclear
            plant said Wednesday that it no longer supports the agreement and called
20          on state regulators to reopen talks.

21          In a five-page motion submitted to the California Public Utilities
22          Commission, The Utility Reform Network said recent revelations of
            backchannel communications between regulators and utility executives
23          forced the organization to rethink its position.

24                          *      *      *

25          "TURN agrees that recent disclosures detailing extensive
26          communications between SCE and CPUC decision-makers during the
            pendency of this proceeding are very troubling," the filing states.
27          "TURN was a good faith participant in the settlement negotiations, and
28          was not aware of the Warsaw note, the private meeting, or any

agreement between Mr. Peevey and SCE at any time before or during the extended settlement negotiations that led to the proposed settlement."

136.   As financial analyst SunTrust Robinson Humphreys told Edison investors, the decline in Edison's stock on June 24, 2015 was spurred by a consumer group's decision to oppose a settlement related to the permanent retirement of the nuclear plant SONGS.

137.   These news events, whether by defendants or forced by others, had a direct and company-specific effect on the price of Edison shares when the market became aware of them, and understood their effects.

**Post-Class Period Developments**

138.   On August 5, 2015, subsequent to the Class Period and after the market had already learned the truth about Edison's fraudulent statements, the ALJ issued a 50-page order examining whether Edison should be sanctioned for its repeated violations of the CPUC *ex parte* rules.  The ALJ ruled more favorably than the market expected, finding only 10 *ex parte* violations rather than the 72 alleged by A4NR. The ALJ also issued an order to show cause why Edison should not be held in contempt of the CPUC and sanctioned.

139.   After further proceedings, the full commission took up the issue and on December 8, 2015, it issued an opinion that criticized Edison's "lax oversight of its executives who are permitted, if not encouraged, to meet with Commissioners at 'social' occasions, industry activities, and other non-office settings" and found that Edison "has become too informal, too casual about what is permissible, permissible if reported, and what is wholly prohibited."  Ultimately, the CPUC sanctioned Edison $16.7 million and ordered it to "develop and implement an internal tracking system to prospectively capture and make public the existence of non-public individual oral and written communications" regarding the SONGS OII.  For Edison's conduct regarding the Warsaw meetings, the CPUC assessed a penalty of $20,000 per day over 826 days for what it termed "SCE's and Mr. Pickett's series of grossly negligent actions and

omissions resulting in false and misleading statements made to the Commission." The sanction for that issue alone was $16.52 million. The CPUC noted, "If undiscovered, their actions would have left the Commission with the false impression that SCE did not have an early discussion with former President Peevey about cost recovery through settlement." The CPUC did not address the impact of the finding of Edison's gross negligence on the settlement because, it noted, "these issues have been raised in pending Petitions for Modification," and were not ripe for decision.

140.   Although the $16.7 million sanction was one of the largest in CPUC history, it was still much less than the $38 million requested by A4NR, and less than the market expected. Tellingly, Edison did not contest the sanction amount.

141.   On May 9, 2016, the CPUC issued an order that officially "reopen[ed] the record to review the 2014 Settlement Agreement." The CPUC issued the order "in light of the Commission's December 2015 Decision fining [Edison] for failing to disclose *ex parte* communications relevant to this proceeding." In response, various parties submitted briefs describing their positions. TURN argued that "the adopted settlement should be set aside due to the pervasive *ex parte* violations involving repeated unreported communications between former President Michael Peevey and executives from Southern California Edison (SCE)." Similarly, ORA maintained that the "settlement process has been compromised by the *ex parte* violations of the Southern California Edison Company ('SCE')." The CPUC has yet to decide whether to unwind the settlement.

## LOSS CAUSATION

142.   During the Class Period, as detailed herein, defendants engaged in a scheme and wrongful course of business that artificially inflated the price of Edison securities, and this misconduct operated as a fraud and deceit on those who transacted in the Company's securities during the Class Period. Defendants carried out this scheme by issuing materially false and misleading statements, and omitting material facts, regarding Edison's employees' unreported *ex parte* communications with CPUC

1    decisionmakers, regarding the negotiation of the SONGS OII Settlement, and the
2    likelihood of its survival.  As the falsity of defendants' statements and the omitted
3    facts were revealed, Edison's stock price fell as the artificial inflation dissipated.  As a
4    result of their transactions in artificially inflated Edison securities during the Class
5    Period, plaintiff and other Class members suffered significant damages as a result
6    thereof.

7        143.   The market for Edison securities was open, well-developed and efficient
8    at all relevant times, with average daily trading volume of more than 2.1 million
9    shares during the Class Period.  As a result of these materially misleading statements
10   and failures to disclose the true state of the settlement, Edison securities traded at
11   artificially inflated prices.  Plaintiff and other Class members transacted in Edison
12   securities relying upon the integrity of the market relating to Edison securities and
13   suffered economic loss as a result thereof.

