FILED
17 MAY -5 PM 2:07
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ NXN _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD ENG, individually and on behalf of all others similarly situated, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDISON INTERNATIONAL, THEODORE F. CRAVER, JR., WILLIAMS JAMES SCILACCI and RON LITZINGER,<br><br>Defendants. | Case No.: 3:15-cv-01478-BEN-KSC<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT PREJUDICE** |

Before the Court is the Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") filed by Defendants Edison International, Southern California Edison's ("SCE")[1] parent company, Theodore F. Craver, Jr., William James Scilacci, and Ron Litzinger. (Docket No. 40.) For the following reasons, the Court **GRANTS** Defendants' motion to dismiss, but gives Plaintiffs leave to file an amended pleading.

---

[1] The Court refers to Defendant as "SCE" throughout.

1

3:15-cv-01478-BEN-KSC

## BACKGROUND[2]

### I. SONGS Settlement[3]

SCE is a partial owner of the San Onofre Nuclear Generating Station ("SONGS"). In January 2012, following installation of two replacement steam generators, one of the new steam generator tubes leaked. SONGS was shut down. The California Public Utility Commission ("CPUC") initiated an investigation, the Order Instituting Investigation (OII), in October 2012. Part of the investigation focused on how to allocate the costs of the outage and eventual shut down as between SCE, San Diego Gas & Electric ("SDG&E"), and consumers.

A settlement was reached between SCE, SDG&E, The Utility Reform Network ("TURN"), and the Office of Ratepayer Advocates ("ORA") in March 2014.[4] Over the course of the next few months, SCE made numerous public statements about the settlement. On March 20, 2014, SCE filed a Form 8-K with the SEC announcing the settlement. On March 27, 2014, SCE made a number of statements regarding the settlement. SCE issued a press release formally announcing that a settlement had been reached and indicated that "[i]f implemented, the Settlement Agreement will constitute a complete and final resolution of the [OII] and related proceedings regarding" SONGS. (SAC ¶ 80.) The same day, SCE held a conference call in which Craver, Edison's Chief Executive Officer, stated that the settlement "resolves all matters related to the [OII] involving" SONGS. (SAC ¶ 81.) On the same call, Litzinger, President of SCE at the time, in responding to an inquiry from an analyst about CPUC's involvement in the

---

[2] The Court is not making any findings of fact, but rather, summarizing the relevant allegations of the SAC for purposes of evaluating Defendants' Motion to Dismiss.
[3] Plaintiff's SAC contains largely the same allegations as the Amended Complaint. Therefore, the Court's summary of the allegations is similar to its prior Order, and new allegations will be discussed where relevant to the Court's analysis.
[4] ORA and TURN are consumer advocacy groups.

settlement, stated that the CPUC commissioners "were not involved [in the settlement process] other than encouraging settlement publically." (SAC ¶ 82.) Similarly, at a May 28, 2014 conference, Craver indicated that the settlement was primarily negotiated with consumer groups. (SAC ¶ 97.)

The CPUC Administrative Law Judge ("ALJ") overseeing the investigation held an evidentiary hearing on May 14, 2014 on the settlement that included the parties to the settlement, objectors, CPUC President Michael Peevey, and other commissioners. In response to a question from an objector about his communications with commissioners, Litzinger stated that "[t]he only ex parte communication [he] had with Commissioners was following the Phase I Proposed Decision. And it was noticed." (SAC ¶ 95.) Similar to its public statements at the time the settlement was reached, SCE's Form 10-Qs, filed on April 29, 2014, July 31, 2014, and October 28, 2014, state that implementing the settlement "will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding" SONGS shut down and settlement. (SAC ¶¶ 90, 99, 107.) On October 28, 2014, during a conference call, Craver, when asked about ex parte communications with reference to recent issues at PG&E, stated that SCE was making sure personnel were aware of expected proper conduct, they had a compliance program and training, and were redoubling efforts on awareness. (SAC ¶ 108.)

Following the parties' approval of a modification recommended by the CPUC, the amended settlement was approved by the CPUC on November 20, 2014. SCE issued a press release the same day describing the settlement as "resolving all issues regarding the public utility commission investigation." (SAC ¶ 112.)

## II. CPUC Investigation and Unreported Ex Parte Communications

Peevey's home was searched on January 27, 2015. Notes about the settlement were found in a desk drawer, although the contents were not disclosed to the CPUC and the public until April 2015. On February 2, 2015, SCE adopted a broader reporting policy regarding ex parte communications with CPUC decisionmakers. On February 9,

3

2015, SCE filed a notice of ex parte communication for a communication that took place on March 26, 2013 at an industry conference in Warsaw, Poland at a meeting that included SCE Vice President of External Relations Stephen Pickett, Peevey, and Edward Randolph, CPUC Director of Energy. Pickett claimed at the time it was a one-sided communication in which he only listened to Peevey, took notes that Peevey kept, and did not engage. SCE claimed in the Notice that, based on new information from Pickett, Pickett may have crossed into a substantive communication in reacting to at least one of Peevey's comments.

