1  ROBBINS GELLER RUDMAN
    & DOWD LLP
2  SPENCER A. BURKHOLZ (147029)
   X. JAY ALVAREZ (134781)
3  THOMAS E. EGLER (189871)
   JEFFREY J. STEIN (265268)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  spenceb@rgrdlaw.com
   jaya@rgrdlaw.com
7  tome@rgrdlaw.com
   jstein@rgrdlaw.com
8
   Lead Counsel for Lead Plaintiff
9

10                UNITED STATES DISTRICT COURT

11              SOUTHERN DISTRICT OF CALIFORNIA

12  HAROLD ENG, Individually and on     )  Case No. 3:15-cv-01478-BEN-KSC
    Behalf of All Others Similarly Situated, )  CLASS ACTION
13                                        )
                          Plaintiff,      )  THIRD AMENDED COMPLAINT
14                                        )  FOR VIOLATION OF THE FEDERAL
          vs.                             )  SECURITIES LAWS
15                                        )
    EDISON INTERNATIONAL, et al.,         )
16                                        )
                          Defendants.     )  DEMAND FOR JURY TRIAL
17  _____)

18

19

20

21

22

23

24

25

26

27

28

1268145_2

Lead Plaintiff City of Fort Lauderdale General Employees' Retirement System (the "Retirement System" or "plaintiff") alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Edison International's Securities and Exchange Commission ("SEC") filings, its press releases, conference calls, public statements issued by defendants, media reports, analyst reports, industry reports and filings before the California Public Utilities Commission ("CPUC").  Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a securities fraud class action on behalf of purchasers of Edison International securities between March 21, 2014 and August 10, 2015, inclusive, and who were damaged thereby (the "Class Period") against Edison International; its former Chairman, President and Chief Executive Officer ("CEO"); its former Chief Financial Officer ("CFO"), Treasurer and Executive Vice President ("EVP"); and its former President of its subsidiary, Southern California Edison ("SCE"), for violating §10(b) and §20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Edison International is the parent holding company of SCE.  SCE is a public utility company and majority-owner of the San Onofre Nuclear Generating Station ("SONGS"), a nuclear power plant in San Diego County.  As a California utility company, SCE relies on ratepayers to fund its operations and is subject to regulation from, *inter alia*, the CPUC.  Edison International and SCE are herein referred to as "Edison" or the "Company."

3.     Edison faced disaster at SONGS in January 2012, when design flaws in its newly installed steam generators led to "unprecedented" wear and an internal radioactive steam leak.  The Company immediately took the SONGS plant off-line.

4.      In October 2012, the CPUC issued an Order Instituting Investigation (the "SONGS OII" or "OII") to determine, *inter alia*, Edison's culpability for the leak and the amount it could charge its ratepayers for the cost of consequential remediation. The Utility Reform Network ("TURN") and the Office of Ratepayer Advocates ("ORA"), the consumer advocacy arm of the CPUC, joined the proceeding to represent ratepayers' interests.  According to the CPUC rules, Edison could avoid an official finding regarding responsibility for the issues at SONGS by negotiating a settlement with the ratepayer representatives, contingent upon CPUC approval.

5.      In June 2013, Edison announced that instead of attempting to repair the flaws with the steam generators, the entire plant would be shut down and deconstructed.  The closing process would require additional billions of dollars and decades of work.  The allocation of the shutdown costs between the Company and ratepayers became part of the CPUC investigation.

6.      Along with facing the SONGS OII proceeding, in July 2013 Edison lodged a culpability-related "notice of dispute" against the steam generator manufacturer, Mitsubishi Heavy Industries, Ltd. ("Mitsubishi" or "MHI").  This "notice of dispute" became an arbitration in October 2013.  Because both the SONGS OII and the arbitration addressed questions regarding who was responsible for the SONGS failure, Edison executives had a motive to resolve the CPUC inquiry quickly.

7.      Starting in at least March 2013, prior to the public announcement of the shutdown and the "notice of dispute," Edison executives met privately with CPUC officials and discussed the terms of a settlement agreement with ratepayers.  From March 2013 through June 2014, Edison executives discussed substantive SONGS OII issues with CPUC officials, outside the presence of the ratepayers' advocates, on at least eight separate occasions.  CPUC rules, however, expressly prohibit such private "*ex parte*" communications with CPUC officials without proper notice to the opposing side.  Edison executives, including defendants, publicly expressed knowledge of the CPUC rules, yet repeatedly violated them with regard to the SONGS OII proceeding.

8.     Several of Edison's executives' improper communications were with CPUC President Michael Peevey ("Peevey"), whose house was searched in January 2015 pursuant to a warrant in an investigation relating to his work at the CPUC.  The first *ex parte* violation relevant to the SONGS OII occurred at a March 26, 2013 meeting in Warsaw, Poland between Peevey, Edward Randolph ("Randolph"), Director of the Energy Division at the CPUC, and SCE Executive Vice President of External Relations, Stephen Pickett ("Pickett").   During the meeting, the three outlined a "framework" of specific terms about cost allocation between Edison shareholders and ratepayers on the shutdown of SONGS, and discussed "what [they] thought a settlement agreement would look like."  Pickett and Peevey both wrote out notes during the meeting, but Peevey kept all of them.   The notes were later discovered during the search of Peevey's house.[1]  Six days after the March 26, 2013 meeting, Pickett typed up his recollection of the notes taken during the meeting with Peevey and shared them with the Individual Defendants (as defined below) and Edison General Counsel Robert Adler ("Adler") via email.[2]

9.     Armed with inside knowledge from this and other improper *ex parte* meetings between defendants and Peevey and another CPUC official about the terms of the SONGS settlement agreement in 2013-2014, Edison executives entered negotiations and completed an agreement with ratepayers.  The final agreement included striking similarities to the terms Pickett, Peevey and Randolph discussed in Warsaw.  As the parties advanced toward CPUC approval, Edison repeatedly touted the finality of the deal to shareholders and celebrated the end of the SONGS cost uncertainty.

10.     Despite their duty to do so, Edison executives failed to disclose their series of improper communications with the CPUC to the investing market and to the

---

[1]   A copy of the notes is attached as Exhibit A.

[2]   A copy of Pickett's email is attached as Exhibit B.

consumer groups that were parties to the settlement negotiations.   In fact, they affirmatively stated the opposite, telling the market that Edison was abiding by all the applicable rules.   Edison repeatedly painted a positive false picture regarding resolution of the SONGS OII.   These statements artificially inflated Edison's stock price.

11.   In January 2015, when the criminal investigation against Peevey uncovered the notes from the Warsaw meeting, Edison began to face very public consequences for its improper acts.   Soon after Peevey's house was searched, but before knowledge of the secret notes for a settlement of SONGS was made public, Edison submitted a "late-filed" notice of the Warsaw meeting, but maintained its innocence, claiming its duty to disclose was "not clear cut."

12.   Despite Edison's effort to downplay the bad facts, the revelations about the secret meetings caused an uproar.   California Assembly member Anthony Rendon called for the CPUC to closely scrutinize Edison's conduct during the settlement process.   The CPUC ordered Edison to produce all SONGS-shutdown-related documents, which in turn revealed additional improper communications.   During this time, Edison attempted to assure the public that it acted properly, but these developments led to uncertainty that the SONGS deal would be unwound.   On June 24, 2015, TURN recanted its support for the agreement and demanded that the CPUC unwind it – an almost unprecedented step caused by the revelation of defendants' improper actions.   On August 10, 2015, ORA followed suit and requested the deal be redone.   These company-specific fraud-related disclosures caused declines in Edison's stock price, and investors to suffer losses.

**JURISDICTION AND VENUE**

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act

1   (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder
2   (17 C.F.R. §240.10b-5).

3       14.  Venue is proper in this District pursuant to §27 of the Exchange Act and
4   28 U.S.C. §1391(b).

5       15.  In connection with the acts and conduct alleged in this Complaint,
6   defendants, directly or indirectly, used the means and instrumentalities of interstate
7   commerce, including, but not limited to, the U.S. mails, interstate telephone
8   communications and the facilities of the national securities exchanges and markets.

**INDIVIDUALS AND ENTITIES**

9

10   **Parties**

11       16.  Lead Plaintiff City of Fort Lauderdale General Employees' Retirement
12   System is a public retirement system in Fort Lauderdale, Florida that provides benefits
13   to approximately 2,300 participants.[3]  The Retirement System purchased Edison
14   common stock at artificially inflated prices during the Class Period and suffered
15   damages as a result of defendants' alleged misconduct.

16       17.  Defendant Edison International is the parent holding company of SCE, a
17   public utility primarily engaged in the business of supplying and delivering electricity
18   to an approximately 50,000 square mile area of Southern California.  Until January of
19   2012, up to 20% of SCE's distributable electricity came from SONGS, a nuclear
20   power plant located in San Diego County.  Edison's principal offices are located at
21   2244 Walnut Grove Avenue, Rosemead, California 91770.  Throughout the Class
22   Period, Edison common stock was traded under the ticker "EIX" on the New York
23   Stock Exchange ("NYSE"), an efficient market.

24       18.  Defendant Theodore F. Craver, Jr. ("Craver") acted as Edison's
25   Chairman of the Board of Directors, President and CEO during the relevant time
26   period.  Craver was elected Chairman and CEO in August 2008, and President in

27

---

28   [3]  The Certificate of Named Plaintiff is attached as Exhibit C.

April 2008.  As CEO, Craver spoke on Edison's behalf in releases, conference calls and SEC filings.  Craver certified the Company's Form 10-K filed with the SEC on February 24, 2015 on behalf of himself and Edison.  He retired on September 30, 2016.

19.     Defendant William James Scilacci ("Scilacci"),  acted as Edison's EVP, CFO and Treasurer during the relevant time period.  Scilacci was appointed to these positions in August 2008.  As CFO, Scilacci spoke on Edison's behalf in releases, conference calls and SEC filings.  Scilacci certified the Company's Form 10-K filed with the SEC on February 24, 2015 on behalf of himself and Edison.  He retired on September 30, 2016.

20.     Defendant Ron Litzinger ("Litzinger") was President of SCE from January 2011 until September 2014.  Since then, Litzinger has served as President for Edison Energy, a non-utility subsidiary of Edison.  During the Class Period, Litzinger spoke on Edison's behalf during conference calls and provided testimony in a declaration and at a hearing before the CPUC in his capacity as an Edison executive regarding *ex parte* communication violations.

21.     Defendants Craver, Scilacci and Litzinger are sometimes collectively referred to herein as the "Individual Defendants."

22.     Because of their positions as Edison's senior-most executive officers during the Class Period, the Individual Defendants obtained, had access to and/or were in possession of material, adverse, non-public information concerning Edison via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith.  As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     As senior executive officers and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act during the Class Period, and was actively traded on the NYSE and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Edison's operations, business and *ex parte* settlement discussions with the commissioners of CPUC regarding its investigation into the problems at SONGS and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Edison securities would be based upon truthful and accurate information.  Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

**Other Individuals and Entities**

24.     Peevey acted as CPUC President from 2002 until he stepped down in 2014.  He also acted as an Edison executive from 1984 until 1995, serving as President of Edison International and President of SCE.  Peevey's tenure at the CPUC was riddled with controversy well before the relevant time period.  As early as 2004, publishers reported harsh critiques of Peevey's conduct, particularly his back-door dealings with utility companies.  On December 16, 2004, *Factiva* wrote about Loretta Lynch and her concern regarding Peevey:

> To Lynch, the California Public Utilities Commission under Michael Peevey, who replaced her as president, has been "running rough shod over the law, the truth, due process, and the public trust."

> The majority of commissioners approve the funding of almost every pet project the utilities put in front of them without really examining costs or benefits, according to Lynch, who noted that Peevey was once president of CPUC-regulated Southern California Edison and its parent Edison International (EIX).

> *            *            *

> "Deals are done every day behind closed doors that are supposed to be done in public," she said.

More recently, on May 24, 2011, the website *Indybay.com* reported that "Peevey's behind-the-scenes engagements with private-sector organizations bent on shaping statewide energy policy demonstrate how power is wielded in California's energy world, a system in which regulators seem to be partnering with utilities rather than policing them."  By November 27, 2014, as Peevey neared the end of his second term, the controversy surrounding him caused enough turmoil to force his retirement.  *The San Diego Union-Tribune* reported:

> Peevey and his staff have been swept up in accusations of overly cozy relations between the commission and Pacific Gas & Electric in the aftermath of the deadly San Bruno natural gas pipeline explosion in 2010.  Peevey has recused himself from related proceedings and has said he will not seek a third appointment when his term expires at the end of the year.

25.    Pickett acted as Executive Vice President of SCE during the relevant time period until he retired on November 30, 2013.  He is a lawyer who previously served as General Counsel for SCE.  Defendants sent Pickett to meet with Peevey in Warsaw, Poland in March 2013.  At the time, Pickett and Peevey were former co-workers, neighbors and friends.  The information Pickett obtained in Warsaw was within the scope of his employment at Edison.