14       144.   Defendants' false or misleading statements had their intended effect and
15   caused Edison securities to trade at artificially inflated levels.

16       145.   As noted above, on various dates between February and June 2015,
17   Edison's stock price declined by substantial amounts and percentages upon the release
18   of negative, and previously known but withheld, information.

19       146.   This price decline removed the artificial inflation from Edison securities,
20   causing real economic loss to investors who transacted in Edison securities during the
21   Class Period.

22       147.   The decline in the price of Edison securities at the end of the Class Period
23   was the direct result of the nature and extent of defendants' prior false statements and
24   material omissions being revealed to and/or leaking into the market.  The timing and
25   magnitude of Edison's significant price decline negates any inference that the loss
26   suffered by plaintiff and other Class members was caused by changed market
27   conditions, macroeconomic or industry factors or company-specific facts unrelated to
28   defendants' fraudulent conduct.

148.   The economic loss plaintiff and other members of the Class suffered was a direct result of defendants' fraudulent scheme to artificially inflate the price of Edison securities and maintain those prices at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of Edison securities when defendants' earlier misrepresentations and omissions became publicly available.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

149.   Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

150.   Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Edison securities was an efficient market at all relevant times by virtue of the following factors, among others:

(a)   Edison's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   Edison's stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c)   As a regulated issuer, Edison filed periodic public reports with the SEC and the NYSE;

(d)   Edison was eligible to and did file SEC Form S-3 registration statements;

(e)   Edison regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)   Edison was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force

1  and certain customers of their respective brokerage firms.  These reports were publicly

2  available and entered the public marketplace.

3  151.  As a result of the foregoing, the market for Edison securities promptly

4  incorporated current information regarding Edison from publicly available sources

5  and reflected such information in the prices of the stock.  Under these circumstances,

6  all those who transacted in Edison securities during the Class Period suffered similar

7  injury through their transactions in Edison securities at artificially inflated prices and a

8  presumption of reliance applies.

9  **CLASS ACTION ALLEGATIONS**

10  152.  Plaintiff brings this action as a class action pursuant to Federal Rule of

11  Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or

12  entities who transacted in Edison securities during the Class Period and were damaged

13  thereby (the "Class").  Excluded from the Class are defendants, the officers and

14  directors of the Company at all relevant times, members of their immediate families

15  and their legal representatives, heirs, successors or assigns, and any entity in which

16  defendants have or had a controlling interest.

17  153.  The Class members are so numerous and geographically dispersed that

18  joinder of all members is impracticable.  Edison stock was actively traded on the

19  NYSE.  Record owners and other members of the Class may be identified from

20  records maintained by Edison or its transfer agent and may be notified of the

21  pendency of this action by mail, using the form of notice similar to that customarily

22  used in securities class actions.  While the exact number of Class members is

23  unknown to plaintiff, Edison reported 41,000 common stockholders of record as of

24  February 21, 2014.  Accordingly, plaintiff reasonably believes that there are thousands

25  of members in the proposed Class.

26  154.  Plaintiff's claims are typical of the claims of the members of the Class as

27  all members of the Class are similarly affected by defendants' wrongful conduct in

28  violation of federal law that is complained of herein.

155.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

156.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether defendants' acts as alleged herein violated the federal securities laws;

(b)     Whether defendants' statements made to the investing public misrepresented or omitted material facts about Edison's business, operations and financial conditions;

(c)     Whether the price of Edison securities was artificially inflated during the Class Period; and

(d)     To what extent the Class members have sustained damages and the proper measure of damages.

157.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

158.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

159.   Defendants are liable for making false statements and failing to disclose adverse facts known to them about Edison.  Defendants' fraudulent scheme and

1   course of business that operated as a fraud or deceit on those who transacted in Edison

2   securities during the Class Period was a success, as it: (i) deceived the investing public

3   regarding Edison's business; (ii) artificially inflated the price of Edison securities; and

4   (iii) caused plaintiff and other Class members to transact in Edison securities at

5   inflated prices.

6   160.   During the Class Period, defendants participated in the preparation of

7   and/or caused to be disseminated the false or misleading statements specified above,

8   which they knew or recklessly disregarded were materially false or misleading in that

9   they contained material misrepresentations and failed to disclose material facts

10   necessary in order to make the statements made, in light of the circumstances under

11   which they were made, not misleading.

12   161.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that

13   they:

14        (a)   employed devices, schemes and artifices to defraud;

15        (b)   made untrue statements of material facts or omitted to state

16   material facts necessary in order to make statements made, in light of the

17   circumstances under which they were made, not misleading; or

18        (c)   engaged in acts, practices, and a course of business that operated as

19   a fraud or deceit upon plaintiff and others similarly situated in connection with their

20   transactions in Edison securities during the Class Period.