SCE's February 24, 2015 Form 10-K reiterated the prior statements about the settlement resolving issues regarding SONGS. It also disclosed the late-filed notice of ex parte communication as to the Warsaw meeting, noted the involved executive and CPUC president were retired, and acknowledged the Alliance for Nuclear Responsibility's ("A4NR") request for CPUC to open an investigation of the ex parte communications. The same day, Craver characterized the CPUC rules on ex parte communications as being geared to disclosure to provide equal access to decision makers, not prohibiting communications entirely, and stated "fundamentally, when we have proceedings before the Commission, we follow the rules." (SAC ¶ 122.)

On April 15, 2015, the CPUC ordered SCE to turn over all documents related to the settlement between March 2013 and November 2014. On April 17, 2015, ORA sought return of $648 million to customers and TURN indicated it would urge the CPUC to assess the maximum sanction against SCE and apply it to reducing customer rates. Documents were produced on April 29, 2015 and included an April 1, 2013 memo detailing "Elements of a SONGS Deal" from Pickett to Defendants Craver, Litzinger, and Scilacci. (SAC ¶ 132.) Plaintiff also alleges that other emails from 2013 and 2014 reflect a general knowledge at SCE of employee contacts with the CPUC that were not reported as ex parte communications.

4

On June 24, 2015, TURN called for the 2014 Settlement to be overturned or reopened. On August 5, 2015, the ALJ issued a lengthy Order to Show Cause why not to impose sanctions for SCE's unreported reportable ex parte communications with the CPUC. The Order discussed SCE's conduct and identified ten violations of the CPUC's rules on ex parte communications. This was followed by issuance of a proposed ruling and a final decision by the CPUC on December 3, 2015 to sanction SCE $16.7 million for failing to report eight reportable ex parte communications.

On May 9, 2016, the CPUC "reopened the record to review the 2014 Settlement Agreement against [the CPUC's] standards for approving settlements . . . in light of the [CPUC's] December 2015 Decision fining [SCE] for failing to disclose ex parte communications relevant to this proceeding." (Order Reopening Record (Docket No. 33, Ex. A).)

## LEGAL STANDARD

The SAC claims violations of Section 10(b) and 20(a) of the Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b-5.[5] To state a securities fraud

---

[5] Section 10(b) of the Exchange Act makes it unlawful to:
    use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b). Pursuant to that section, the SEC promulgated Rule 10b-5, which makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), states that a person who:
    directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such a controlled person is liable . . . unless the controlling person

5

claim, a plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase and sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014).

All factual allegations are accepted as true and "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[6]

Securities fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud." *Id.* "Rule 9(b) applies to all elements of a securities fraud action, including loss causation."[7] *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

---

acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Section 20(a) claims may be dismissed summarily if, as here, the plaintiff fails to adequately plead a primary violation of Section 10(b). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

[6] The Court grants Defendants' Request for Judicial Notice as to all documents relied on or referred to in the SAC, SCE's reported stock price history, and other publicly available financial documents, including SCE's SEC filings. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n. 2 (9th Cir.2006) (SEC filings subject to judicial notice).

[7] Plaintiffs asserted in their Opposition that "loss causation issues need only comply with Fed. R. Civ. P. 8(a), not Rule 9(b)." (Pls.' Opp'n at 24.) However, at oral argument, Plaintiffs conceded that the Rule 9(b) pleading requirements also applies to loss causation.

## DISCUSSION

The Court previously dismissed Plaintiffs' Amended Complaint for failing to sufficiently allege the elements of scienter and loss causation. (*See* Docket No. 35.) Defendants' Motion to Dismiss argues Plaintiffs' have failed to cure the deficiencies in the Amended Complaint. The Court agrees.

### A. Loss Causation

To sufficiently plead loss causation, a plaintiff must "allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008)). "In other words, the plaintiff must *plausibly* allege that the defendant's fraud was '*revealed* to the market and *caused* the resulting losses.'" *Id.* (quoting *Metzler* at 1063) (emphasis added and in original); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, *plausibly* establish loss causation, a Rule 12(b)(6) dismissal is inappropriate") (emphasis added).