26.    Randolph is, and at all relevant times was, the Director of the Energy Division at the CPUC.  Randolph is the only other known attendee of the meeting between Pickett and Peevey in Warsaw.

27.    Adler acted as Executive Vice President and General Counsel for Edison during the relevant time period until he retired in January of 2015.  Craver designated Adler to "oversee SCE's efforts to negotiate a settlement of the [SONGS] OII," although Craver put him in charge of fielding settlement-related questions and concerns from the parties to the settlement, the Individual Defendants communicated directly with Peevey about the SONGS settlement.

28.    TURN and ORA are ratepayer advocacy groups who negotiated the SONGS OII settlement with Edison.

# BACKGROUND

**The History of SONGS**

29.     SONGS is a nuclear power plant on the Southern California coastline. Edison operates the plant and owns 78% of its shares.  San Diego Gas & Electric Company ("SDG&E") and the City of Riverside own the remaining 20% and 2% of shares, respectively.  SONGS consists of three nuclear containment units.  The original plant, Unit 1, operated from 1968 to 1992.  Unit 2 began commercial operations in 1983 and Unit 3 began service in 1984.  Until 2012, SONGS was a major source of power for the residents of Southern California.  When operating at full strength, SONGS provided ratepayers with 2,150 megawatts of energy, or 20% of Edison's total output.

30.     Each of the two nuclear containment units housed a separate nuclear reactor.  In basic terms, the reactors rely on nuclear fission to heat surrounding water. The water, which is extremely hot and radioactive, is then pumped into a series of pressurized tubes inside steam generators.  The steam generators use heat exchangers to transfer the heat from the radioactive water to a separate pool of non-radioactive water, turning it into steam.  The expanding steam in turn rotates turbines, which produce usable electricity.  Under typical use conditions, the steam generator systems should last 20 to 40 years.

31.     In 2004, the original steam generators in Units 2 and 3 began to approach the end of their effective lifespans and required replacement.  Edison planned to replace the old steam generators with the largest and most intricate available and intended to purchase replacement power while it completed the installation.  Edison estimated the replacement project would cost $680 million.  The CPUC approved Edison's proposal and the Company began planning for the replacements.

32.     Edison hired Mitsubishi to build the new steam generators.  Edison provided extensive oversight of the project and participated in the design and manufacture processes.  The project was implemented and initially appeared to be a

1  success.  The Unit 2 reactor was restarted in April 2010 and Unit 3 was brought back
2  online in February 2011.

3        33.    The upgrade project, however, ultimately proved to be a disaster.  On
4  January 10, 2012, Edison took Unit 2 offline for routine refueling.  On January 31,
5  2012, with Unit 2 still offline, an alarm sounded at Unit 3 because of what turned out
6  to be a leak of radioactive steam from a generator tube.  Because of the radioactive
7  leak, Edison suspended operation of both steam generators.  They would never go
8  back into service.

9        34.    Subsequent investigations into both Unit 2 and Unit 3 revealed that
10  tightly packed tubes inside the steam generators had repeatedly collided with each
11  other as the steam generators vibrated.  This vibration and friction was not part of the
12  plan for the upgraded steam generators.  The constant friction created
13  "unprecedented" wear in thousands of tubes in both units and rendered them prone to
14  leakage.  Several reports blamed Edison for the design and manufacturing failures.
15  On March 19, 2012, the Nuclear Regulatory Commission ("NRC") dispatched an
16  Augmented Inspection Team to gather facts about the outages.  On July 18, 2012, the
17  NRC issued a report entitled, "San Onofre Nuclear Generating Station – NRC
18  Augmented Inspected Team Report," which, among other things, identified flaws in
19  the design of the replacement steam generators.  On December 23, 2013, the NRC
20  issued a Notice of Violation to Edison, which concluded that Edison failed to establish
21  "design control measures . . . for verifying or checking the adequacy of certain
22  designs."

23        35.    Meanwhile, on February 9, 2013, *The San Diego Union-Tribune*
24  described a "proprietary report [from] the generator manufacturer [Mitsubishi],"
25  which showed Edison was "aware of safety problems before installations and failed to
26  fully correct them."

27        36.    The San Onofre problems surfaced within a year of the March 11, 2011
28  devastating nuclear meltdown in Fukushima, Japan, which created worldwide concern

about nuclear reactors.  Like the Fukushima plant, SONGS sat on the Pacific coastline not far away from populated areas.  The San Onofre leak inflamed public opinion and amplified calls to close the entire plant.  Ultimately, on June 7, 2013, Edison announced it would permanently retire SONGS.

37.    The price tag for the SONGS shutdown was $4.7 billion, not including accelerated decommissioning costs.  Local media outlets called for Edison's investors, rather than the ratepayers, to cover this expense.  On March 13, 2013, *The Los Angeles Times* wrote:

> With so much money at stake, it's unsurprising that in recent months the question of who pays for San Onofre, how much and when has dominated the discussions about the plant before the CPUC.  It's a fair bet that, in time, the volume of legal briefs on those issues will far exceed those relating to the more basic questions of what happened and whose fault it is.
>
> That's because the latter questions have mostly been answered: The replacement steam generators were poorly designed, and the responsible party is Southern California Edison.  Even if it turns out that the generators' builder, Mitsubishi Heavy Industries, screwed up the job, that happened on Edison's watch.  As far as ratepayers are concerned, the utility is "it."
>
> That points to the basic philosophical issue of why Edison's customers, and not its shareholders, should continue to pay for a nuclear plant that shows as much life right now as a raccoon flattened by a semi-truck on the 5 Freeway.

38.    The allocation of the $4.7 billion in costs between Edison and the ratepayers created uncertainty among Edison's investors, and an overhang to its stock, and was closely watched by the investing community.  The balance of whether investors or ratepayers would foot the bill for the shutdown, therefore, was a material issue for investors.

**The CPUC Action: SONGS OII**

39.    On October 25, 2012, the CPUC's five commissioners, including Peevey and Michael Florio ("Florio"), initiated the SONGS OII proceeding to consider "the causes of the outages, the utilities' responses, the future of the SONGS units, and the

1    resulting effects on the provision of safe and reliable electric service at just and

2    reasonable rates."

3    40.    In many ways, OII proceedings resemble litigation under the Federal

4    Rules of Civil Procedure, as various parties present their cases to a decisionmaker

5    through written motions and oral hearings.  CPUC proceedings are guided by their

6    own specific rules and statutes, which provide for the collection and presentation of

7    evidence to a decisionmaker.

8    41.    "Rate-setting" proceedings like SONGS OII are designed to determine

9    the amount the utility company may charge its customers.  The energy companies

10   typically represent themselves through counsel and advocacy groups typically

11   represent ratepayers' interests.   Each rate-setting action is assigned a CPUC

12   administrative law judge ("ALJ"), who specializes in utility disputes.  ALJs handle

13   day-to-day issues and render proposed decisions, but their rulings are subject to the

14   review of CPUC commissioners.  The CPUC assigns a commissioner – called the

15   Assigned Commissioner ("AC") – to each rate-setting case.  The AC often confers

16   with other commissioners before approving or modifying an ALJ's order.

17   Accordingly, the ALJ and all commissioners are considered "decisionmakers" under

18   the CPUC rules.  *See* Cal. Pub. Util. Code §1701 *et seq.*; *see also* CPUC Rules of

19   Prac. and Proc. 8.1, 8.3, 8.4.  As in litigation, parties to the proceeding can agree to

20   resolve the dispute through settlement, subject to approval from the decisionmakers.

21   42.    On November 1, 2012, the CPUC assigned Hon. Melanie Darling as the

22   ALJ and Florio as the AC to preside over the SONGS proceeding.  Several groups

23   joined as parties to represent ratepayers' interests including TURN and ORA.  The

24   Alliance for Nuclear Responsibility ("A4NR"), which describes itself as an

25   organization that "works to educate and protect the citizens of the State of California

26   and future generations from the dangers of radioactive contamination," also joined the

27   SONGS OII as a party, but was not a signatory to the settlement agreement.

28

**CPUC *Ex Parte* Rules**

43.     The CPUC employs specific rules for *ex parte* communications, which it defines as "any oral or written communication between a decisionmaker and a person with an interest in a matter before the commission concerning substantive, but not procedural issues."  The commission allows *ex parte* communications without prior notice, but imposes duties to maintain equality among the parties if the rules are violated.  For instance, regardless of who initiated the interaction, the party must file a notice of the *ex parte* communication within three days if the communications are not one-way communications between the CPUC decisionmaker and the interested party. The notice must include the date, time and location of the communication; whether it was oral or written; the identities of everyone present; and a description of all non-decisionmakers' communications.  The rules provide that if a decisionmaker meets with one party and it is a reportable event, all other parties must be granted an individual meeting of a substantially equal period of time.

44.     Edison and its executives were familiar with the *ex parte* rules and their nuances.  For instance, Edison concedes that it must limit its communications with decisionmakers to procedural statements or insubstantial responses, such as "I understand" or "I will get back to you," in order to avoid disclosure.  Further, the record is replete with reminders to Edison and its employees to follow the rules.  The order initiating the SONGS OII issued by the CPUC on October 25, 2012 specifically held that "[e]x parte communications in this proceeding are subject to the restrictions and reporting requirements stated in Article 8 of the Commission's Rules of Practice and Procedure."  Early in the proceedings, the ALJ sent Edison an email reminding it that "[i]t is improper and unfair for parties to have [*ex parte*] communications without disclosure to other parties in a rate-setting proceeding."[4]

---

[4]   *See* Morgan Lee, *IMPROPER LOBBYING IN SAN ONOFRE PROBE? ONOFRE LOBBYING RAISES QUESTIONS: Edison says it's not aware of talks taking place without notice*, San Diego Union-Tribune, Dec. 25, 2013.

45.     Additionally, throughout the Class Period, executives at Edison repeatedly referenced the *ex parte* communication rules and their importance.  For example, on September 25, 2014, Edison Chief Ethics and Compliance Officer Mike Montoya, SCE General Counsel Russell Swartz, and SCE Senior Vice President of Regulatory Affairs R.O. Nichols ("Nichols") emailed Edison company personnel to discuss CPUC rules.  The email appears to refer to recently revealed *ex parte* violations by PG&E, another utility company.  The email stated that "[w]hile we are well aware of the CPUC's *ex parte* communications rules, this situation makes clear that awareness of the rules is not enough.  We must understand them and ensure that they are consistently adhered to."  Also, during a third quarter 2014 earnings call on October 28, 2014, Craver told investors:

> [W]e're certainly trying to make sure that all of our personnel know what's expected of them, in terms of proper conduct with the CPUC. We have a compliance program.  We have training.  We have redoubled efforts along those things, just to make sure that that's very present in everyone's mind.

And during a fourth quarter 2014 earnings call on February 24, 2015, Craver acknowledged the *ex parte* rules are "designed to provide equal access to all parties to the proceeding with equal time . . . to make sure that if we have conversations with decisionmakers, that those are noticed."

46.     In reality, defendants had been secretly flouting the CPUC *ex parte* rules since at least March 2013.

## THE IMPROPER *EX PARTE* COMMUNICATIONS

47.     On the surface, Edison appeared to abide by the CPUC rules.  From the start of the SONGS OII through January 2015, Edison filed 15 notices of *ex parte* communications.   The notices disclosed various relatively minor interactions, including in-person meetings with commissioners' advisors and a letter to Peevey about the NRC investigation.  They also included a December 6, 2012 notice that discussed a November 30, 2012 meeting between Edison executives and CPUC officials, where they discussed Edison's planned December 3, 2012 response to the

1   OII regarding the framework for the phased proceedings including issues to be

2   considered.  As described below, these issues were similar to the issues secretly

3   discussed at the Warsaw meeting without input from TURN or ORA, and also by the

4   Individual Defendants (Craver and Litzinger) with Peevey and Florio.  Despite

5   defendants' knowledge and use of the CPUC *ex parte* disclosure procedures, they

6   violated the rules when they engaged in a series of secret meetings with CPUC

7   officials between March 2013 and June 2014.

8   **The Two Warsaw Meetings and Their Aftermath**

9        48.    In March of 2013, Pickett and Peevey traveled to Warsaw as part of a

10   "study tour" of 20-30 individuals organized by the California Foundation on the

11   Environment and Economy ("CFEE").  Defendants knew Peevey planned to attend the

12   tour and sent Pickett with specific instructions to seek him out and discuss the status

13   of the SONGS restart.