21   162.   Defendants, individually and together, directly and indirectly, by the use,

22   means or instrumentalities of interstate commerce and/or the mails, engaged and

23   participated in a continuous course of conduct to conceal the truth and/or adverse

24   material information about Edison's business, operations and financial condition as

25   specified herein.

26   163.   Defendants employed devices, schemes and artifices to defraud, while in

27   possession of material, adverse, non-public information, and engaged in acts, practices

28   and a course of conduct as alleged herein by, among other things, participating in the

making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon those who transacted in Edison securities during the Class Period.

164.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Edison's operating condition and financial status from the investing public and supporting the artificially inflated price of its securities.

165.   As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Edison securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in defendants' public statements during the Class Period, plaintiff and the other Class members acquired Edison securities during the Class Period at artificially high prices and were ultimately damaged thereby.

166.   At the time of said misrepresentations and omissions, plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had plaintiff and other Class members and the marketplace known the truth regarding Edison's improper conduct, which defendants did not disclose, plaintiff and other Class members would not have transacted in Edison securities, or, if they had

1    transacted in its securities during the Class Period, would not have done so at the

2    artificially inflated prices which they paid.

3         167.   By reason of the foregoing, defendants have violated §10(b) of the

4    Exchange Act and Rule 10b-5.

5         168.   As a direct and proximate result of these defendants' wrongful conduct,

6    plaintiff and the other Class members suffered damages in connection with their Class

7    Period transactions in Edison securities.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

11        169.   Plaintiff repeats and realleges each and every allegation above as if fully

12   set forth herein.

13        170.   The Individual Defendants acted as controlling persons of Edison within

14   the meaning of §20(a) of the Exchange Act:

15             (a)    By reason of their positions as executive officers and/or directors,

16   their participation in and awareness of the Company's operations and intimate

17   knowledge of the false statements and omissions made by the Company and

18   disseminated to the investing public, the Individual Defendants had the power to

19   influence and control and did influence and control, directly or indirectly, the

20   decisionmaking of the Company, including the content and dissemination of the

21   various statements which plaintiff contends are false and misleading;

22             (b)    The Individual Defendants participated in conference calls with

23   investors and were provided with or had unlimited access to copies of the Company's

24   reports, press releases, public filings and other statements alleged by plaintiff to be

25   misleading before or shortly after these statements were issued and had the ability to

26   prevent the issuance of the statements or cause the statements to be corrected; and

27             (c)    Because of their positions as CEO, CFO, Treasurer and President

28   of a subsidiary, the Individual Defendants directly participated in the Company's

1  management and were directly involved in Edison's day-to-day operations.  The

2  Individual Defendants also controlled the contents of Edison's quarterly reports and

3  other public filings, press releases, conference calls, and presentations to securities

4  analysts and the investing public.  The Individual Defendants prepared, reviewed

5  and/or were provided with copies of the Company's reports, press releases and

6  presentation materials alleged to be misleading, before or shortly after their issuance,

7  and had the ability and opportunity to prevent their issuance or cause them to be

8  corrected and failed to do so.

9      171.   By reason of such conduct, the Individual Defendants are liable pursuant

10  to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

12      WHEREFORE, plaintiff prays for judgment as follows:

13      A.    Declaring that defendants are liable pursuant to the Exchange Act;

14      B.    Determining and certifying that this action is a proper class action and

15  certifying plaintiff as a Class representative and plaintiff's counsel as Class Counsel

16  pursuant to Rule 23 of the Federal Rules of Civil Procedure;

17      C.    Awarding compensatory damages in favor of plaintiff and the Class

18  against defendants, jointly and severally, for damages sustained as a result of

19  defendants' wrongdoing, in an amount to be proven at trial;

20      D.    Awarding plaintiff and the Class pre-judgment and post-judgment

21  interest as well as reasonable attorneys' fees, costs and expenses incurred in this

22  action; and

23      E.    Awarding such other relief as the Court may deem just and proper.

24

25

26

27

28

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

DATED:  October 5, 2016

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
   & DOWD LLP
X. JAY ALVAREZ
THOMAS E. EGLER
JEFFREY J. STEIN


s/ X. JAY ALVAREZ
X. JAY ALVAREZ

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

1

2

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 5, 2016.

s/ X. JAY ALVAREZ
X. JAY ALVAREZ

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  JayA@rgrdlaw.com

# Mailing Information for a Case 3:15-cv-01478-BEN-KSC Eng v. Edison International et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Xavier Jay Alvarez**
  jaya@rgrdlaw.com,spatel@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com

- **Lauren Claire Barnett**
  lauren.barnett@mto.com,monica.walker@mto.com

- **John Michael Gildersleeve**
  john.gildersleeve@mto.com,lori.cruz@mto.com,lauren.barnett@mto.com,raphael.sepulveda@mto.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com,jkehoe@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **John Willson Spiegel**
  john.spiegel@mto.com

- **Jeffrey J. Stein**
  JStein@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)