As Plaintiffs noted, the decline in stock price must be "statistically significant."[8] *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010) (citing *Metzler* at 1063); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (finding amended complaint adequately pleaded loss causation where it alleged the corrective disclosure "caused [the] stock price to drop *precipitously*") (emphasis added). "[W]hether a drop in a stock's price is statistically significant will vary depending on the average trading range for that particular stock." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 n. 9 (5th Cir. 2004). For example, "[a] drop of 10% for a volatile stock

---

[8] *See* Docket No. 49 at 2, Pl.'s Reply to Defs.' Response to Pls.' Notice of Recent Developments.

7

3:15-cv-01478-BEN-KSC

may not be statistically significant whereas the same drop for a stock with little average movement may be significant." *Id.*

Here, Plaintiffs' SAC relies on the same six purported corrective disclosures they alleged in their Amended Complaint: (1) A4NR's February 10, 2015 request for sanctions against SCE (price dropped 2% on February 11); (2) California Assemblyman's March 19, 2015 letter requesting the CPUC order SCE to produce documents (price dropped .99% on March 20, 2015); (3) CPUC's April 15, 2015 order directing SCE to produce documents (price dropped .79%); (4) ORA and TURN's April 17, 2015 announcement they were seeking fines (price dropped .99%); (5) SCE's April 29, 2015 production of documents (price dropped 1.73% on April 30); and (6) TURN's June 24, 2015 request that the CPUC reopen the settlement (price dropped 2.71%). (SAC ¶¶ 126-134.) The SAC does not identify any additional corrective disclosures followed by a decline in stock price.

The Court finds the reasoning in its prior Order determining Plaintiffs failed to sufficiently allege loss causation remains sound. Therefore, it adopts the reasoning set forth in its September 14, 2016 Order regarding loss causation. (*See* Docket No. 35 at 19-21.) In addition, the Court finds Plaintiffs' SAC does not *plausibly* alleged that the scanty .79% to 2.71% declines in stock price were "statistically significant." *See Lloyd, supra,* 811 F.3d at 1210-1211 (stock price allegedly dropped 22%); *Metzler, supra,* 540 F.3d at 1064 (characterizing 10% stock price drop as "modest"); *In re Gilead Sciences, supra,* 536 F.3d at 1054 (stock price allegedly dropped 12%); *Greenberg, supra,* 364 F.3d at 665 (stock price allegedly dropped 63%).

Although the Court is required to assume the facts in the SAC are true, "it is not required to indulge unwarranted inferences in order to save a complaint from dismissal." *Metzler, supra,* 540 F.3d at 1064-65. The SAC's allegations that the SCE's stock price fell by "statistically significant" amounts are not facts; they are inferences or legal conclusions Plaintiffs believe are warranted from the facts that are alleged. As part of

8

their motion, Defendants provided SCE's stock price history, which indicates that the declines in stock price in the range of .79% to 2.71% were typical movements for SCE's stock in the days prior and subsequent to the alleged corrective disclosures. (Defs.' Req. for Judicial Notice, Ex. 21.) In their Opposition, Plaintiffs merely provided a conclusory assertion that "the allegations are straightforward. When company-specific news about defendants' bad acts reached the market, Edison's stock price dropped a material amount."[9] (Pls.' Opp'n at 24). When the Court raised its concerns about the seemingly insignificant drops in stock price during oral argument, Plaintiffs did not demonstrate that they had alleged the statistical significance of the drops in the SAC.[10]

Thus, the SAC does not plausibly alleged that the six disclosures were followed by "statistically significant" stock price drops. As a result, Plaintiffs have failed to sufficiently plead loss causation.

**B.  Scienter**

Having found Plaintiffs' SAC does not plausibly plead loss causation, the Court need not analyze the scienter allegations. However, the Court expresses its doubts over whether Plaintiffs' SAC also sufficiently alleges scienter by their inclusion of "new facts," which appear to be more inferences and/or legal conclusions Plaintiffs wish the Court to draw.

---

[9] Plaintiffs' lack of further explanation may be in part due to their erroneous earlier assumption that they were not required to plead loss causation under the heightened Rule 9(b) standard. *See fn. 7, supra.*

[10] Surprisingly, counsel for Plaintiffs argued in essence that the SAC only needed to allege there were "statistically significant" drops, which the Court must accept as true, and that "how much the stock price dropped because of a disclosure [is] irrelevant." (Tr. of Mot. to Dismiss Hearing on November 30, 2016 at 18:9-20:17.) The Court disagrees because, as explained above, counsel's assertion ignores that Plaintiffs are required to *plausibly* allege the statistical significance of the price drops, which includes evaluation of the amount of the stock drop.

9

## CONCLUSION

Defendants' Motion to Dismiss is **GRANTED without prejudice**. Plaintiffs shall have **twenty-one (21) days** from the date of this Order to file a Third Amended Complaint.

**IT IS SO ORDERED.**

DATED: May 5, 2017

HON. ROGER T. BENITEZ
United States District Court Judge