14       49.    On the evening of March 26, 2013, Pickett, Peevey and Randolph met

15   privately for dinner at the Bristol Hotel in Warsaw and discussed a possible

16   "framework" for a settlement of the SONGS OII between Edison and various

17   ratepayer groups.  At the time, Edison had not yet discussed settlement directly with

18   ratepayers' representatives.  During the meeting, Peevey provided details about the

19   terms the CPUC would be willing to approve. ***Pickett took notes at the meeting and,***

20   ***according to Randolph, Pickett described "what he thought a settlement agreement***

21   ***would look like***."  During the meeting, Peevey added annotations to Pickett's notes

22   and kept the notes with him at the meeting's conclusion.  After the dinner meeting, at

23   12:13 a.m. in Warsaw, Pickett emailed SCE Executive Vice President of Public

24   Affairs Polly Gault ("Gault").  He wrote, "Greetings from Poland, where I just had

25   dinner with . . . Peevey. ***Redacted – NonResponsive***."[5]  Almost the entire email string

26   is redacted, but Randolph has described the Pickett meeting with Peevey as discussing

27

28   _____

     [5]   A copy of this email is attached as Exhibit D.

1  a settlement agreement for SONGS.  According to the CPUC's three-day disclosure

2  deadline, to act in compliance with applicable law, Edison should have reported this

3  meeting by March 29, 2013.  It did not.

4       50.     The following evening, Pickett and Peevey attended a dinner party in

5  Warsaw where they sat next to each other and further discussed the SONGS OII.

6  During the dinner, Pickett again emailed Edison executives to brag about his

7  interactions with Peevey.  To Gault, he wrote "[f]rom Poland sitting next to Peevey,

8  God help me. . . .  Yes, I am moderately intoxicated.  Thank God!"[6]  Twenty minutes

9  later, Pickett emailed SCE Senior Attorney Elizabeth Matthias ("Matthias") and

10  bragged that he was "[s]itting next to Peevey taking in the last formal evening of the

11  trip. *Redacted - NonResponsive*"[7] Immediately afterward, he emailed Gault again and

12  described his interaction with Peevey, saying "sitting next to Peevey at dinner in

13  Warsaw *working . . . SONGS*.  *Deserve combat pay*."[8]  Even with those emails being

14  almost fully redacted by Edison, the plausible inference is that Pickett was discussing

15  the SONGS settlement with Peevey, and a reasonable investigation by the defendants

16  would have come to the same conclusion – a fact noted by the CPUC.  Edison's

17  deadline to report this communication was March 30, 2013.  It failed to meet it.

18       51.     On the same day as the dinner party, while Pickett was still in Warsaw,

19  defendant Litzinger's assistant scheduled a meeting for April 1, 2013, the first

20  Monday after Pickett's return to California.  The subject of the meeting was "CFEE

21  Download" – *i.e.*, Pickett's discussions with Peevey – and its only invitees were

22  Pickett, defendants Craver, Scilacci and Litzinger, and General Counsel Adler.[9]

23

24

---

25  [6]   A copy of this email is attached as Exhibit E.

26  [7]   A copy of this email is attached as Exhibit F.

27  [8]   A copy of this email is attached as Exhibit G.

28  [9]   A copy of this scheduling email is attached as Exhibit H.

52.     At the meeting on April 1, 2013, Pickett told Craver, Scilacci, Litzinger and Adler that Peevey had affirmatively laid out "a framework for a possible resolution of the SONGS OII" in Warsaw.  This admission caused the executives to discuss whether Edison should file a late-filed *ex parte* notice regarding Pickett's interactions with Peevey.  Litzinger admitted he became "concerned" because "SCE had not designated . . . Pickett as its representative to discuss settlement." Accordingly, after the meeting Litzinger confronted Pickett and stressed that he "was not authorized to negotiate a settlement" and that "SCE was in 'listen-only' mode." Pickett claims he also "consulted with SCE's counsel on the ex parte reporting issue" after the April 1 meeting.   That same day, after meeting with the Individual Defendants and Adler, Pickett sent them an email that contained a recently typed-up version of the Warsaw notes.[10]  Indeed, the attached document, entitled "Elements of a SONGS Deal," provided a near-exact copy of the notes he created with Peevey in Warsaw six days earlier.[11]

53.     Although Litzinger claims he told Pickett not to participate in settlement negotiations, Edison admits that he subsequently took "a few . . . short-lived internal steps to develop a potential settlement framework" regarding the SONGS OII.  On April 4, 2013, Pickett sent an email entitled "next steps" to two Edison executives, SCE Vice President of SONGS Strategic Review Megan Scott-Kakures ("Scott-Kakures") and SCE Director of Regulatory Operations Russell Worden ("Worden"). Pickett recommended that the Company "take my notes and turn [them] into a simple term sheet we could use to help guide the negotiations." He also referenced Litzinger's oversight of the project and stressed the importance of a quick turnaround, writing "Ron [Litzinger] is going to want to pull a subset of the [Internal Nuclear

---

[10]   A copy of this email is attached as Exhibit B.

[11]   Exhibit I provides a simple comparison between the Warsaw notes (attached as Exhibit A) and Pickett's memorandum (attached as Exhibit B), which demonstrates their striking resemblance.

1    Management Group] together sometime next week to discuss this, so if we could have

2    something on paper by Tuesday or so it would be great."[12]  To close out the email,

3    Pickett referenced another in-person meeting with Peevey *the following day* – his

4    *third* such meeting in a 10-day span.  Although he claims this meeting was to discuss

5    a separate issue – "L.A. Basin reliability" – nothing prevented the friends from again

6    discussing the SONGS settlement, as they had during the prior two meetings in

7    Warsaw.

8        54.    Edison's privilege log filed with the CPUC on April 29, 2015, supports

9    the fact that over the next eight days, Edison executives, including Pickett, Adler,

10   Worden and Scott-Kakures, circulated multiple drafts of the term sheet.  Edison

11   withheld these documents from its production to the CPUC.[13]

12       55.    On April 11, 2013, Litzinger met with Pickett again to discuss his

13   conduct in Warsaw.  Litzinger again "confirmed that the meeting in Poland was a one-

14   way communication" and   "reinforced the message that Mr. Pickett was not

15   authorized to negotiate any SONGS settlement."   After meeting with Pickett,

16   Litzinger emailed the Individual Defendants and Adler to summarize the discussion.

17   Litzinger disclosed that he became concerned about whether Pickett's interaction was

18   "listen only" because he "heard whispers from the CPUC of significant SCE presence

19   on the [SONGS settlement] issue."   Litzinger's discussion with Pickett did not

20   assuage his fears, as he "left the meeting uneasy" and expressed worry about "yet

21   another  'social dinner'" that Pickett *had just scheduled* with Peevey.  (Quotation

22   marks around "social dinner" included in original email.)  Despite his fears, Litzinger

23   could not help but relay some new inside information he obtained from Pickett to the

24   other Individual Defendants and Adler.  The email stated:

25                   For what it is worth, he volunteered independently that we should
                 only engage with TURN at first (he mentioned Matt Friedman).  I used
26

27   [12]  A copy of this email is attached as Exhibit J.

28   [13]  A copy of Edison's privilege log is attached as Exhibit K.

that as an opportunity to seek out the answer to our question on "TURN without DRA [Department of Ratepayer Advocates]." Steve said that can be done, but would likely result in a "protested settlement" with a hearing-DRA of course filing the protest. He would recommend considering inviting DRA in later in the process. I took it all under advisement. ***He said President Peevey feels strongly about Geesman***. I merely responded his testimony shows him to be merely a "bomb thrower". He said is smart and could be trusted – "at least when he was in a superior position as a regulator." I again stated his testimony was inflammatory.[14]

Notwithstanding Litzinger's concerns and fears about Pickett's meeting with Peevey in Warsaw and continued discussions with Peevey, including another "social dinner," the defendants took no further steps to find out what really happened by failing to investigate the Warsaw discussions, including interviewing Peevey and Randolph, as confirmed later by the CPUC, and interviewing other Edison executives.

56.     Five days after Pickett and Litzinger's meeting, on April 16, 2013, Pickett and Peevey indeed did meet for "yet another 'social dinner.'"[15] This was the ***fourth*** documented in-person meeting between the longtime personal friends in a span of just three weeks. The next day, Pickett again bragged to Gault, claiming "Had dinner with . . . Peevey last night ***Redacted – NonResponsive***."[16]

57.     A month later, Edison executives exchanged emails regarding the ***substantive information Pickett discussed with Peevey in Warsaw***. On May 29, 2013, Senior Director of State Energy Regulation Michael Hoover ("Hoover") relayed to Vice President of Regulatory Policy and Affairs Les Starck ("Starck") that Carol Brown, Peevey's Chief of Staff, "indicated that Pickett was well prepared in Poland with specifics" about the SONGS OII.[17]

58.     When Edison finally disclosed the Warsaw meeting in the CPUC action, the CPUC required it to produce "all documents pertaining to oral and written

---

[14]   A copy of this email is attached as Exhibit L.

[15]    A copy of this email confirming the dinner is attached as Exhibit M.

[16]   A copy of this email is attached as Exhibit N.

[17]   A copy of this email is attached as Exhibit O.

1  communications about potential settlement of the SONGS OII between any SCE

2  employee and CPUC decisionmaker(s) between March 1, 2013 and November 31,

3  2014" and "all written communications internal to SCE which reported, discussed,

4  referred to, or otherwise contained, a description of oral or written communications

5  about settlement with CPUC decisionmaker(s)." Edison complied with this request in

6  three installments, on April 29, 2015, July 3, 2015 and October 20, 2015. These

7  productions provided the emails and declarations referenced in this pleading.

8       59.     On December 8, 2015, after the CPUC reviewed the evidence, it issued a

9  decision (the "CPUC Decision") that criticized Edison's failure to properly investigate

10  Pickett's interactions with Peevey. It wrote:

11       There is no indication that SCE made any attempt to contact former
         President Peevey, or Mr. Randolph, to clarify the content of the
12       communication or get a copy of the Notes. Nor did SCE acknowledge
         the possibility of a Rule 8.4 violation and follow-up with Mr. Pickett
13       when he promptly began to take internal steps to develop a potential
         framework for settlement in the event of a permanent shutdown of
14       SONGS.

15       60.     The terms discussed at the Warsaw meeting impacted the SONGS OII

16  settlement. Several of the terms listed in Pickett's notes were similar to the final

17  settlement agreement. For instance, both call for ratepayers to absorb the entire cost

18  of replacement power, both require Edison to pay replacement generator costs

19  incurred after February 1, 2012, both call for Edison and the ratepayers to divide

20  money recovered from Mitsubishi, and both require significant annual donations from

21  Edison to the University of California for a center to study greenhouse gas emissions.

22  **The Individual Defendants'** *Ex Parte* **Violations**

23       61.     Rather than tighten their policies after the Warsaw meeting, or address

24  their concerns about Pickett's actions, the Individual Defendants made their own

25  improper communications with decisionmakers. The CPUC Decision outlined six

26  additional *ex parte* violations, five of which involved at least one Individual

27

28

1  Defendant.[18]  The CPUC found these violations unjustly left the ratepayer groups "in

2  the dark" about the status of the settlement.

3       62.   On **June 26, 2013**, Litzinger met with AC Florio after an unrelated

4  hearing.  Edison admits that Litzinger "provided a brief update on the status of SCE's

5  bargaining efforts with respect to the severance of SONGS employees."  This issue

6  was one of the terms listed in Pickett's email to the Individual Defendants and Adler

7  on April 1, 2013 and the original Warsaw notes.  The CPUC found this non-public

8  communication substantive because:

9         The question of SCE's employee compensation commitments and cost
          recovery of employee severance costs relate to substantive issues in the
10        OII because the reasonableness of these expenses would be considered
          by the Commission when reviewing 2013 SONGS Operations and
11        Maintenance (O&M) expenses in Phase 3 or later.

12      63.   On **September 6, 2013**, Litzinger and Starck met Peevey over lunch to

13  discuss the terms of a SONGS settlement.  Peevey suggested to Litzinger that Edison

14  could expect to recover either its capital or its replacement power costs, but not both.

15  This settlement term was listed in the original Warsaw notes and Pickett's April 1,

16  2013 email to the Individual Defendants and Adler.  Edison admits "Litzinger said

17  that the outcome would be somewhere in between those extremes" and also told

18  Peevey  "settlement negotiations were progressing."   Subsequent internal emails

19  among Edison executives reveal that Litzinger improperly drove the conversation.  On

20  the same day as the lunch, Pickett asked Starck "How did it go? . . . *If you don't want*

21  *to put it in an email, call me*."  Starck replied with a summary, describing the lunch as

22  "[f]riendly and cordial" and providing more insight into Litzinger's contribution to the

23  discussion.  He wrote, "***Ron [Litzinger] responded that it would be a combination of***

24  ***disallowances of the two*** . . . no reaction from Mike [Peevey].  Ron did say that he felt

---

25

26  [18]  The sixth improper communication occurred on May 28, 2013 when Starck
     emailed an SCE press release to all five commissioners.  According to the CPUC, the
27   press release contained "substantive and argumentative content about the
     reasonableness of SCE's actions related to the design of the RSGs, a substantive issue
28   in the OII."

good about the progress of settlement discussions with multiple parties."[19]  Starck then forwarded his summary to Hoover, SCE Director of Regulatory Affairs Laura Genao ("Genao"), and other executives.   Genao responded, "You should talk to Mike H[oover] about the potential ex parte implication of today's conversation."  Hoover replied, "*He should not put this in notes......*" (ellipses in original).[20]  The CPUC determined that Litzinger's interaction violated *ex parte* rules because "when SCE's President contrasted his position with that of former President Peevey on a substantive issue in a non-public meeting, it became a reportable ex parte communication."

64.     On *November 15, 2013*, Craver and Peevey met for dinner to discuss the terms of the SONGS settlement.  Edison admits that Craver "briefly described SCE's efforts to get MHI to the table to discuss a financial settlement with respect to the defective replacement steam generators" and "outlined SCE's efforts to secure letters of support from various federal elected officials for MHI to engage with SCE on the matter."  This term was listed in the original Warsaw notes and Pickett's April 1, 2013 email to the Individual Defendants and Adler.  After the dinner, Craver sent Peevey an email that reiterated his control over the discussion.  He wrote, "*As I emphasized* with you during our dinner, we are pulling out all the stops to bring MHI to the table and hold them accountable for their failed steam generator design."[21]   The CPUC determined that "Mr. Craver's communications constituted an unreported, non-public communication between an SCE executive and former President Peevey on a substantive issue in the OII."

65.     On *May 28, 2014*, Hoover emailed Nichols about a conversation he just had with Peevey regarding the University of California donation for greenhouse gas research, which is referenced in the Warsaw notes and Pickett's April 1, 2013 email to

---

[19]   A copy of this email is attached as Exhibit P.

[20]   A copy of this email is attached as Exhibit Q.

[21]   A copy of this email is attached as Exhibit R.

1   the Individual Defendants and Adler.  In the email, Hoover relayed that Peevey had

2   recently discussed the issue with Litzinger.  He wrote:

3          [Peevey] does not understand why we will not fund the UC data analysis
            program.  He said Florio is supportive . . . .  [Peevey] says he has talked
4          to you and Ron about it and he is frustrated. . . .  [Peevey] wanted me to
            pass along that SONGS is on a "tight schedule" and [Peevey] would hate
5          to see it "slip."[22]

6   The CPUC determined that "[t]hese facts and reasonable inferences support the

7   conclusion that an unreported, non-public communication occurred between one or

8   more SCE executives and former President Peevey on the substantive issue of a

9   potential modification to the SONGS OII settlement agreement," and that Edison was

10  aware of it.

11         66.    On *June 11, 2014*, Peevey followed up with Hoover to discuss the

12  amount Edison would donate to greenhouse gas research.  Hoover emailed Nichols to

13  report that Peevey "talked with Ron [Litzinger] last week" and is "lowering the ask to

14  3 million."[23] The CPUC decided "[f]rom this evidence, it is reasonable to infer there

15  was a non-public unreported communication between former President Peevey and

16  Mr. Litzinger."  SCE admitted that on June 5, 2014, Peevey called Litzinger to discuss

17  greenhouse gas research.

18         67.    Despite acknowledged familiarity with the CPUC rules, defendants

19  repeatedly engaged Peevey and Florio in substantive communications about resolving

20  the SONGS OII.  Defendants failed to timely notify the other parties to the settlement

21  of these communications and therefore deprived them of an opportunity to gain equal

22  time with the decisionmakers.

23         68.    Unbeknownst to Edison's investors, defendants' improper *ex parte*

24  communications gave them substantial, unfair leverage in their negotiations with

25  TURN and ORA, and therefore put the settlement as a whole in jeopardy.  During the

26
_____

27  [22]   A copy of this email is attached as Exhibit S.

28  [23]   A copy of this email is attached as Exhibit T.

1  Class Period, defendants repeatedly assured the public that the proposed settlement
2  would resolve the SONGS OII for good.

3        69.    At the same time Edison executives were having undisclosed and
4  unlawful *ex parte* communications about a settlement with the CPUC, Edison was
5  planning to bring an action against Mitsubishi.  On July 18, 2013, Edison announced
6  via press release that it had "served a formal Notice of Dispute" on Mitsubishi,
7  blaming it for "designing and manufacturing defective Replacement Steam
8  Generators" at SONGS.  The press release quoted Litzinger as stating that the action
9  was "'about making sure that Mitsubishi takes responsibility for providing the
10 defective steam generators that led to the closing of SONGS.'"  The allegations of
11 responsibility on Mitsubishi's part were described in the 23-page notice, as well as in
12 a 50-page "Request For Arbitration" Edison subsequently filed against Mitsubishi in
13 October 2013.  Although the notice and request for arbitration were heavily redacted
14 when released to the public, the available allegations made clear Edison's position that
15 Mitsubishi was solely responsible for the problems.  Edison, however, faced the risk
16 that the CPUC process, which was designed to address the "[n]ature and effects of the
17 steam generator failures in order to assess the reasonableness of SCE's consequential
18 actions and expenditures," would come to different conclusions and interfere with the
19 potential multi-billion dollar claim against Mitsubishi.  Edison executives, therefore,
20 had a great incentive to end the CPUC investigation as quickly and quietly as possible.

21               **FALSE AND MISLEADING STATEMENTS**
22 **First Suggestion of a Settlement**

23        70.    Defendants affirmatively decided to keep the unlawful *ex parte*
24 communications with the CPUC secret as they engaged in settlement negotiations
25 with TURN and ORA.  They never informed the other parties to the settlement about
26 the non-public contacts, depriving TURN and ORA of equal time with CPUC officials
27 and of knowledge about the dictated deal terms.  Using this improper advantage,
28 defendants negotiated and finalized an agreement to settle the OII proceeding.

1    Defendants knew the risks they took by violating the rules, including the risk that the

2    parties would ask that the settlement be invalidated, but continued to hide the true

3    facts.

4        71.    Late on March 20, 2014, Edison filed a statement on Form 8-K with the

5    SEC, which first announced a possible settlement to resolve the CPUC investigation

6    into SONGS.  The Company stated:

7        Under rules of the California Public Utilities Commission
         ("CPUC"), prior to signing any settlement, settling parties must provide
8        notice and convene at least one conference for the purpose of providing
         all parties with the opportunity to discuss settlements in the proceeding.
9        Pursuant to these rules, on March 20, 2014, Southern California Edison
         Company ("SCE"), San Diego Gas & Electric Co. ("SDG&E"), The
10       Utility Reform Network, and the CPUC Office of Ratepayer Advocates
         ("ORA") (together, the "Parties") jointly gave seven days advance
11       written notice (the "Notice") to all parties in the San Onofre OII of a
         conference to discuss terms to resolve the CPUC's proceedings
12       regarding the outages and subsequent permanent shutdown of the San
         Onofre Nuclear Generating Station Units 2 and 3, I. 12-10-013 and
13       related proceedings.  At the same time, the Parties sent a letter to the
         Administrative Law Judges presiding over the OII requesting a stay of
14       proceedings pending the outcome of the settlement conference.  Any
         such settlement conference is confidential and limited to the parties in
15       the proceeding and their representatives.

16                          *        *        *

17       **The Notice is related to settlement discussions that have been
         held directly among the Parties**.  Under the CPUC's rules, the terms
18       discussed by the Parties are confidential and may not be disclosed
         outside the negotiations without the consent of all Parties participating in
19       the negotiations.   Consequently, except for discussions at the
         confidential settlement conference, the settlement terms discussed by the
20       Parties will be maintained as confidential unless the Parties mutually
         agree to publicly release the terms or unless and until a formal settlement
21       agreement has been signed, as to which no assurance can be given.

22       72.    Edison's March 20, 2014 filing was false and misleading because it failed

23   to  disclose  material  information  about  defendants'  prior  improper  *ex parte*

24   communications regarding the SONGS settlement.  On December 8, 2015, the CPUC

25   affirmed the ALJ's proposed findings that, at the time of Edison's March 20, 2014

26   statements, Edison and its executives had non-public substantive communications

27   regarding the SONGS OII with CPUC decisionmakers on **six occasions** without

28   proper notice to the parties of the settlement.  When Edison's counterparties, TURN

and ORA, analyzed its improper communications with decisionmakers, they asked the CPUC to unwind the settlement.  The improper communications included:

(a)     the **March 26, 2013** meeting in Warsaw, Poland among Pickett, Peevey and Randolph, where they laid out a framework for the SONGS settlement;

(b)     the **March 27, 2013** Warsaw dinner attended by Pickett and Peevey, during which they had discussions regarding the SONGS settlement and where Pickett admitted he was sitting next to Peevey and "working" SONGS;

(c)     the **May 28, 2013** email from Starck to all five commissioners attaching an argumentative press release about Edison's conduct during the steam generator design;

(d)     the **June 26, 2013** communication between Litzinger and AC Florio that discussed employee severance packages related to the SONGS shutdown;

(e)     the **September 6, 2013** lunch attended by Litzinger and Peevey, where they discussed Edison's cost recovery plan for SONGS; and

(f)     the **November 15, 2013** dinner meeting between Craver and Peevey, where they discussed Craver's efforts to bring Mitsubishi to the SONGS negotiating table and obtain support from public officials.

73.     The true facts then known or deliberately disregarded by defendants Edison, Craver, Scilacci and Litzinger when Edison made the statements detailed in ¶71 above were that:

(a)     As the CPUC found, Edison's "lax" culture permitted its employees, including Pickett, to be "too informal" and "too casual about what is permissible" in its interactions with decisionmakers.

(b)     The Individual Defendants sent Pickett to meet Peevey in a foreign country, knowing the two men had a decades-long close personal relationship and that Peevey had a reputation for improper communications with utility companies.  The CPUC opined, "it is difficult to imagine the meeting as described by Mr. Pickett, and believe that this top SCE executive made no comment to the President of the Commission about any of the substantive issues raised."

(c)     On at least four occasions *during* this trip to Warsaw, Pickett emailed Gault or Matthias to boast that he "just had dinner with Peevey," and was "sitting next to Peevey" and "*working* . . . SONGS."

(d)     On the same day Pickett emailed Gault and Matthias, Litzinger scheduled a meeting between Pickett and the Individual Defendants, as well as Alder, upon Pickett's return from Warsaw to discuss the Warsaw meeting.   At the April 1, 2013 meeting, Pickett debriefed defendants about the content of his discussions with Peevey, which included "a framework for a possible resolution of the SONGS OII."   Litzinger recalls that Pickett's report left him "concerned."   After the meeting, Pickett sent a detailed document to Craver, Scilacci, Litzinger and Adler entitled "Elements of a SONGS Deal" that mirrored the notes he took reflecting his conversations with Peevey in Warsaw.   The executives specifically discussed whether the meeting was reportable under the *ex parte* rules but decided not to report it because it would jeopardize the settlement they wanted to negotiate with the consumer groups.

(e)     On April 11, 2013, Litzinger emailed Craver, Scilacci and  Adler to confess that he still felt "uneasy" about Pickett's communications with Peevey in Warsaw.   Among other things, he criticized Pickett for scheduling "yet another 'social dinner'" with Peevey but did not stop him from actually meeting with Peevey a week later.   He also expressed worry because he had "heard whispers" that the CPUC might reveal the "significant SCE presence on the [SONGS settlement] issue."   This undermines defendants' claim that they had become satisfied the Warsaw discussions were from "Mr. Peevey to Mr. Pickett, and not from Mr. Pickett to Mr. Peevey."

(f)     As the CPUC found, "[n]otwithstanding early concerns by Mr. Litzinger and Mr. Craver regarding Mr. Pickett's truthfulness, SCE did nothing to probe further about his claimed silence at the meeting, except to ask him again."   Specifically, Edison never contacted Randolph, who attended the Warsaw meeting and who later revealed in a June 8, 2015 declaration that was filed on August 5, 2015 with the CPUC, that Pickett told Peevey "what he thought a settlement agreement would look like."   The Individual Defendants also failed to interview SCE executives Hoover and Starck, who both knew about Pickett's improper conduct.   Indeed, on *May 29, 2013*, Hoover emailed Starck to report that Peevey's Chief of Staff said Pickett was "'well prepared . . . with specifics'" when discussing the SONGS settlement with Peevey in Warsaw.   The CPUC

criticized Edison's failure to undertake an "effective inquiry" into Pickett's story or the whereabouts of his notes from Warsaw:

> SCE failed to exercise due diligence to investigate Mr. Pickett's *unlikely* initial version of the meeting – or his evolving versions of the meeting – each recalling additional information about his conversation with President Peevey. SCE also did not attempt to retain and disclose the written document used in connection with the ex parte communication, nor did it disclose that Mr. Pickett had re-created his recollection of the document for SCE just a few days later.

(g) Litzinger's unsupported claim that Pickett was "not authorized to negotiate any SONGS settlement" is directly contradicted by Edison's internal emails. On *April 11, 2013*, Litzinger relayed settlement strategies from Pickett to Craver, Scilacci and Adler, including Pickett's suggestion to "only engage with TURN at first" before expanding to other ratepayer groups. Litzinger also relayed inside information that Pickett received from Peevey, writing "[h]e said President Peevey feels strongly about [including] Geesman [the lawyer for A4NR]" in the SONGS negotiations. Litzinger admitted he took the suggestions "under advisement" before passing them on to the other Individual Defendants.

(h) Pickett, Adler and other high-level Edison executives spent eight days circulating drafts of a term sheet based on Pickett's "Elements of a SONGS Deal" memorandum. Pickett initiated the process in order to "help guide the negotiations" with ratepayer groups. Notably, many of the terms Pickett discussed with Peevey and Randolph in Warsaw appeared in the final settlement agreement with TURN and ORA 20 months later.

(i) As the CPUC held, Craver and Litzinger engaged in their own improper *ex parte* communications with decisionmakers, discussing several of the same topics Pickett and Peevey discussed in Warsaw. On June 26, 2013, Litzinger met with AC Florio and "provided a brief update on the status of SCE's bargaining efforts with respect to the severance of SONGS employees." Employee severance is issue 7(d) in the Warsaw notes and listed as issue 6(d) in Pickett's "Elements of a SONGS Deal" email to the Individual Defendants and Adler on April 1, 2013. On September 6, 2013, Litzinger met Peevey for lunch and discussed whether Edison or

the ratepayers should pay for the Company's lost capital and replacement power costs. The Warsaw notes and Pickett's notes from his April 1, 2013 email to the Individual Defendants and Adler list Edison's losses as issues 1 and 2, and replacement power costs as issue 3. On November 15, 2013, Craver met privately with Peevey over dinner and had a two-way discussion about SCE's attempts to engage in settlement talks with MHI. The allocation of the MHI recovery is issue 5 in the Warsaw notes and Pickett's notes in the April 1, 2013 email to the Individual Defendants and Adler.[24]

74.     Market participants reacted favorably to Edison's press release announcing settlement discussions. On March 20, 2014, in a report entitled "SONGS settlement in the works?," a Deutsche Bank analyst noted:

> We expect investors to react favorably to this development, as it suggests comprehensive settlement is both possible and might be reached in the near term. In our view, *SONGS is the last overhang* on a new, simpler regulated growth story, *so if the company can resolve this issue, we believe EIX stock should command a premium valuation relative to slower-growing regulated electric utility peers*.

On March 21, 2014, *TheStreet.com* wrote: "*This potential liability has been a huge risk factor for the stock*. Settling the exact cost of moving on from the incident has been a big step forward for the company."

**SONGS OII Settlement Announcement**

75.     On March 27, 2014, after the close of the market, Edison filed a press release formally announcing a settlement to resolve the SONGS investigation:

> On March 27, 2014, SCE entered into a Settlement Agreement with The Utility Reform Network ("TURN"), the Office of Ratepayer Advocates ("ORA") of the California Public Utilities Commission ("CPUC") and San Diego Gas & Electric Company ("SDG&E"). *If implemented, the Settlement Agreement will constitute a complete and final resolution of the CPUC's Order Instituting Investigation ("OII") and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at the San Onofre Nuclear Generating Station ("San Onofre") and the related outage and subsequent shutdown of San Onofre*. The Settlement Agreement does not affect proceedings before the Nuclear Regulatory Commission or proceedings related to recoveries from third parties described below. The Settlement Agreement was signed following an all-party settlement conference in

---

[24]   *See* Exhibits A and B.

the OII, which was required under CPUC rules as a condition to a settlement.

76.     Later in the day on March 27, 2014, Edison hosted a conference call led by defendants Craver, Scilacci and Litzinger.  During the call, Craver spoke about the SONGS settlement and assured investors that "*[t]his agreement resolves all matters related to the order instituting investigation involving the San Onofre nuclear generating station*."

77.     During the same call, an analyst asked about the extent of the CPUC's involvement in the settlement proceedings and Litzinger denied any CPUC involvement:

> [Analyst:] Obviously, the CPUC has to approve this but we've heard from the CPUC president a number of times talking about settlement and his hope for that et cetera.  Just to get a sense, how involved is the CPUC in this proceeding, although they're not directly a party, or is this something that's completely autonomous and separate from the CPUC side of it?
>
> *            *            *
>
> [Litzinger:] No, it's the normal settlement process.  *You reach a settlement agreement with the parties involved in the proceeding, not with the commissioners.  So, they were not involved other than encouraging settlement publicly* and then now we – the commissioners weigh in at this stage in the process after we file the agreement with them and that's where the administrative law judges and then the commissioners get to weigh in on the settlement.

78.     Defendants' March 27, 2014 statements were materially false and misleading when made for the same reasons as the March 20, 2014 statement, as set forth in ¶¶72-73.

79.     Defendants' false statement and omission had an immediate and positive effect on the investing community's perception of the SONGS settlement.  For example, on March 27, 2014, a Wells Fargo analyst claimed that the formal agreement, *if approved*, "removes a major fundamental concern."  On March 28, 2014, a Deutsche Bank analyst wrote "[w]hile we view the overall settlement as balanced we believe a more timely conclusion to the case is a strong positive for EIX, as this had been an overhang for some time."  On that same date, a UBS analyst report

1   raised its EIX rating recommendation to buy based on the SONGS agreement:  "*If*

2   *approved*, this removes a major overhang on the story and should clear the way for

3   investors who may have shied away from the stock until now for its elevated

4   regulatory risk."

5   **Ratepayers Complain About the Unfair Deal**

6       80.    While the settlement was seen as a clear positive event for Edison

7   shareholders, the ratepayers – which would pay large amounts under the deal – soon

8   began to complain publicly.  For example, on April 20, 2014, Ray Lutz, a lawyer for

9   the Coalition to Decommission San Onofre, lamented that "[r]atepayers are

10   shouldering about $3.3 billion [in San Onofre costs], while investors are largely made

11   whole."

12       81.    On May 11, 2014, *The San Diego Union-Tribune* editorial page

13   expressed a similar sentiment:

14       Southern California Edison, the utility that broke San Onofre, is

15   spinning the settlement proposed last month as a fair deal for consumers. That's because $1.4 billion of the cost would be absorbed by Edison and its 20 percent partner in the plant, San Diego Gas & Electric.

16

17       Let that sink in for a minute

      Imagine you own a bakery.  An engineering mistake destroys your
18   biggest oven.  Would customers agree to cough up 70 percent of the oven's lost value – and buy you a replacement, too?

19

20       82.    On June 1, 2014, *The Los Angeles Times* editorial page concurred:

21       Put simply, Edison and SDG&E wanted their customers to pay for

22   everything, as though the transformation of an operating nuclear plant into a nonfunctioning husk were an act of God like a meteor strike, not

23   human error.  The settlement, which was negotiated by the consumer advocacy group TURN and the Public Utilities Commission's Office of

24   Ratepayer Advocates, relieves customers of about $1.4 billion of the $4.7 billion the utilities had wanted to keep collecting.

25   **First Quarter 2014 Form 10-Q and Conference Call**

26       83.    Edison continued to actively conceal the truth about its interactions with

27   the CPUC while it assured investors that the beneficial deal would resolve the dispute

28   in its entirety.  In its Form 10-Q filed on April 29, 2014, the Company reiterated:

*If implemented, the Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre.*

84. During a conference call on the same day, led by defendants Craver, Scilacci and Litzinger, Craver encouraged investors to look toward a bright future. He said, "*[t]he significant progress made in resolving SONGS . . . should allow investors to focus on Edison International's long-term earnings and dividend growth.*"

85. Defendants' April 29, 2014 statements were materially false and misleading when made for the reasons set forth in ¶¶72-73.

**Settlement Hearing**

86. By the second quarter of 2014, rumors of Peevey's corruption and improper communications with energy companies had become widespread throughout the industry. For instance, on March 28, 2014 the *San Francisco Chronicle* reported:

> [C]ritics have accused the commission and its president, Michael Peevey, of being hesitant to penalize PG&E, saying the regulators have grown too close to the company. The city of San Bruno even sued the commission last month seeking documents city officials say could expose a "cozy" relationship between the commission and PG&E.

Similarly, on April 17, 2014, the *Half Moon Bay Review* published an article entitled "Time to End Shadowy Relations Between Utilities Regulators" that criticized "the completely outrageous relationship that has blossomed between CPUC President Michael Peevey and the very companies he's paid to regulate." In light of the scrutiny surrounding Peevey and the CPUC, Edison started receiving pointed questions about their *ex parte* contacts with the CPUC.

87. On April 24, 2014, the ALJ issued an order setting an evidentiary hearing for May 14, 2014 to examine the parties' settlement agreement. Attendees to the hearing included the parties to the settlement (including Edison, TURN and ORA), objectors (including A4NR), and decisionmakers (including the ALJ, Peevey, and the

other commissioners).   During the proceeding, objectors were permitted to ask "[q]uestions seeking clarification of the provisions of the Agreement."

88.   At the May 14, 2014 hearing, an attorney representing ratepayer interests specifically asked Litzinger about Edison's communications with commissioners. Litzinger only addressed his personal interactions, but still blatantly misrepresented the facts:

> Q:   Was Southern California Edison having ex parte meetings with the commissioners while the secret negotiations were taking place?
>
> A:   ***The only ex parte communications I had with Commissioners was following the Phase 1 Proposed Decision.  And it was noticed***.

The attorney posed the same question to President Peevey, who met with Litzinger on several occasions.  In response, Peevey took a starkly defensive stance:

> PEEVEY:   As far as TURN goes, I think it's general knowledge my relationship with TURN is, to be fair, chilly.  And I have never talked to Mr. Freedman on this topic during that whole time at all.   Period. Mr. Freedman.  That's it.  Sorry.
>
> [ATTORNEY]:   What about Southern Cal Edison?
>
> PEEVEY:   Sorry.  Edison?
>
> [ATTORNEY]:   Yeah.
>
> PEEVEY:   I'm not here to answer your questions. . . .  I'm not here to answer your goddamn question.  Now shut up.  Shut up.

The ALJ later concluded that Litzinger "testified falsely" at this hearing.  The CPUC found "Litzinger made a false statement to the Commission while testifying under oath" and that it "was misled by Mr. Litzinger's false statement."   Litzinger's statement was false and misleading for the reasons set forth in ¶¶72-73.

**Stanford C Bernstein Strategic Decisions Conference**

89.   At a May 28, 2014 conference, defendant Craver appeared and discussed the settlement.  Craver had an opportunity to discuss the full negotiation process including the *ex parte* communications, but chose not to do so.  During the conference, an analyst asked him: "[W]hat is the probability that the current SONGS

settlement will be accepted by the CPUC?"  In response, Craver discussed the publicly known negotiation process, but excluded his own and other Edison executives' *ex parte* negotiating with the CPUC.  He said: "*[W]e primarily negotiated that with the principal consumer advocacy groups of TURN and ORA, those are really the ones that are critical for anything that involves impacts on rates*."

90.   Defendants' May 28, 2014 statements were materially false and misleading when made for the same reasons described in ¶¶72-73 above, and because defendants failed to disclose one more of their own improper *ex parte* communications, which covered a topic discussed by Pickett and Peevey in Warsaw:

> The **May 28, 2014** email and series of communications among Hoover, Nichols, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research.

**Second Quarter 2014 Form 10-Q and Conference Call**

91.   Edison filed its second quarter 2014 Form 10-Q with the SEC on July 31, 2014.  Without referencing the *ex parte* communications, Edison again claimed:

> *If implemented, the San Onofre OII Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre.*

92.   In the follow-up conference call, led by defendants Craver, Scilacci and Litzinger, Craver stressed the firmness of the deal:

> All the intervenors who are going to provide testimony have done so, and that was really what I was capturing there.  In terms of the direct signatories, it's the two utilities, the labor group [Coalition of California Utility Employees], ORA, TURN, and Friends of the Earth.  So those were the direct signatories, representing all four of the main intervener groups.  In the testimony, several other groups – mostly consumer, various forms of consumer-related groups – also provided positive, supportive testimony of the settlement.
>
> *And, as I indicated in my comments, really relatively few came forward with any opposition to the settlement.  So, I think basically everyone who has standing that wants to speak, has spoken.  And at this point, really all that part is over with.  We're really at the stage of waiting for the ALJ Proposed Decision*.

93.     Defendants' July 31, 2014 statements were materially false and misleading when made for the reasons set forth in ¶¶72-73, 90, and because defendants failed to disclose another of their own improper *ex parte* communications, which covered topics discussed by Pickett and Peevey in Warsaw:

> The ***June 11, 2014*** emails and related communications show a series of discussions between Hoover, Litzinger and Peevey that focused on Edison's donation to the University of California greenhouse gas research.

94.     Analysts echoed Edison's positive outlook to the market.  On August 1, 2014, a SunTrust Robinson Humphrey analyst wrote: "Our bullish outlook on EIX is driven by the following factors: (1) the ***final*** approval of the SONGS settlement agreement should remove the key overhang on the stock . . . ."

95.     An analyst from BMO Capital Markets described the settlement terms in an August 21, 2014 report:

> If approved, EIX would be authorized to recover in rates its remaining investment in SONGS (about $1.34 billion) over a ten-year period from 2/1/12 and would earn a reduced rate of return of 2.62%, which would float over time.  In addition, EIX would be allowed to recover all of its approximately $680 million in purchase power costs associated with replacing the output from SONGS by the end of 2015.

> Meanwhile, SCE continues to pursue claims against Mitsubishi for the defective replacement steam generators.  The NRC has already determined that MHI's faulty computer codes were the cause of the tube wear that led to the malfunctions.  The proposed SONGS settlement includes a provision that requires SCE and SDG&E to share benefits with customers should financial recoveries be forthcoming from Mitsubishi or insurance.

> Sharing of SCE recovery proceeds:

> (a)    NEIL: 82.5% ratepayers/17.5% shareholders;

> (b)    MHI: shareholders receive 85% of first $100 million; two-thirds of next $800 million; and one-quarter of amounts above $900 million; and

> (c)    Litigation costs recovered before sharing starts.

96.     On September 5, 2014, the ALJ suggested changes to the SONGS OII settlement agreement.  On September 24, 2014, the parties filed a Joint Amended

Settlement Agreement that adopted all of the ALJ's suggestions.  The changes implemented an even split of any recovery of money from Mitsubishi among ratepayers and Edison and added the University of California donation, which Peevey had privately insisted upon and was listed in the Warsaw notes and Pickett's April 1, 2013 email to the Individual Defendants and Adler.

97.  On September 23, 2014, after the parties submitted the amended agreement, but before the CPUC accepted it, Edison summarized the changes in a Form 8-K.  The changes included:

(d)  "Any recoveries obtained from NEIL under the outage policy, net of legal costs incurred in pursuing such recoveries from NEIL, will be allocated 95% to the ratepayers and 5% to SCE."

(e)  "Any recoveries obtained from MHI, net of legal costs incurred in pursuing such recoveries, will be allocated 50% to ratepayers and 50% to SCE."

(f)  "Provisions were added to the Amended Settlement Agreement regarding the funding of a Research, Development and Demonstration program at the University of California that is intended to develop technologies and methodologies to reduce greenhouse gas emissions, particularly at existing and future California power generating plants that will be replacing the power generated by the San Onofre plant that would total approximately $4 million per year for five years for SCE's share."

**Third Quarter 2014 Form 10-Q and Conference Call**

98.  On October 28, 2014, the Company stated:

On September 23, 2014, SCE entered into an Amended and Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). *If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre*. The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in

response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014.

99.     During a conference call that same day, led by defendants Craver and Scilacci, an analyst asked Craver about *ex parte* communications. In response, Craver failed to mention the series of *ex parte* meetings and correspondence Edison executives had conducted with CPUC members:

> [Analyst]: A couple questions. One is, can you tell us whether or not the ex parte communication situation that has evolved at PG&E has had any impact at all on your ability to conduct business at the CPUC? And if there's any potential for either a self-policing review or an external party looking for – looking into your communications with PUC?
>
> [Craver]: Greg, this is Ted. In terms of has it caused any kind of interruption in the business that we have before the PUC, I think probably the best thing I can point to is the ongoing General Rate Case activities. I think I mentioned in my comments that we actually just finished up the evidentiary hearings as scheduled. So at least from what we can see, this seems to be really something that's primarily focused on the San Bruno item, as opposed to the activities that we have before the PUC.
>
> ***So, we're certainly trying to make sure that all of our personnel know what's expected of them, in terms of proper conduct with the PUC. We have a compliance program. We have training. We have redoubled efforts along those things, just to make sure that that's very present in everyone's mind. But beyond that, really we're pretty much in business as usual.***

100.     Defendants' October 28, 2014, statements were materially false and misleading when made. The true facts then known to or recklessly disregarded by defendants are described in ¶¶72-73, 90, 93 above.

101.     The market reacted quickly and positively to the statements. On October 29, 2014, a Credit Suisse analyst stated: "Fundamentally we think a lot of things are going right for EIX with 1) SONGS and EME firmly in the rearview mirror with mostly positive outcomes . . . ." An October 29, 2014 note from Morningstar analysts stated that the resolution of SONGS "has also improved Edison International's credit quality." An October 29, 2014 Jeffries Report noted that its target price of $70 per share was based on SONGS' "overhang being eliminated by recent settlement announcements." An October 29, 2014 RBS report increasing its

target price, noted that with the finalization of the SONGS settlement on November 20, 2014 – "[w]ith our expectation that this gets cleared up, we believe EIX will be heading into 2015 with earnings and dividend growth as a tailwind."

102.   On November 3, 2014, *The Los Angeles Business Journal* linked the positive news to Edison's increased stock price:

> But analysts and investors nevertheless have a rosy outlook for the company.  That's because, with a final San Onofre deal likely wrapping up this month, it looks like Edison management will be freed up to address a more fundamental concern for investors: the company's lagging dividend payout . . . .

*     *     *

> "Boosting the dividend growth has been a very important factor behind the stock price run-up," said Ali Agha, managing director of equity research for SunTrust Robinson Humphrey of Atlanta.

> "The unresolved issue of paying for the San Onofre closure was a big reason why Edison has not been able to grow the dividend."

**CPUC Formally Approves Settlement**

103.   On November 20, 2014, President Peevey and the other commissioners approved the amended settlement agreement.  On the same day, Edison issued a press release that celebrated the finality of the deal: "'***This settlement resolves all issues regarding the public utilities commission investigation of San Onofre in a fair and reasonable manner*** . . . .'"

104.   Defendants' November 20, 2014 statement was materially false and misleading when made.  The true facts then known to or recklessly disregarded by defendants are described in ¶¶72-73, 90, 93 above.

105.   Market analysts celebrated the apparent finality of the deal and its positive implications for Edison's shareholders.  On November 20, 2014, a RBC analyst wrote, "[w]e believe that with the acceptance of the San Onofre Nuclear Generating Station (SONGS) amended Settlement Agreement, Southern California Edison (SCE) (EIX) and San Diego Gas & Electric (SDG&E) (SRE) can finally head into 2015 with a focus on ***driving rate base growth***."  Similarly, a November 21, 2014

Morningstar report said, "[t]he settlement approval represents what we think is ***the final hurdle before Edison's board of directors is comfortable raising the dividend at a much faster rate*** than the 3% average growth the last four years."

106.   The approval of the amended settlement agreement concluded the CPUC investigation into SONGS, its massive failure and blame for the failure, and the ultimate closure of the plant.  It also resolved the issue of who would pay for closure costs, with the lion's share being placed upon Edison ratepayers, to the benefit of Edison shareholders.

107.   In December 2014, Peevey left the CPUC at the end of a second three-year term.  Media stories discussed a cloud over his legacy relating to allegations of cronyism with a Northern California utility, but none discussed the *ex parte* communications with Edison employees concerning San Onofre.

108.   Edison's stock price continued an upward rise until January 29, 2015, when it closed at its highest value up to that point: $69.05.

**The Late-Filed Notice**

109.   The short timeline leading up to Edison's forced disclosure of the Warsaw meeting fully confirmed defendants' scienter and rationale for submitting the late-filed notice.  On January 27, 2015, the California Attorney General's Office executed a criminal search warrant on Peevey's home.  In the desk drawer of his office, they found the notes he and Pickett had created in Warsaw on March 26, 2013.

110.   On January 30, 2015, Edison learned that the notes would soon be revealed to the public when *The San Diego Union-Tribune* reported on the search of Peevey's house, noting that the Attorney General "seized 'RSG notes on Hotel Bristol stationery.'"

111.   Three days later, on February 2, 2015, Edison internally adopted a broadened *ex parte* communications reporting policy.  The purported new policy placed heavy restrictions on interactions with CPUC decisionmakers and expressly prohibited "private dinners," "cocktails" and meetings outside "normal business

1    hours," all of which occurred in Warsaw.  According to Edison, the policy went into

2    effect on February 2, 2015 and did not apply retroactively.

3         112.   One week later, on February 9, 2015, Edison finally disclosed Pickett's

4    meeting with Peevey in Warsaw.  The disclosure came 685 days after the meeting, but

5    just 10 days after defendants learned the Warsaw notes would become public.  The

6    late-filed notice failed to give any specific reason for the delay, citing only "further

7    information received from Mr. Pickett last week."  Edison downplayed the news,

8    attributing the late disclosure to revised policies and the Company's desire to "avoid

9    'close calls' when it comes to compliance."

10        113.   Defendants admit that the Attorney General's discovery of the notes

11   prompted further discussion with Pickett and, ultimately, the late-filed notice.

12   However, since defendants had Pickett's "Elements of a SONGS Deal" memorandum

13   all along, the notes did not provide any new information.[25]

14   **2014 Form 10-K and Conference Call**

15        114.   Even after Edison submitted the late-filed notice that disclosed the

16   Warsaw meeting, it continued to make material misrepresentations and omissions

17   about its contacts with the CPUC and the finality of the settlement.  On February 24,

18   2015, Edison filed its 2014 Form 10-K, which defendants Craver and Scilacci

19   prepared, reviewed and signed.  Defendants stated in the Form 10-K:

20             On November 20, 2014, the CPUC approved the Amended and
             Restated Settlement Agreement (the "San Onofre OII Settlement
21           Agreement") that SCE had entered into with TURN, the ORA, SDG&E,
             the Coalition of California Utility Employees, and Friends of the Earth
22           (together, the "Settling Parties").  ***The San Onofre OII Settlement
             Agreement resolved the CPUC's OII and related proceedings
23           regarding the Steam Generator Replacement Project at San Onofre
             and the related outage and subsequent shutdown of San Onofre***.

24
25        115.   During a conference call that same day, led by defendants Craver and
26   Scilacci, an analyst asked Craver about *ex parte* communications in general, and, in
27   particular the "late filed *ex parte*" of February 9, 2015.  In response, Craver did not

28   _____
     [25]  *See* Exhibit I.

1    mention any further details of the Warsaw meeting between Peevey and Pickett, or the

2    other unreported *ex parte* meetings and correspondence Edison executives (including

3    defendants) had conducted with CPUC members:

4        [Analyst:]  Just a separate follow-up question.  Ted, may be you
         could just give us a little bit of color of – we see all the headlines on
5        PG&E and ex parte issues and the new [mid-one] potential ex parte
         filing.  Just how much is this impacting the ability to function on the
6        normal things that you have to get done at the Commission, including the
         getting the GRC done?  *And also, just how should we think about the*
7        *risk of you potentially having additional ex parte filings?*

8        [Craver:]  Yes, in terms of affecting the business, I would say it
         doesn't really have a significant effect on the business.  This is a fairly
9        arcane area.  But I would just say, generally speaking, the ex parte rules,
         particularly on matters like the San Onofre matter, the OII, that's really
10       *designed to provide equal access to all parties to the proceeding with*
         *equal time*.  So it's I think one of the misconceptions is in something like
11       SONGS OII that you are precluded from having conversations.  You're
         not.  It's just the rules are designed *to make sure that if we have*
12       *conversations with decisionmakers, that those are noticed, that those –*
         *that we include in there how much time we spent with which*
13       *decisionmaker, so that all the other parties have equal access, equal*
         *amount of time*.  That's the whole concept behind it.
14
         So I don't see any of this as hurting the ability to do business.  It's
15       complicated and cumbersome, and sometimes kind of difficult on the
         interpretation of some of the specific provisions.  *But, fundamentally,*
16       *when we have proceedings before the Commission, we follow the rules.*
         We go about doing the business the way it's really set up to do it.
17       There's plenty of opportunity in all of those proceedings for all parties to
         be heard.  That's the point of having these things before the Commission.
18       So I don't see any big element there.

19       116.   The statements in the Form 10-K and during the conference call were

20   materially false and misleading when made for the reasons set forth in ¶¶72-73, 90, 93

21   above.

22                           **SCIENTER SUMMARY**

23       117.   Defendants knowingly or were deliberately reckless in issuing the false

24   statements set forth above, as reflected in ¶¶72-73, 90 and 93.  In sum, by 2013,

25   Peevey had a long-standing public reputation for improper communications with

26   utility companies.  Defendants knew that Pickett and Peevey were former co-workers,

27   neighbors and friends, but nevertheless they sent Pickett to meet Peevey in a foreign

28   country to discuss SONGS.  This decision was consistent with Edison's "lax" culture,

1   which – according to the CPUC – permitted its employees to be "too informal" and

2   "too casual about what is permissible" in its interactions with decisionmakers.

3       118.   While in Warsaw, Pickett and Peevey had substantive discussions about a

4   potential SONGS settlement agreement, and both took notes of the potential terms.

5   Randolph, who was also present at the meeting, confirmed that Pickett did not merely

6   listen to Peevey, but rather affirmatively described "what he thought a settlement

7   agreement would look like."  Although Edison's emails are heavily redacted, they

8   make clear that Pickett repeatedly told Edison executives about his interactions with

9   Peevey in Warsaw as they unfolded.  On a least four occasions, Pickett emailed Gault

10  or Matthias to boast that he "just had dinner with Peevey," was "sitting next to

11  Peevey," or was "***working . . . SONGS***."

12      119.   While Pickett was still in Warsaw with Peevey, Litzinger scheduled a

13  meeting among Pickett, the Individual Defendants, and Adler upon his return.  At the

14  April 1, 2013 meeting, Pickett told them that Peevey had laid out "a framework for a

15  possible resolution of the SONGS OII."  Later that day, Pickett sent the Individual

16  Defendants and Adler an email that contained a typed-up near-replica of the notes he

17  took in Warsaw.

18      120.   On April 11, 2013, Litzinger again met with Pickett to discuss the

19  Warsaw meeting with Peevey.  After meeting with Pickett, Litzinger emailed Craver,

20  Scilacci and Adler and informed them he was concerned about whether Pickett's

21  interaction was "listen only" because he "heard whispers . . . from the CPUC of

22  significant SCE presence on the [SONGS settlement] issue."  Litzinger's concern was

23  not alleviated, as he "left [the] meeting uneasy" and expressed worry about "yet

24  another 'social dinner'" that Pickett had scheduled with Peevey, and which occurred

25  five days later.  Despite Litzinger's stated discomfort with Pickett's conduct, he still

26  took time to relay inside information Pickett had obtained from Peevey.  Litzinger

27  informed the other Individual Defendants that – according to Pickett – Edison should

28  "only engage with TURN at first" with respect to working out a SONGS settlement

1   agreement.  He also conveyed Pickett's message that "Peevey feels strongly about

2   [including] Geesman [the lawyer for A4NR]" in the settlement discussions.

3         121.   Notwithstanding Litzinger's concerns and fears about the meeting in

4   Warsaw, the Individual Defendants did nothing to find out what really happened.  The

5   CPUC found:

6         There is no indication the SCE made any attempt to contact former
          President Peevey or Mr. Randolph, to clarify the content of the
7         communications or get a copy of the Notes.

8                                  *        *        *

9         SCE failed to exercise due diligence to investigate Mr. Pickett's unlikely
          initial version of the meeting . . . nor did it disclose that Mr. Pickett had
10        re-created his recollection of the document [notes] for SCE just a few
          days later.

11

12        122.   Additionally, as the CPUC held, Craver and Litzinger engaged in their

13   own improper *ex parte* communications with Peevey and Florio, discussing several of

14   the same SONGS settlement topics Pickett and Peevey discussed in Warsaw.  On June

15   26, 2013, Litzinger met with Florio and "provided a brief update on the status of

16   SCE's bargaining efforts with respect to the severance of SONGS employees."  On

17   September 6, 2013, Litzinger met Peevey for lunch and discussed whether Edison or

18   the ratepayers should pay for the Company's lost capital and replacement power costs.

19   On November 15, 2013, Craver met privately with Peevey over dinner and had a two-

20   way discussion about SCE's attempts to engage in settlement talks with MHI.  On or

21   about May 28, 2014, Litzinger and Peevey discussed whether to include a donation to

22   the University of California for greenhouse gas research as part of the settlement.  On

23   or about June 11 2014, Litzinger and Peevey talked again about greenhouse gas

24   research, this time discussing the amount Edison should donate to the University of

25   California.

26        123.   On more than one occasion, Litzinger misled investors about Edison's

27   communications with the CPUC to conceal the Company's misconduct.   On

28   March 27, 2014, Litzinger told an analyst that commissioners "***were not involved***

1   *other than encouraging settlement publicly*."   At a hearing on May 14, 2014,

2   Litzinger testified under oath that "*[t]he only ex parte communications I had with*

3   *Commissioners was following the Phase 1 Proposed Decision*."

4       124.   Defendants knew Pickett and Peevey discussed substantive issues related

5   to the SONGS OII.   Rather than report this communication as the rules require,

6   defendants opted to keep it secret and use the information – along with the

7   information they obtained from their own unreported *ex parte* communications – to

8   fraudulently improve Edison's negotiating position.

9   ## LOSS CAUSATION

10       125.   The false and misleading statements and the material omissions

11   defendants made during the Class Period had the effect of artificially inflating

12   Edison's stock price.   The artificial inflation in Edison's stock price was dissipated

13   through a series of partial disclosures of the truth regarding Edison's conduct and

14   business practices in connection with the SONGS settlement, as evidenced by

15   commentary from market participants and the specific Edison stock price declines.[26]

16   These stock price declines were due to firm-specific fraud-related disclosures and not

17   the result of market, industry, or firm-specific non-fraud factors.   Furthermore, Edison

18   is a low volatility stock in an industry that has low stock price volatility compared to

19   the overall market and companies in other sectors, such as technology.   For example,

20   in 2015, the S&P 500 Utilities Index was 37% less volatile than the S&P 500.   Edison

21   was even less volatile – 43% less volatile than the market.   Considering its sector and

22   lack of volatility, smaller changes in Edison's stock price due to company-specific

23   news could still be significant compared to the market and its own sector.   Lead

24   Plaintiff and the Class purchased Edison stock at inflated prices and suffered damages

25   when Edison's stock price declined upon the revelation of the truth and the

26

27   [26]   Although not required to plead a claim under the PSLRA, statistical significance in

28   this case further demonstrates the adequacy of loss causation.

1   materialization of the risk that ORA and TURN would seek to unwind the SONGS

2   settlement.

3       126.   The following loss causation allegations are not exhaustive since fact and

4   expert discovery are not complete.

5       127.   On February 9, 2015, Edison finally submitted its notice of *ex parte*

6   communication filed with the CPUC, but this disclosure was clouded by contradiction

7   and obscurity.   Edison claimed that "Mr. Pickett does not recall exactly what he

8   communicated to Mr. Peevey," but that he provided Edison with some unspecified

9   "further information" such that "it now appears that he may have crossed into a

10  substantive communication."   Edison stated that Peevey approached Pickett during an

11  industry event in Poland, and not the other way, and also contradictorily maintained

12  that the discussion was "by Mr. Peevey to Mr. Pickett, and not from Mr. Pickett to

13  Mr. Peevey," but that "Mr. Pickett believes that he expressed a brief reaction to at

14  least one of Mr. Peevey's comments."   Edison's statement claimed it was "not clear-

15  cut whether [the rules] require[ ] the meeting to be reported," yet "SCE provides this

16  notice."   The disclosure failed to mention any of Edison's other numerous *ex parte*

17  communications detailed *infra*.   According to a February 10, 2015 *Los Angeles Times*

18  article, Edison spokeswoman, Maureen Brown, said "the utility looked at 'thousands'

19  of its contacts with the PUC 'and the only one we found that prompted disclosure was

20  the one we filed today.'"

21      128.   On February 10, 2015, A4NR, a party to the SONGS OII, but not a

22  signatory to the settlement agreement, filed a motion for sanctions and requested

23  Edison release all communications with state utility commissioners.   According to a

24  February 11, 2015 *San Diego Union-Tribune* article, Edison said "no decision ha[d]

25  been made about whether to release the emails voluntarily but an internal review of

26  the records turned up nothing improper."   Defendants' efforts to downplay or obscure

27  the significance of the *ex parte* notice disclosure and rebut any inference of

28  wrongdoing temporarily worked, as the market believed Edison's public denials of

1    any wrongdoing.  When analysts issued reports after Edison's February 24, 2015

2    earnings release and conference call, they took defendants at their word that the late

3    filed notice was not a big deal and the SONGS settlement was not at risk.  A February

4    26, 2015 UBS report noted that "SONGS in the rearview mirror."  A February 26,

5    2015 Evercore report noted it was maintaining its $67 target price, and that with

6    "resolution of the EME bankruptcy and the SONGS shut-down the EIX story is now

7    significantly de-risked."

8        129.   On March 19, 2015, California Assembly member Anthony Rendon

9    ("Rendon"), chairman of the powerful Assembly's Utilities and Commerce

10   Committee, published a letter he wrote to Peevey's replacement CPUC chair, Michael

11   Picker ("Picker"), about reopening the settlement.  According to a March 20, 2015 *Los*

12   *Angeles Times* article, Rendon asked Picker to compel Edison to "'turn over to the

13   commission all internal and external emails relative' to San Onofre," and stated that it

14   was "'imperative to investigate and scrutinize the entire settlement process . . . to

15   assure that the settlement process was legitimate and uncorrupted.'"  According to a

16   March 20, 2015 *San Diego Union-Tribune* article, Rendon warned Picker, "'your

17   efforts to reform the commission and restore the public's trust cannot be completed

18   until the dark clouds of the SONGS settlement and the specter of process

19   manipulation by your predecessor are fully and completely removed.'"  Rendon

20   continued, "'[a]nything short of total transparency will be viewed by the public, this

21   committee and history as a complete failure to meet the duties of the commission.'"

22   Rendon's letter indicated that Picker admitted that he now had "qualms" about voting

23   for the settlement in November 2014.  These disclosures called into question whether

24   the SONGS settlement would be undone, despite Edison's public denials.  As a result

25   of this firm-specific fraud-related news, on March 20, 2015, Edison's stock price

26   *declined* a statistically significant amount, from $64.81 to $64.17, or .99%, while the

27   market (S&P 500) *increased* .90%, and Edison's peer group (the S&P 500 Utilities)

28   *increased* .93%.

130.   On April 10, 2015, the Warsaw notes were filed in *Citizens Oversight, Inc. v. California Public Utilities*, a federal class action against the CPUC for the SONGS shutdown.  On April 11, 2015, *The San Diego Union-Tribune* discussed the striking similarities between the Warsaw notes and the actual settlement agreement, which Edison adopted 20 months later.   However, an Edison spokesperson downplayed the significance of the notes and "noted that some elements of the final plan differed from the notes," and the settlement was reached after "'extensive review, hearing and comment in a public process.'"

131.   On April 14, 2015, after the market closed, the CPUC ordered SCE to turn over all documents related to the potential settlement of the San Onofre closure dated between March 2013 and November 2014.  As a result of this company-specific fraud-related news, on April 15, 2015, Edison's stock price ***declined*** a statistically significant amount, from $62.99 to $62.49, or .79%, while the S&P 500 ***increased*** .51%, and the S&P Utilities ***increased*** .19%.

132.   On April 16, 2015, *The San Diego Union-Tribune* reported that Ben Hueso, the Chairman of the State Senate Committee overseeing utilities, stated that because of recent revelations about the SONGS settlement, "'I do not think the settlement should stand.'"  Yet, Edison spokeswoman, Maureen Brown, defended the settlement as being "'reasonable and in the public interest.'"

133.   On April 17, 2015, ORA said it had analyzed the notes from the Warsaw meeting,  was "outraged" about the rule violations, and "[could] not honestly say that it got the best deal for ratepayers."  While ORA sought at least $648 million returned to customers of Edison and SDG&E because of recently revealed evidence of inappropriate conversations, it explicitly stated that it would not seek to overturn the settlement.  ORA explained that "Edison should not be given a second bite at the apple."  On the same day, TURN stated that it would "urge the CPUC to assess the maximum sanction on SCE for its *ex parte* violations and apply any financial penalties toward reducing customer rates" and "may" seek to overturn the settlement after

1    review of the documents turned over by Edison pursuant to the CPUC order.  Edison

2    issued a denial that day – disagreeing with the statements issued by ORA and TURN.

3        134.   On April 18, 2015, *The San Diego Union-Tribune* reported that the

4    A4NR had conducted an analysis that showed that the settlement agreement was more

5    favorable to Edison than the Warsaw notes settlement framework by between $919

6    million to $1.522 billion.

7        135.   On April 20, 2015, analyst Evercore issued a report lowering its price

8    target for Edison; and noted that the recent disclosure was a "potentially significant

9    setback.  By our measure, every $500 [million] of exposure to fines . . . impacts

10   valuation by $1.30/share.  We are lowering our EIX target price to $65 from $67 . . .

11   [o]ur 12-month downside case of $59 assumes a steep penalty or a reopening of the

12   SONGS deal . . . ."  On the same day, Credit Suisse issued a report stating, "we are

13   becoming increasingly aware of elevated investor concern around the SONGS

14   settlement," and quantified some of the potential impact on Edison.

15       136.   As a result of these disclosures, Edison's stock price declined from

16   $62.99 to $60.01, or 4.8%, from April 14, 2015 to April 22, 2015, as market

17   participants began to realize the increased risk of a huge fine or the consumer parties

18   to the settlement walking away from the deal.  During this period, the S&P 500

19   *increased* .59% and the S&P Utilities *increased* .02%.  In fact, a number of analysts

20   interpreted these disclosures as fraud-related firm-specific news that negatively

21   impacted Edison's stock price:

- An April 29, 2015 UBS report noted that shares had dropped 5% "in recent weeks" related to these disclosures;

- An April 29, 2015 Deutsche Bank report noted that Edison's year to date performance had been impacted by California political regulatory uncertainty and "concerns that the settlement will get thrown out";

- An April 29, 2015, RBC report noted "recent underperformance, which was likely driven by near-term headlines associated with the revisiting of the SONGS settlement"; and

- • An April 29, 2015 Wells Fargo report noted that due to SONGS headlines, Edison had underperformed a peer group since mid-March by 5%.

137. On April 29, 2015, Edison produced the documents the CPUC had ordered on April 14. In a statement that coincided with the release of the documents, defendants tried to reduce the impact of the documents being produced by stating they had reviewed over two million documents, and found only "a few dozen documents" of communications between Edison and the CPUC; the "documents show there were no improper communications" and that the negotiations were "independent and not influenced by any CPUC decisionmaker." In support of their denials, Edison filed declarations from Pickett and Litzinger denying any misconduct in connection with SONGS.

138. On May 6, 2015, non-party to the settlement agreement, A4NR amended its motion for sanctions. Specifically, A4NR alleged 72 violations of the *ex parte* rules and sought $38 million in sanctions. On May 19, 2015 and June 5, 2015, the California Attorney General's Office executed criminal search warrants at the CPUC headquarters in San Francisco and the SCE offices in Los Angeles, respectively. The warrants sought information about the SONGS settlement process, and specifically demanded materials related to the meeting between Pickett and Peevey in Warsaw. On May 26, 2015, A4NR filed an amended motion to modify the settlement.

139. On June 24, 2015, the day before TURN and ORA were required to respond to the A4NR's amended motion to modify the settlement, TURN publicly denounced the settlement agreement. While it previously sought only sanctions, TURN now became the first party to formally ask the CPUC to overturn its prior ruling and unwind the existing agreement. *The San Diego Union-Tribune* reported:

> The San Francisco consumer group that brokered the $4.7 billion deal dividing costs for the shutdown of the failed San Onofre nuclear plant said Wednesday that it no longer supports the agreement and called on state regulators to reopen talks.

In a five-page motion submitted to the California Public Utilities Commission, *The Utility Reform Network said recent revelations of backchannel communications between regulators and utility executives forced the organization to rethink its position*.

\*       \*       \*

"TURN agrees that recent disclosures detailing extensive communications between SCE and CPUC decisionmakers during the pendency of this proceeding are very troubling," the filing states. "TURN was a good faith participant in the settlement negotiations, and was not aware of the Warsaw note, the *private meeting*, or any *agreement between Mr. Peevey and SCE at any time* before or during the extended settlement negotiations that led to the proposed settlement."

140.   A June 24, 2015 Deutsche Bank report noted that "TURN recommending that the settlement be overturned is clearly not a positive development for EIX . . . reopening the SONGS case increases the uncertainty for EIX." As a result of this fraud-related company-specific news, Edison's stock *declined* a statistically significant amount, *by 2.71%*, while the S&P 500 only declined .73% and the S&P Utilities declined only .79%. Market participants attributed Edison's stock decline to company-specific news related to the possible unwinding of the SONGS settlement. In discussing the TURN filing, a June 24, 2015 report by Credit Suisse titled "Turn Changes Its Mind" noted the "uncertainty around the *ex parte* issues and the drag CA proceedings can have on the stocks," and that "EIX's relative 1.9% underperformance against the group today . . . would suggest a $0.07 EPS drag." A SunTrust June 25, 2015 report attributed "the 3% decline in Edison's stock yesterday" to TURN's decision "to oppose the settlement."

141.   On August 5, 2015, the ALJ issued a 50-page order examining whether Edison should be sanctioned for its repeated violations of the CPUC *ex parte* rules and allowed Edison time to respond. The ALJ ruled more favorably than the market expected, finding only 10 *ex parte* violations rather than the 72 alleged by A4NR. As of the ALJ's order, TURN but not ORA had requested the settlement be reopened. A August 6, 2015 Guggenheim report noted that the "likelihood of the SONGS

1  settlement re-opening diminishes" and noted ORA's prior concern over reopening the

2  settlement.

3      142.   An August 7, 2015 *San Diego Union-Tribune* article reported on a sworn

4  declaration by Randolph, the third person in the room at the Warsaw 2013 meeting,

5  who described the conversation between Pickett and Peevey as a "detailed" and "two-

6  way Settlement discussion," and "apparently contradicting what Edison has said about

7  the meeting for months – that it was essentially a one-way chat initiated by Peevey,"

8  and "contradicts Pickett's sworn testimony" in April 2015.

9      143.   On August 10, 2015, ORA took the same action taken by TURN on June

10 24, 2015, and indicated to media outlets that it would withdraw from the settlement.

11 Market participants responded negatively to the news.  An August 10, 2015 Deutsche

12 Bank report titled "Let's Call the Whole Thing Off," downgraded Edison based on the

13 news, lowering its price target from $68 to $62.  The report noted, "we believe [the]

14 risks of it being opened up and fully litigated have now increased substantially"; "this

15 materially raises the risk that the PUC will throw out the settlement"; and "it seems

16 reasonable to question whether this might impinge on timing and pace of dividend

17 growth."  On the firm-specific fraud-related news, Edison's stock price ***declined*** a

18 statistically significant amount, by 2.41%, whereas the S&P 500 ***increased*** 1.28%, and

19 the S&P Utilities only declined .40%.

20     144.   In sum, the artificial inflation was dissipated from Edison's stock, at a

21 minimum, via the following partial disclosures:

22     •   On March 20, 2015, Edison's stock ***declined*** in a statistically
           significant amount of .99%, while the market (S&P 500)
23         ***increased*** .90%, and one of Edison's peer groups (the S&P
           Utilities) ***increased*** 93% in response to the firm-specific fraud-
24         related news – the March 19, 2015 letter by Rendon, the
           Chairman of the Assembly's Utilities and Commerce Committee,
25         issued after the market closed, requesting the CPUC investigate
           the SONGS settlement and raising the prospect of the deal being
26         undone;

27     •   On April 14, 2015, after the market closed, the CPUC ordered
           Edison to turn over all documents related to the SONGS
28         settlement.  As a result of this company-specific fraud-related

news, on April 15, 2015, Edison's stock *declined* in a statistically significant amount of .79%, while the S&P 500 *increased* .51% and the S&P Utilities *increased* .19%;

• On June 24, 2015, TURN announced that based on its review of recently released Edison documents, it was requesting that the SONGS deal be undone.  In response to this firm-specific fraud-related information, Edison's stock *declined* in a statistically significant amount of 2.71%, while the S&P 500 *only declined* .73% and the S&P Utilities only *declined* .79%; and

• On August 10, 2015, ORA indicated that it would also request that the SONGS deal be unwound.  Upon this firm-specific fraud-related news, Edison's stock price *declined* in a statistically significant amount of 2.41%, whereas the S&P 500 *increased* 1.28%, and the S&P Utilities *only declined* .40%.

### POST-CLASS PERIOD DEVELOPMENTS

145.  On December 8, 2015, the CPUC issued an opinion that criticized Edison's "lax oversight of its executives who are permitted, if not encouraged, to meet with Commissioners at 'social' occasions, industry activities, and other non-office settings" and found that Edison "has become too informal, too casual about what is permissible, permissible if reported, and what is wholly prohibited."  The CPUC sanctioned Edison $16.7 million.  However, the SONGS settlement was now disputed by both ratepayer groups, and the CPUC opinion did not alter the prior effect of this development.

146.  On May 9, 2016, the CPUC issued an order that officially "reopen[ed] the record to review the 2014 Settlement Agreement."  The CPUC issued the order "in light of the Commission's December 2015 Decision fining [Edison] for failing to disclose *ex parte* communications relevant to this proceeding."  In response, various parties submitted briefs describing their positions.  TURN argued that "the adopted settlement should be set aside due to the pervasive *ex parte* violations involving repeated unreported communications between former President Michael Peevey and executives from Southern California Edison (SCE)."  Similarly, ORA maintained that the "settlement process has been compromised by the *ex parte* violations of the Southern California Edison Company ('SCE')."

147.   On December 13, 2016, the CPUC issued a ruling directing the parties "to meet and confer to determine whether there is potential for agreement on modifications" to the 2014 settlement agreement.  In its ruling, the CPUC discussed the effect of Edison's unreported *ex parte* meetings on the negotiation process:

> What is important, as noted by TURN, is that any settlement proposed to the Commission be the result of a "good faith negotiation process."  Here the unreported *ex parte* communications created information asymmetry that could directly benefit Edison and its shareholders.  That combined with the renouncing of the Agreement by both TURN and ORA leave serious doubt as to whether the Agreement resulted from a good faith negotiation process.

148.   On March 29, 2017, *The San Diego Union-Tribune* reported that the parties to the settlement agreement have agreed to three in-person mediation sessions in June 2017 before former United States District Court Judge Layn Phillips.  The same article reported that earlier in March 2017, arbitrators in the Edison and Mitsubishi case "awarded Edison $125 million in damages, a fraction of the $7 billion the utility had sought.  The [arbitrators] also ordered Edison to pay $58 million in legal fees to Mitsubishi."

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

149.   Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

150.   Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Edison securities was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     Edison's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     Edison's stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c)     As a regulated issuer, Edison filed periodic public reports with the SEC and the NYSE;

(d)     Edison was eligible to and did file SEC Form S-3 registration statements;

(e)     Edison regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     Edison was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace; and

(g)     As set forth herein, Edison's stock price reacted to company-specific news.

151.  As a result of the foregoing, the market for Edison securities promptly incorporated current information regarding Edison from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in Edison securities during the Class Period suffered similar injury through their transactions in Edison securities at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

152.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who transacted in Edison securities during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

153.   The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Edison stock was actively traded on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Edison or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to plaintiff, Edison reported 41,000 common stockholders of record as of February 21, 2014.  Accordingly, plaintiff reasonably believes that there are thousands of members in the proposed Class.

154.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

155.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

156.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      Whether defendants' acts as alleged herein violated the federal securities laws;

(b)      Whether defendants' statements made to the investing public misrepresented or omitted material facts about Edison's business, operations and financial conditions;

(c)      Whether the price of Edison securities was artificially inflated during the Class Period; and

(d)     To what extent the Class members have sustained damages and the proper measure of damages.

157.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

158.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

159.   Defendants are liable for making false statements and failing to disclose adverse facts known to them about Edison.   Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Edison securities during the Class Period was a success, as it: (i) deceived the investing public regarding Edison's business; (ii) artificially inflated the price of Edison securities; and (iii) caused plaintiff and other Class members to transact in Edison securities at inflated prices.

160.   During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

161.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their transactions in Edison securities during the Class Period.

162.    Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Edison's business, operations and financial condition as specified herein.

163.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information, and engaged in acts, practices and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon those who transacted in Edison securities during the Class Period.

164.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Edison's operating condition and financial status from the investing public and supporting the artificially inflated price of its securities.

165.   As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Edison securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in defendants' public statements during the Class Period, plaintiff and the other Class members acquired Edison securities during the Class Period at artificially high prices and were ultimately damaged thereby.

166.   At the time of said misrepresentations and omissions, plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had plaintiff and other Class members and the marketplace known the truth regarding Edison's improper conduct, which defendants did not disclose, plaintiff and other Class members would not have transacted in Edison securities, or, if they had transacted in its securities during the Class Period, would not have done so at the artificially inflated prices which they paid.

167.   By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

168.   As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Edison securities.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

169.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

170.   The Individual Defendants acted as controlling persons of Edison within the meaning of §20(a) of the Exchange Act:

(a)   By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decisionmaking of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading;

(b)   The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c)   Because of their positions as CEO, CFO, Treasurer and President of a subsidiary, the Individual Defendants directly participated in the Company's management and were directly involved in Edison's day-to-day operations.   The Individual Defendants also controlled the contents of Edison's quarterly reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.   The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

171.   By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

1      1.    Declaring that defendants are liable pursuant to the Exchange Act;

2      2.    Determining and certifying that this action is a proper class action and certifying plaintiff as a Class representative and plaintiff's counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

3.    Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

4.    Awarding plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

5.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 26, 2017

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
X. JAY ALVAREZ
THOMAS E. EGLER
JEFFREY J. STEIN


s/ X. Jay Alvarez
X. JAY ALVAREZ

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 26, 2017.

<u>s/ X. Jay Alvarez</u>
X. JAY ALVAREZ

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        jaya@rgrdlaw.com

# Mailing Information for a Case 3:15-cv-01478-BEN-KSC Eng v. Edison International et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Xavier Jay Alvarez**
  jaya@rgrdlaw.com,spatel@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lauren Claire Barnett**
  lauren.barnett@mto.com,monica.walker@mto.com

- **Robert S Brewer , Jr**
  brewer@scmv.com

- **Tom Egler**
  TomE@rgrdlaw.com,kathyj@rgrdlaw.com,jstein@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **John Michael Gildersleeve**
  john.gildersleeve@mto.com,lori.cruz@mto.com,lauren.barnett@mto.com,raphael.sepulveda@mto.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com,jkehoe@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **John Willson Spiegel**
  john.spiegel@mto.com

- **Jeffrey J. Stein**
  JStein@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)